**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

|  |  |  |
|---|---|---|
| RAQUEL CAMPS, in her capacity as the personal representative of the ESTATE OF ALBERTO CAMPS, | ) ) ) | |
| EDUARDO CAPPELLO, in his individual capacity, and in his capacity as the personal representative of the ESTATE OF EDUARDO CAPPELLO, | ) ) ) | |
| ALICIA KRUEGER, in her individual capacity, and in her capacity as the personal representative of the ESTATE OF RUBÉN BONET, | ) ) ) | Case No. _____  JURY TRIAL REQUESTED |
| and, MARCELA SANTUCHO, in her individual capacity, and in her capacity as the personal representative of the ESTATE OF ANA MARÍA VILLARREAL DE SANTUCHO, | ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| ROBERTO GUILLERMO BRAVO, | ) | |
| Defendant. | ) | |

**COMPLAINT**

1

Plaintiffs, Raquel Camps on behalf of the Estate of Alberto Camps, Eduardo Cappello II in his personal capacity and on behalf of the Estate of Eduardo Cappello I, Alicia Krueger (formerly Bonet) in her personal capacity and on behalf of the Estate of Rubén Bonet, and Marcela Santucho in her personal capacity and on behalf of the Estate of Ana María Villarreal de Santucho (collectively "**Plaintiffs**") complain and allege as follows:

## PRELIMINARY STATEMENT

1.      This case arises out of the killing, attempted killing, and torture of political prisoners detained at Almirante Zar Naval Base in Trelew, Argentina (hereinafter the "**Trelew Massacre**"). On or about August 22, 1972, defendant Roberto Guillermo Bravo (hereinafter "**Defendant**" or "**Bravo**") and his fellow military officers shot and killed sixteen unarmed prisoners and gravely wounded three others. Bravo acted under color of state authority and violated United States and international law. Plaintiffs are the surviving family members of four victims of the Trelew Massacre.

## INTRODUCTION

2.      On August 15, 1972, the Argentine military detained nineteen political prisoners at Almirante Zar Naval Base (hereinafter "**Almirante Zar**") in Trelew, Argentina, following an attempted escape from the nearby Rawson Penitentiary Prison.

3.      Defendant Roberto Guillermo Bravo was a commissioned officer in the Argentine military. Over the course of the prisoners' week-long detention, Bravo and other officers stationed at Almirante Zar threatened the prisoners and tortured them, subjecting them to stress positions, forced nudity, and mock executions.

2

4. In the early hours of August 22, 1972, Bravo and three other officers came to the cells of the sleeping prisoners, armed with machine guns and pistols. They ordered the prisoners out of their cells and lined them up against a wall, ordering them to look down. Bravo and the other officers opened fire on the unarmed prisoners. Some fled back to their cells. Bravo and the other officers searched the cells for survivors to execute them.

5. Sixteen of the nineteen prisoners died from their injuries, including Rubén Bonet, Eduardo Cappello, and Ana María Villarreal de Santucho. The remaining three prisoners, including Alberto Camps, survived the massacre, but were critically wounded.

6. Two of the officers who took part in the shooting with Bravo and the officer in command of Almirante Zar on the night of the massacre have been convicted in Argentina for their roles in the massacre. A third officer who took part in the shooting has never been identified (the "**unidentified officer**"). Bravo has been charged but not prosecuted in Argentina. Argentina has twice requested Bravo's extradition from the United States to prosecute him for the Trelew Massacre.

7. Plaintiffs, the surviving family members of Rubén Bonet, Alberto Camps, Eduardo Cappello, and Ana María Villarreal de Santucho, bring this action against Bravo, seeking compensatory and punitive damages for his role in the extrajudicial killing, attempted extrajudicial killing, and torture of their family members in the Trelew Massacre and during their week-long detention at Almirante Zar.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiffs' claims of extrajudicial killing, attempted extrajudicial killing, and torture in accordance with 28 U.S.C. § 1331, because the action arises

3

under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

9.      On information and belief, Bravo is a naturalized citizen of the United States, and currently resides in North Miami, Florida.

10.     The United States District Court for the Southern District of Florida is a proper venue for this action pursuant to 28 U.S.C. § 1391 (b)(1) and (c)(1) because Bravo resides in the city of North Miami, Florida.

### PARTIES

*Defendant*

11.     From 1964 to 1979, Bravo was a commissioned officer in the Argentine military. In August of 1972, Bravo was stationed at the Almirante Zar Naval Base in Trelew, Argentina, and held the rank of *Teniente de Corbeta*, which is equivalent to the rank of Ensign in the United States Navy. In 1973, after the Trelew Massacre, Bravo came to the United States as a military attaché to the Argentine Embassy in Washington, D.C.

12.     Bravo became a permanent resident of the United States in 1980 and a naturalized citizen in 1987.

*Plaintiffs*

13.     Plaintiffs bring the claims detailed herein in their individual capacity and/or on behalf of family members murdered or injured in the Trelew Massacre.

14.     Plaintiff Raquel Camps is an Argentine citizen residing in Argentina. She is the daughter of Alberto Camps, who was shot and severely injured during the Trelew Massacre and subsequently killed, in part for testifying about the events of that night. Plaintiff Raquel Camps

4

brings this action for the shooting and torture of Alberto Camps in her capacity as the personal representative of Alberto Camps's estate.

15.    Plaintiff Eduardo Cappello ("**Eduardo Cappello II**") is the nephew of Eduardo Cappello ("**Eduardo Cappello I**"), who was killed during the Trelew Massacre. He is Eduardo Cappello I's closest surviving relative. Eduardo Cappello II is an Argentine citizen residing in Argentina. Eduardo Cappello II brings this action for the killing and torture of Eduardo Cappello I, both in his individual capacity and in his capacity as the personal representative of Eduardo Cappello I's estate.

16.    Plaintiff Alicia Krueger (formerly Bonet) is an Argentine and French citizen residing in France. Rubén Bonet, Alicia Krueger's late husband, was killed during the Trelew Massacre. Alicia Krueger brings this action for the killing and torture of Rubén Bonet, both in her individual capacity and in her capacity as the personal representative of his estate.

17.    Plaintiff Marcela Santucho is an Argentine citizen residing in Argentina. Her mother, Ana María Villarreal de Santucho, was killed in the Trelew Massacre. Marcela Santucho brings this action for the killing and torture of Ana María Villarreal de Santucho, both in her individual capacity and in her capacity as the personal representative of her mother's estate.

## STATEMENT OF FACTS

18.    Except with respect to Plaintiffs' background and matters falling within their personal knowledge, on information and belief Plaintiffs allege as follows:

### General Lanusse's dictatorship

19.    In 1971, the Argentine military installed General Alejandro Agustín Lanusse as President of Argentina, during a period of successive dictatorial administrations.

20.     The Lanusse government engaged in a pattern of unlawful practices to combat "subversives" and attempted to legalize these actions through decrees and emergency laws. It systematically persecuted political opponents under a so-called "maximum security plan", which Argentine courts have since concluded was the scaffolding for widespread crimes against humanity committed during that period.

21.     As part of this policy, the Argentine government eliminated core civil and political rights for political dissidents, including permitting arbitrary detentions and use of torture in interrogations, and denying access to counsel. Meanwhile, Argentine security forces compiled lists of dissidents to target, and those advocating on behalf of political prisoners—including their lawyers and family members—were persecuted. By 1972, the Argentine government had assembled death squads and paramilitaries to kidnap and disappear dissidents, their families, and their supporters.

22.     The government also limited the free expression of its opponents and the media. The international Index of Censorship documented the government's regular persecution of journalists who reported on the government's repressive actions.

*The prisoners' transfer to Almirante Zar*

23.     In May of 1972, as part of this pattern of persecution, the Argentine government began moving political prisoners to facilities far from their lawyers, families, and communities. Prisoners from the north were sent far south, and vice versa. Plaintiffs' relatives—political prisoners originally held in the cities of Buenos Aires and Rosario—were transferred to Rawson Penitentiary Prison ("**Rawson**"), a maximum-security prison in Chubut, Patagonia, about 1,400 miles south of Buenos Aires.

24.     In August 1972, twenty-five political prisoners held at Rawson attempted to escape to the nearby Trelew Airport. Six were successful. The other nineteen were recaptured and transferred by bus to Almirante Zar Naval Base, a few miles from the airport.

25.     These nineteen prisoners included Plaintiffs' relatives Rubén Bonet, Eduardo Cappello I, Ana María Villarreal de Santucho, and Alberto Camps, as well as fifteen other prisoners: J. Alejandro Ulla, José Mena, Humberto Suárez, Humberto Toschi, Miguel Polti, Mario Delfino, Alberto Del Rey, Clarisa Place, Carlos Astudillo, Alfredo Kohon, María Angélica Sabelli, María Antonia Berger, Susana Lesgart, Mariano Pujadas, and Ricardo Haidar.

26.     The attempted escape from Rawson embarrassed the Lanusse government and the Argentine military.

27.     At Almirante Zar, the recaptured political prisoners were held in two-person cells designed for conscripts being disciplined, not for civilian prisoners. The prisoners were held at Almirante Zar for approximately one week before they were shot.

28.     During their detention, they were primarily restricted to their cells. Armed guards escorted the prisoners from their cells, one or two at a time, for meals, to use the showers or toilets, or for interrogation. The prisoners ate meals at gunpoint. No contact with the outside world was allowed. Over the course of the week, each prisoner was interrogated multiple times.

29.     Defendant Bravo, Lieutenant Commander Luis Emilio Sosa ("**Sosa**"), and other officers subjected the prisoners to humiliating and degrading treatment amounting to torture, including sleep deprivation, stress positions, forced nudity, and mock executions.

30.     Bravo ordered prisoners to strip and lie naked on the floor for long periods of time. He forced prisoners into stress positions on the floor or against walls. Bravo pointed a loaded and cocked pistol at political prisoner Clarisa Place's head and threatened to kill her because she

7

refused to lie naked on her back on the floor. He forced prisoner Mariano Pujadas to strip and sweep the floor while nude. Bravo and the other officers conducted a mock shooting of some prisoners. Bravo told a subordinate they should kill the prisoners instead of feeding them.

31.     The cells contained a concrete slab for a bed. Guards systematically deprived prisoners of sleep. The prisoners received only one mattress for each two-person-cell, only for a few hours per night, and only on certain nights. On some nights the prisoners received no mattress at all. Mattresses and blankets were removed from the cells very early each morning.

*The night of the massacre*

32.     On the evening of August 21, 1972, conscripts guarding the prisoners' cellblock were removed from their posts.

33.     In the early hours of August 22, 1972, Bravo, Sosa, Lieutenant Commander Juan Carlos Antonio Herrera, Lieutenant Emilio Jorge Del Real, and the unidentified officer went to the cellblock where the prisoners were detained, armed with machine guns and pistols. The officers were visibly drunk and yelled threats and insults at the prisoners.

34.     The officers ordered Corporal Carlos Amadeo Marandino ("**Marandino**"), who was guarding the cellblock, to open all the cells and leave. This was contrary to standard procedure; normally, prisoners' cells were opened only one at a time, rather than all at once. Marandino did as he was told. He retired to an area separated from the cellblock by a screen.

35.     When Marandino unlocked the cells, the prisoners were asleep.

36.     The officers woke the prisoners by kicking the cell doors, blowing whistles, and shouting insults and threats. They ordered the prisoners out of their cells and told them to line up against the cell block wall, with their chins to their chests. The prisoners complied.

37.     Bravo and the other officers opened fire on the prisoners with machine guns and pistols.

38.     Many of the prisoners were killed or injured in the first round of gunfire. Alberto Camps, Ricardo Haidar, María Antonia Berger, Mario Delfino, Alfredo Kohon, and María Angélica Sabelli, who survived the initial gunfire, fled back into their cells to hide. Some sought shelter behind their beds.

39.     After the initial gunfire subsided, Bravo yelled, "this one is still alive," and shot an injured prisoner.

40.     Bravo entered the cell in which Alberto Camps and Mario Delfino were hiding and ordered them to stand up. Bravo asked if Camps would answer questions posed to him at an earlier interrogation. Camps refused. Bravo shot Camps in the abdomen; he then fatally shot Delfino from about five feet away. Bravo left the cell where he had shot Alberto Camps and Mario Delfino without seeking medical attention for them.

41.     Bravo fatally shot another prisoner, Alberto Del Rey, who was lying injured on the ground.

42.     Bravo then entered Ricardo Haidar and Alfredo Kohon's cell and asked if they would answer questions. When they answered affirmatively, Bravo left. Another officer then entered the cell and shot Haidar in the chest, before fatally shooting Kohon.

43.     Haidar, severely wounded, fell to his bed and pretended to be dead. He could hear what was happening around him as the shooting continued. He heard J. Alejandro Ulla ask an officer to "just shoot" and immediately afterwards heard a shot. He did not hear Ulla after that.

44.     Ulla was shot at least twice, once in the chest and once in the right thigh. The shot in the chest left an orifice in the area of his left nipple and gunpowder residue suggesting the shot was at close range.

45.     One officer entered María Antonia Berger and María Angélica Sabelli's cell. Sabelli was dead and Berger lay on the floor, wounded. The officer shot Sabelli in the head and Berger in the face.

46.     Several prisoners were shot execution-style at close range, including Bonet, Villarreal de Santucho, Ulla, and Sabelli. Others were shot while incapacitated, injured or hiding in their cells, including Camps, Haidar, Berger, Kohon, and Delfino.

47.     Bravo and the other officers departed, leaving the injured and dying prisoners on the floor of the cells and hallway, without seeking medical assistance for the prisoners they had wounded.

48.     By the end of the massacre, Bravo and the other officers had killed thirteen of the nineteen prisoners, including Plaintiffs' decedents Ana María Villarreal de Santucho and Eduardo Cappello I.

49.     Ana María Villarreal de Santucho was visibly pregnant at the time of her death. She died of multiple close-range gunshot wounds to the abdomen.

50.     Eduardo Cappello I died from a gunshot wound to the face.

51.     Six prisoners were critically wounded, but initially survived: Alberto Camps, María Antonia Berger, Ricardo Haidar, Alberto Kohon, Miguel Polti, and Rubén Bonet. Officers and medical personnel awoken by the gunfire arrived at the scene and took these prisoners to the base infirmary. Berger, screaming in pain, asked to be killed.

52.     Rubén Bonet was shot multiple times. Among his injuries was a close-range shot to the head. Despite obvious critical injuries, he lay untreated in the infirmary for hours. He then died.

53.     Alberto Kohon and Miguel Polti also died at Almirante Zar's infirmary before they could be transferred to hospitals to receive critical treatment.

54.     Alberto Camps, María Antonia Berger, and Ricardo Haidar were transferred to hospitals where they underwent surgery for their life-threatening injuries. While still convalescing, they were held incommunicado, and interrogated by military investigators. They provided sworn declarations detailing the events on the early morning of August 22, 1972.

*Bravo and the Argentine military's cover-up*

55.     During the massacre, Bravo and his fellow perpetrators sowed the seeds of a cover story—that they had been trying to prevent the prisoners' escape—to justify their killings.

56.     Berger and Haidar heard the officers, including Bravo, yell about prisoners attempting to escape *after* the first round of shooting, while finishing off some prisoners at close range.

57.     Marandino, who was within earshot of the scene but could not see it, heard officers yell about an attempted escape. He later stated that he did not find the claim of an attempted escape credible.

58.     In or around the last moments of the massacre, Bravo said to the other officers participating in the shooting, "They tried to escape. Pujadas tried to grab the Captain's gun, he tried to fight back." The "Captain" was Lieutenant Commander Sosa. Pujadas was shot seventeen times during the attack.

11

59.     Sosa told one of the first doctors on the scene, Dr. Eusebio Talavera, that a prisoner shot him. However, Dr. Talavera examined Sosa and found no injuries.

60.     The following morning, superior officers told conscripts there had been an escape attempt on the base. The officers ordered the conscripts to adhere to the escape story if asked and threatened to punish them if they did not comply. Some conscripts who questioned the story were beaten. Another was transferred away from Almirante Zar.

61.     A senior officer ordered Marandino to tell military investigators that the prisoners had attempted to escape and had beaten Lieutenant Commander Sosa in the process.

62.     When workers from a local funeral home came to collect the bodies, a conscript told one of them, Miguel Marileo, "[W]e didn't kill them, the guys with the stripes did, Lieutenant Commander Sosa and his gang." Officers grabbed the conscript and took him away. Later, Marileo was told: "you saw nothing, you've not been on this base, be careful because you have a very young little boy." Marileo understood this to be a threat to his life and to his family.

63.     The base commander, Captain Rubén Norberto Paccagnini, ordered the responding doctors not to talk to their families or reporters about what they had seen as they treated the wounded.

64.     The military investigator, Jorge Enrique Bautista, conducted an investigation in which he presented leading questions to witnesses, failed to examine the bodies or order autopsies, failed to seize or examine the clothes of the deceased, failed to seize the weapons used in the shooting, failed to inspect the guard logbook, and failed to interview Captain Paccagnini, who was present and in command at Almirante Zar the night of the massacre.

65. Bautista did not bring charges against any of the officers involved in the Trelew Massacre, and ordered only minor sanctions against Bravo and Sosa for ordering all the cellblock doors to be opened at once, contrary to protocol.

66. On the night of August 22, 1972, immediately after the Trelew Massacre, the Lanusse dictatorship enacted Censorship Law No. 19797, making it a criminal offense to publish any non-government or non-military accounts about the events at Trelew and the activities of persons deemed subversives. Local and national journalists interpreted this as a threat against anyone contradicting the official military version of the Trelew Massacre. In the following weeks and years, the military threatened and attacked journalists who attempted to investigate or report on the Trelew Massacre.

**Families of the Trelew Massacre victims faced insurmountable obstacles in seeking justice**

*Plaintiffs have exhausted remedies in Argentina as to Bravo*

67. In the immediate aftermath of the Trelew Massacre, and during the dictatorships that followed, the families of the Trelew Massacre victims, including Plaintiffs, could not learn what took place, how their family members died, or who was responsible for the massacre.

68. Plaintiff Alicia Krueger (formerly Bonet) and the family of Plaintiff Marcela Santucho filed complaints against the Argentine military in 1972. The family of Plaintiff Eduardo Cappello II filed a complaint against the Argentine military in 1974. They all sought answers and tried to hold accountable both the military and the individual officers responsible for the massacre, whose identities they did not know. All three cases languished in court without any resolution, while the military stonewalled these processes. By the time these cases were dismissed years later,

the courts had completely lost their independence over the course of the Lanusse dictatorship and subsequent "Dirty War."

69.     Even after the return of democracy in Argentina in 1983, victims of crimes committed by government agents during the military dictatorships in Argentina in the 1970s and 1980s had no avenues for accountability through either civil or criminal proceedings. Attempts to hold members of the military accountable were met with strong pushback, political pardons, amnesties, restrictive statutes of limitations, and threats by military factions that destabilized Argentina's weak democracy.

70.     It was not until June 2005 that the Supreme Court of Argentina for the first time held that crimes against humanity and other atrocities committed by the military dictatorships during the 1970s and 1980s could not be subject to an amnesty or statute of limitations. Following this decision, prosecutions for crimes against humanity committed by the Argentine military were finally initiated. At that time, the families of the Trelew Massacre victims, including Plaintiffs, filed renewed criminal complaints concerning the massacre, demanding an investigation, and, if warranted, prosecutions.

71.     In 2006, five officers were indicted. Plaintiffs joined the criminal prosecution as civil parties. A warrant for Bravo's arrest was issued in 2008, charging him with sixteen counts of murder and three counts of attempted murder. Argentina requested his extradition from the United States in 2009. Plaintiffs supported the extradition request, expecting Bravo would be prosecuted alongside the other officers who participated in the Trelew Massacre. On November 2, 2010, however, a U.S. Federal Court declined to certify Bravo's extradition.

72.     Under Argentine law, Bravo cannot be prosecuted *in absentia*. No civil remedies are available in Argentina until the criminal investigation and prosecution have run their course.

Any effort to hold Bravo accountable in Argentina for his role in the Trelew Massacre is impossible while he remains in the United States.

*Extraordinary circumstances prevented Plaintiffs from bringing this case until now*

73.     The military's cover-up of the Trelew Massacre prevented Plaintiffs from investigating and discovering the truth of what happened on the night of August 22, 1972. For decades, the victims' families were unable to learn the identities of the perpetrators or of key witnesses present on the night of the massacre or in its aftermath.

74.     Plaintiffs also faced extraordinary risks for seeking accountability. Plaintiffs, their families, and many other families of the Trelew Massacre victims were persecuted for their efforts to seek truth and justice. Many were arrested, subjected to home raids, unlawful detention, and illegal government surveillance. They were threatened and attacked by death squads, and, in some cases, killed or forcibly disappeared.

75.     Lawyers who assisted the families of Trelew Massacre victims were also at great risk. Lawyers were systematically surveilled, intimidated, and persecuted: law offices were bombed, and lawyers were assassinated. For example, 130 of the 180 members of the Lawyers' Guild Association, which assisted political dissidents and prisoners and their families, were murdered or disappeared by Argentine government forces during the 1970s and early 1980s.

76.     In July 1974, the lawyer representing Plaintiff Alicia Krueger in her complaint against the military for Rubén Bonet's death was murdered by a military death squad. Alicia learned that she, too, was on the death squad's kill list and went into hiding with her family. They left Argentina in 1977, first for Brazil and then France as political asylees.

77.     The home of Plaintiff Eduardo Cappello II's paternal grandparents was raided multiple times. In 1977, when Eduardo Cappello II was a toddler, his father (Eduardo Cappello I's

brother), mother, and twelve-year-old half-brother were abducted and disappeared by military forces; Eduardo II was spared because he was not with the rest of his family that day. He was raised by his paternal grandparents who moved to a small town to protect him.

78.    Although Plaintiff Marcela Santucho was only nine years old when her mother was killed in the Trelew Massacre, she and her sisters were persecuted and forced into hiding. Several members of their family were abducted and disappeared. Others were murdered. Marcela and her sisters escaped Argentina as teenagers. Marcela's grandmother also had to flee Argentina and resettled in Switzerland as a political asylee, where Marcela eventually joined her.

79.    Alberto Camps and his young family were persecuted in part because he survived the Trelew Massacre and continued to publicly speak out on the events of that night. Plaintiff Raquel Camps was born in 1976, while the family lived in hiding. On or about August 15, 1977, the fifth anniversary of the Rawson Prison escape, military death squads attacked the Camps family. They gunned down Alberto and abducted Raquel, her three-year-old brother Mariano, and their mother, Rosa María Pargas. The children were returned to their grandmother several weeks later, but Rosa María was never seen again. Following this ordeal, Raquel's grandparents destroyed all traces of her father Alberto, including his childhood photos, and abandoned efforts to seek accountability for the crimes committed against him.

80.    Other Trelew Massacre victims' families were also persecuted by military death squads. In August 1975, Mariano Pujadas' family was decimated. A military death squad kidnapped the family from their home, leaving behind only two young children. The death squad tortured the family and threw them down a well with explosives. As the news of this attack spread, the Trelew Massacre victims' families understood these killings as a message and a threat.

81.     Intimidation of the Trelew Massacre victims' families and the lawyers who sought to assist them persisted well beyond Argentina's return to democracy. In 2006, members of the military from Almirante Zar spied on lawyers and others involved in investigating the Trelew Massacre in an attempt to impede their investigation. In 2015, the Chief of the Armed Forces Jorge Godoy and fifteen other officers were convicted for their involvement in this campaign of intimidation and illegal surveillance.

82.     Nonetheless, since 2005, Plaintiffs have supported and participated in the criminal prosecution of the other perpetrators of the Trelew Massacre. They expected Bravo to be held accountable in Argentina once extradited as part of these proceedings. However, his extradition was denied in November 2010.

83.     In 2012, when the other officers responsible for the Trelew Massacre were convicted, the Argentine court ordered the transfer of the complete case file to the courts processing Bravo's extradition. The government of Argentina presented a new extradition request to the United States in September 2014. In September 2017, Argentina forwarded certified translations of the appellate decision affirming the convictions of the perpetrators of the Trelew Massacre who had been tried in Argentina. Several years have passed and despite Plaintiffs' and the Argentine government's diligence the possibility of extradition and accountability for Bravo in Argentina seems remote.

## GENERAL ALLEGATIONS

84.     The acts described herein were inflicted under color of law and under color of official authority of the Argentine Republic and were inflicted deliberately and intentionally.

85.     At all relevant times described herein, including on August 21 and 22, 1972, Bravo was stationed at the Almirante Zar as a commissioned officer.

86.     Bravo conspired with his subordinates and other officers in the Argentine military to plan and carry out the Trelew Massacre. Bravo conspired and acted in concert with one or more members of the Argentine military pursuant to a common plan, design, and scheme to torture the political prisoners held at Almirante Zar and to carry out the Trelew Massacre, as a result of which Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho were subjected to the violations described herein.

87.     Bravo knowingly joined and participated in carrying out the common plan, design, and scheme. In addition to being personally liable for his own actions, Bravo is jointly and severally liable for the actions of his co-conspirators, all of which were actions undertaken in furtherance of a common plan, design, and scheme to commit the Trelew Massacre.

88.     Bravo also engaged in a joint criminal enterprise with the officers in the Argentine military who planned or carried out the detention and mistreatment of the political prisoners in the week leading up to and culminating in the Trelew Massacre. The common purpose of the criminal enterprise was to torture, shoot, and kill the political prisoners detained at Almirante Zar. The torture and killing of Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho, and the torture and shooting of Alberto Camps at Almirante Zar were a core part of this purpose. As a result of his direct participation in the detention and mistreatment of political prisoners at Almirante Zar and in the Trelew Massacre, Bravo had knowledge of and was an active participant in the torture, shooting, and killing of the prisoners. It was Bravo's intention that the prisoners be tortured, shot, and killed.

89.     The killing and torture of Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho, and the shooting and torture of Alberto Camps at Almirante Zar were foreseeable consequences of a common, shared intention to massacre the prisoners detained at Trelew.

90.     Defendant is also responsible by virtue of having aided and abetted, or otherwise substantially assisted in the killing and torture of Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho, and the shooting and torture of Alberto Camps at Almirante Zar, including through his role in shooting Alberto Camps and other prisoners, and then by covering up the crimes and obstructing an effective investigation into the murders. Defendant participated in the killings and attempted killings, and falsely claimed there was an attempted prison break to ensure he and the other officers were not held responsible for the crimes.

91.     At all relevant times, Defendant knew and purposefully intended that his actions would aid, abet, or assist in the commission and cover-up of the killing, shooting, and torture. Defendant is therefore jointly and severally liable for the wrongful conduct of the persons he aided and abetted.

92.     Bravo's acts and omissions as described herein were deliberate, intentional, wanton, malicious, oppressive, and done with a willful and conscious disregard for the rights of Plaintiffs' family members and those of Plaintiffs. Consequently, Plaintiffs are entitled to punitive damages.

## FIRST CLAIM FOR RELIEF

*By Plaintiffs Eduardo Cappello II, Alicia Krueger, and Marcela Santucho in their individual capacities, and Plaintiff Eduardo Cappello II as representative of Eduardo Cappello I's Estate, Plaintiff Alicia Krueger as representative of Rubén Bonet's Estate, and Plaintiff Marcela Santucho as representative of Ana María Villarreal de Santucho's Estate*

Extrajudicial Killing of Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho

93.    Plaintiffs Eduardo Cappello II, Alicia Krueger, and Marcela Santucho in their individual capacities, and Plaintiff Eduardo Cappello II as representative of Eduardo Cappello I's Estate, Plaintiff Alicia Krueger as representative of Rubén Bonet's Estate, and Plaintiff Marcela Santucho as representative of Ana María Villarreal de Santucho's Estate, re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 92 as if fully set forth herein.

94.    In the early hours of August 22, 1972 Bravo and his fellow perpetrators woke Rubén Bonet, Eduardo Cappello I, Ana María Villarreal de Santucho, and sixteen other political prisoners in the middle of the night, ordered them out of their cells, and opened fire on them without provocation. They then searched for survivors, interrogating and shooting them, and leaving the wounded for dead.

95.    Eduardo Cappello I, Ana María Villarreal de Santucho, and Rubén Bonet died from the multiple gunshot wounds sustained during the Trelew Massacre. Bravo did not seek medical attention for their life-threatening injuries. Eduardo Cappello I and Ana María Villarreal de Santucho died during the attack itself, while Rubén Bonet succumbed to his injuries hours later in the base infirmary.

96.    Bravo's conduct constitutes extrajudicial killing as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

97.     No regularly constituted court authorized the killing of Eduardo Cappello I, Ana María Villarreal de Santucho, or Rubén Bonet. Eduardo Cappello I, Ana María Villarreal de Santucho, and Rubén Bonet were never sentenced to death for any crime.

98.     Bravo and his fellow perpetrators acted under actual or apparent authority, or under color of law, of the Argentine Republic.

99.     As pleaded in paragraphs 84 to 92 with respect to the Trelew Massacre, Bravo conspired with, aided and abetted, and/or participated in a joint criminal enterprise with other members of the Argentine military in committing the acts of extrajudicial killing set forth in paragraphs 32 to 66 above.

100.    Prior to their execution, Eduardo Cappello I, Ana María Villarreal de Santucho, and Rubén Bonet were placed in imminent fear for their lives; they suffered severe emotional and physical abuse and agony prior to their killing. The killing of Eduardo Cappello I, Ana María Villarreal de Santucho, and Rubén Bonet inflicted severe mental pain and suffering on their family members, Plaintiffs Alicia Krueger, Eduardo Cappello II, and Marcela Santucho.

101.    As a direct and proximate result of Bravo and the other officers' wrongful killing of the decedents of Eduardo Cappello II, Alicia Krueger, and Marcela Santucho——Eduardo Cappello I, Rubén Bonet, and Ana María Villarreal de Santucho——these Plaintiffs have and will continue to suffer from loss of companionship, support, and services.

102.    As a result of the killings of Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho, Plaintiffs have suffered damages in an amount to be determined at trial. Bravo's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and exhibited a reckless indifference to the rights of Plaintiffs Eduardo Cappello II,

Alicia Krueger, and Marcela Santucho, and the rights of their family members. Consequently, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

*By Plaintiff Raquel Camps as representative of Alberto Camps's Estate*

Attempted Extrajudicial Killing of Alberto Camps

103.    Plaintiff Raquel Camps in her capacity as representative of the Estate of Alberto Camps, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 92 as if fully set forth herein.

104.    During the Trelew Massacre, Bravo and other officers shot at Alberto Camps. After Camps retreated to his cell, Bravo entered, interrogated Camps, and shot Camps in the abdomen. Bravo placed Camps in imminent mortal danger. Bravo left Camps bleeding on the prison floor, without medical intervention, intending that he die from his injuries.

105.    Bravo's conduct constitutes attempted extrajudicial killing as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

106.    No regularly constituted court authorized the killing or shooting of Alberto Camps. Alberto Camps was never sentenced to death for any crime.

107.    Bravo and his fellow perpetrators acted under actual or apparent authority, or under color of law, of the Argentine Republic.

108.    As pleaded in paragraphs 84 to 92, with respect to the Trelew Massacre, Bravo conspired with, aided and abetted, and/or participated in a joint criminal enterprise with other

members of the Argentine military in committing the acts of attempted extrajudicial killing set forth in paragraphs 32 to 66 above.

109.     Alberto Camps was placed in imminent fear for his life; he suffered severe physical and emotional abuse and agony during his attempted extrajudicial killing and for the remainder of his life.

110.     Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and exhibited a reckless indifference to the rights of Alberto Camps. Consequently, Plaintiff Raquel Camps is entitled to an award of punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

*By Plaintiff Raquel Camps as representative of Alberto Camps's Estate, Plaintiff Eduardo Cappello II as representative of Eduardo Cappello I's Estate, Plaintiff Alicia Krueger as representative of Rubén Bonet's Estate, and Plaintiff Marcela Santucho as representative of Ana María Villarreal de Santucho's Estate*

Torture

111.     Plaintiff Raquel Camps in her capacity as the personal representative of Alberto Camps's Estate, Plaintiff Eduardo Cappello II in his capacity as the personal representative of Eduardo Cappello I's Estate, Plaintiff Alicia Krueger in her capacity as the personal representative of Rubén Bonet's Estate, and Plaintiff Marcela Santucho in her capacity as the personal representative of Ana María Villarreal de Santucho's Estate, re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 92 as if fully set forth herein.

112.     On August 15, 1972, Rubén Bonet, Eduardo Cappello, Alberto Camps, Ana María Villarreal de Santucho, and fifteen other political prisoners were taken into the custody of the

Argentine military. Over the following week, Bravo and his co-conspirators subjected the prisoners to stress positions, mock executions, and other cruel and unusual punishment.

113.    Then, in the early hours of August 22, Bravo and the other officers woke Rubén Bonet, Eduardo Cappello, Alberto Camps, Ana María Villarreal de Santucho and the other prisoners in their cellblock, ordered them out of their cells, and opened fire on them without provocation. They then searched for survivors, interrogating and shooting them, leaving the wounded for dead.

114.    The acts described herein caused Plaintiffs' decedents Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho excruciating injuries and severe mental and emotional pain and suffering.

115.    In the week leading up to the massacre, and in the moments before Bravo and his co-perpetrators opened fire on them, as detailed in paragraphs 27 to 66, the prisoners endured fear for their lives and safety, inflicting severe mental suffering. The prisoners had been woken in the middle of the night and ordered out of their cells without warning. Bravo and the other officers had previously conducted mock executions, and the Argentine government was known for executing prisoners. The prisoners knew their lives were at risk, and feared they were about to be killed or tortured.

116.    When the officers opened fire and inflicted injuries on them, Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho suffered excruciating pain and agony, both physical and mental.

117.    Those who survived the initial round of gunfire continued to suffer extreme mental and emotional anguish, as they feared for their lives while Bravo and the other officers went from cell to cell searching for and shooting the survivors. Rubén Bonet and Alberto Camps's physical

anguish continued for hours after the attack, as they lay injured without medical attention. Alberto Camps was eventually taken to a hospital, underwent painful surgery, and survived. Rubén Bonet, on the other hand, succumbed to his injuries before he could be transferred to a hospital and receive treatment for his injuries.

118.    These acts intentionally inflicted severe pain or suffering on Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho, and constitute torture as defined by the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

119.    The acts described herein were inflicted deliberately and intentionally for purposes that include, among others, punishing Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho for acts that they or third persons were suspected of having committed (including the attempted prison break from Rawson and political opposition to the Argentine government), intimidating or coercing Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho into providing information on the attempted prison break or other political activities, or discriminating against Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho on the basis of their political beliefs.

120.    The torture of Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho did not arise from and was not inherent in or incidental to lawful sanctions.

121.    At the time these acts occurred, Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho were in the custody or physical control of Bravo or Bravo's co-conspirators or co-perpetrators who were members of the Argentine military. These acts were committed under actual or apparent authority, or under color of law, of the Argentine Republic.

122.     As a result of this torture, the Estates of Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho have suffered damages in an amount to be determined at trial.

123.     As pleaded in paragraphs 84 to 92, with respect to the Trelew Massacre, Bravo conspired with, aided and abetted, and/or participated in a joint criminal enterprise with other members of the Argentine Military in committing the acts of torture set forth in paragraphs 27 to 66 above.

124.     In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and exhibited a reckless indifference to the rights of Rubén Bonet, Eduardo Cappello I, Alberto Camps, and Ana María Villarreal de Santucho. Consequently, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

To the extent permitted by law, Plaintiffs seek the following relief against Bravo:

(a)     Compensatory damages;

(b)     Punitive damages;

(c)     Reasonable attorneys' fees, costs and expenses; and,

(d)     Such other and further relief as the court may deem just and proper.

## Jury Trial Request

Plaintiffs request a trial by jury for each claim for relief and all triable issues.

Dated: October 20, 2020     By:

\_\_\_/s/ A. Margot Moss_____

26

A. MARGOT MOSS
Florida Bar Number 091870
mmoss@markuslaw.com

**MARKUS/MOSS PLLC**
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
Fax: (305) 379-6668
Email: mmoss@markuslaw.com

**KEKER, VAN NEST & PETERS LLP**
JOHN W. KEKER
(*pro hac vice pending*)
AJAY S. KRISHNAN
(*pro hac vice pending*)
FRANCO MUZZIO
(*pro hac vice pending*)
633 Battery Street
San Francisco, CA 94111
Tel: (415) 391-5400
Fax: (415) 397-7188
Email: jkeker@keker.com
akrishnan@keker.com
fmuzzio@keker.com

**CENTER FOR JUSTICE & ACCOUNTABILITY**
CLARET VARGAS
(*pro hac vice pending*)
ELZBIETA T. MATTHEWS
(*pro hac vice pending*)
CARMEN K. CHEUNG
(*pro hac vice pending*)
One Hallidie Plaza, Suite 750
San Francisco, CA 94102
Tel: (415) 544-0444
Fax: (415) 544-0456
Email: cvargas@cja.org
ematthews@cja.org
ccheung@cja.org

*Attorneys for Plaintiffs Raquel Camps, Eduardo Cappello, Alicia Krueger, and Marcela Santucho*