## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-cv-24294-KMM

RAQUEL CAMPS, et al.,

  Plaintiff,

v.

ROBERTO GUILLERMO BRAVO,

  Defendant.

_____/

## DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL

Defendant, ROBERTO GUILLERMO BRAVO ("Defendant" and/or "Bravo"), by and through his undersigned counsel, pursuant to Local Rule 7.1 of the United States District Court for the Southern District of Florida and Rules 50(b), 50(c)(1), 59(a), and 59(e) of the Federal Rules of Civil Procedure, submits this Renewed Motion for Judgment as a Matter of Law ("Motion")[1] or Alternatively, Motion to Amend Judgment and/or for New Trial, and  requests this Court enter Judgment as a Matter of Law in Defendant's favor dismissing with prejudice all of Plaintiffs' claims in this case, or, alternatively, reducing the punitive damages award, or vacating the jury verdict in this case and ordering a new trial. The grounds for this Motion are as follows:

### I.  INTRODUCTION

Plaintiffs filed their Complaint on October 20, 2020, alleging that they were entitled to pursue claims against Defendant under the Torture Victim Protection Act ("TVPA") for Extrajudicial Killing, Attempted Extrajudicial Killing, and Torture [D.E. 1] for actions that took place **in 1972** in Argentina. This Court conducted a five day jury trial beginning on June 27, 2022,

---

[1] During day 5 of trial, this Court denied Defendant's Rule 50(a) Motion, and Defendant now renews that Motion under Rule 50(b). Defendant herein incorporates all the factual and legal arguments in his Motion for Directed Verdict [DE 138] and his Reply in Further Support of Motion for Directed Verdict [D.E. 146].

**HABER LAW, P.A.**
251 NW 23 Street | Miami, Florida  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

which ended on July 1, 2022. On July 1, 2022, the jury returned a verdict in favor of Plaintiffs on all counts. [D.E. 153]. There is no case in American jurisprudence which has allowed foreign Plaintiffs to pursue claims in a United States Court against an American citizen for an incident that occurred in a foreign country **forty-eight years** before the claim was filed. Plaintiffs rely upon "equitable tolling" to toll the statute of limitations from 1992 (when the TVPA was enacted) until 2020 when the Complaint in this lawsuit was filed. Equitable tolling, however, cannot rescue these claims. First, it was the Court that should have ruled on the question of equitable tolling, not the Jury. The Court could have, and should have, decided this issue and not even allowed it to proceed to the Jury for two reasons – first, because questions of equity, such as whether the statute of limitations should be equitably tolled, are traditionally decided by Courts of law, not Jurors; and, second, because Plaintiffs failed to meet their burden at trial of establishing a legal right to equitable tolling in order to toll the running statute of limitations for **twenty-eight years** (from the date of the enactment of the TVPA in 1992 until the filing of their Complaint in 2020).T his case should have been dismissed, at the close of Plaintiffs' evidence, and before the case went to the Jury. The legal ruling on the meaning, import and scope of equitable tolling under the TVPA was and remains a decision for this Court.

The scope and application of equitable tolling in this case could potentially determine how far back in history TVPA plaintiffs are permitted to reach in order to assert TVPA claims and what factors the Court and a jury may consider in determining whether to equitably toll the statute of limitations.

## II.     TRIAL PROCEEDINGS RELEVANT TO "EQUITABLE TOLLING"

Plaintiffs' explanation for why they were entitled to toll the statute of limitations from 1992 until 2020 was first disclosed in the Joint Pretrial Stipulation (D.E 91) in which Plaintiffs took the position that tolling was based upon only three factors: (i) "unremittingly hostile

circumstances" in Argentina (D.E. 91 at 7); (ii) the alleged inability to locate Defendant Bravo until 2008 (*Id.*); and, (iii) Argentina's efforts to extradite Bravo which Plaintiffs described as "ongoing." *Id.* Plaintiffs' portion of the Joint Pre-trial Stipulation makes no mention of any criminal proceedings in Argentina or the pending extradition of Bravo in the United States [D.E. 91], as a basis for equitable tolling.

At trial, faced with pointed questions from the Court regarding their theory of equitable tolling, Plaintiffs substantially expanded the scope of their theory and identified several additional factors upon which they planned to rely at trial regarding tolling: "…the pursuit and reliance upon domestic remedies…" and "country conditions and fear…" Tr. Day 2 at 30-31.[2] Plaintiffs' counsel described their theory of how equitable tolling operated in this context by arguing that: "Fear and persecution took our Plaintiffs from 1972 to 2005." *Id.* at 32, 35. Plaintiffs also argued that the alleged "[in]ability to find Mr. Bravo…is a separate extraordinary circumstance…." "[t]hat independently gets us from 1972 to 2008." *Id.* at 31-32. Finally, faced with additional questioning by the Court, Plaintiffs' counsel admitted that: **"Unless we have reasonable reliance on the criminal proceedings then we have a problem."** *Id.* (emphasis added).[3] "Fear gets us to at least 2005." *Id.* at 35.

The Court, however, remained skeptical of Plaintiffs' theory of equitable tolling:

THE COURT: I'll be candid with the Plaintiffs. I disagree that the Fourth Circuit [*Warfaa v. Ali*, 1 F.4th 289 (4th Cir. 2021)]…case stands for the proposition you've identified with respect to the reliance on the criminal proceeding that could take place in Argentina. And I have not been able to find any case that similarly, unlike the truth and reparation proceedings, and the rationale for relying upon the truth and reparation proceedings that may be going on in another country, which **would be time consuming and may lull a Plaintiff into reasonably relying on those proceedings to bring the remedies that they may otherwise be seeking in this cause of action.** I've been unable to find any court that analogized criminal proceeding or a prospective criminal proceeding to have the same impact. Are you aware of any case?

---

[2] "Tr." refers to the Trial transcripts in this case, which have been filed in the public records [D.E. 132, 140, 142, 145, and 148]. "Dep. Tr." refers to the Deposition Transcript of the specific Plaintiff.
[3] All emphasis in cites throughout this Motion has been added by the undersigned.

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

Tr. Day 4, 15:14-25; 16:1. Plaintiffs' counsel responded as follows: "the time and effort required to participate in criminal proceedings in Argentina is analogous and similar to that required to participate in [Truth and Reconciliation]… Proceedings in other situations." *Id*. at 20:11-14.

> THE COURT: I would characterize that as a ***proffer*** for which there has not been evidence.

Tr. Day 4, 20:15-16. The Court at trial also questioned Plaintiffs' position that the statute of limitations "has not begun to run, and it has no definitive point at which it would start to run." *Id*. at 21:10-12. Finally, the Court concluded at the end of the colloquy with the following statement: "Let's take that to its natural conclusion then. There is no statute of limitations for Mr. Bravo then." *Id.* at 22:1-2.

At trial, Defendant Bravo testified that he never concealed his whereabouts since the day he moved to the United States in 1973. Tr. Day 3, pp. 115-116. He opened and closed several businesses, publicly registered those businesses on public websites, bought and sold homes in his own name and the name of his wife and attended college. He had his three children enrolled in Miami schools. *Id*. at 99-116. In the face of overwhelming evidence which reflected that Bravo had not been concealing himself, Plaintiffs eventually withdrew that argument. *Id.* at p. 87.

During trial, some of the Plaintiffs admitted that despite learning of Defendant's location, they chose to wait until the criminal proceedings and the extradition proceedings ran their course and did not even look for counsel to file this action. *See* Capello Testimony, Tr. Day 2, 60:1-6; Krueger Dep. Tr. 106:12-22; Santucho Dep. Tr. 34:16-18, 24-25, 35:1-2. Likewise, Plaintiff Camps testified that, after the 1998 investigation by the Argentinean government where she received monetary compensation, she did not seek out more information because "it was very difficult" for her given the circumstances and she "needed more time in order to continue investigating or looking into it." Tr. Day 4, 160:13-18. Krueger also received monetary compensation from the Argentine government in or about April 2000. Krueger Dep. Tr. 76:3-25.

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

Plaintiff, Krueger also testified that, even though she knew where Bravo was living in 2008, she did not pursue a lawsuit against him because she "didn't know at that time how to proceed." *Id.* at 86:12-17. She also testified that she was able to write a letter to the President of Argentina regarding the Trelew incident in 1995 because "this was a different government, the previous governments had been military governments…" *Id.* at 88:5-20. She also admitted that the Argentine government in 1995 would be more receptive to her claims. *Id*. at 88:21-22; 89: 1-12. Ms. Krueger also wrote a letter to the Argentine Government regarding Trelew in 1997. *Id*.

Plaintiff Camps also testified that she knew where Bravo was living in 2008. Tr. Day 4, 173:19-22. At trial she testified about her role with respect to the criminal proceedings which took place in Argentina commencing in 2005. *See generally id.* at 163 – 172.  She described her involvement in those proceedings as a "complainant seeking justice." *Id.* at 168: 16-17. She described what she did as "very exhausting" and "physically draining." *Id.* at 169:17-18. When asked what she did with respect to the criminal proceeding she testified as follows: "I helped out – helped the attorneys out to start investigations.  I went to hearings. I attended the hearings. I had meetings frequently with the attorneys to see how the case was moving forward." *Id.* at 170:5-8. Ms. Camps provided no further details about her involvement in the Argentine criminal proceedings other than the fact that she went to hearings and helped out the attorneys. She also testified that she did not bring this action because she was dealing with the criminal proceedings, an extradition request had been filed and to file a lawsuit in the United States would have required "time, money and an emotional investment."  Tr. Day 4, pp. 175-76.

Following the presentation of evidence, the Court instructed the Jury as follows with respect to Plaintiffs' claim of equitable tolling:

> There are situations in which the statute of limitations is suspended or tolled. Tolling applies if the plaintiffs show they could not bring the suit due to extraordinary circumstances beyond their control and that were unavoidable even with diligence. The plaintiffs must prove that such circumstances existed by a preponderance of the evidence.

**HABER LAW, P.A.**
251 NW 23 Street | Miami, Florida  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

Such extraordinary circumstances may include, but are not limited to; where litigants or witnesses fear or face danger pursuing claims related to human rights' violations; where plaintiffs could not investigate their claims because of the circumstances in their home country; where plaintiffs were unable to locate the defendant; **or where plaintiffs did not pursue their claims in the United States while they were participating in or relying on accountability proceedings in the country where the incident occurred**, or where the defendant was immune from suit.

Tr. Day 5 at 192:11-25; 193:1; *see also* D.E. 150, pp. 19-20.

Finally, during trial the Court made it clear that the Verdict Form to be submitted to the Jury was to have *two* questions as to the statute of limitations: one, whether "Plaintiffs have shown extraordinary circumstances tolled the statute of limitations," **and** two, "until what date was the statute of limitations tolled." Tr. Day 5, 19:11-23, 22:19-24; 24:7-25; 25:1 (general discussion pp. 14-24). However, the verdict form submitted to the jury [D.E. 153] did not include the second question: until what date the statute of limitations should be tolled.[4]

As we demonstrate below, Plaintiffs have asked this Court to create new law and substantially expand the scope of the term "extraordinary circumstances" as defined in the case law. Plaintiffs are asking this Court to hold that the pendency of criminal proceedings in a foreign country are the functional equivalent of a "truth and reconciliation commission" conducted by two countries in Africa, *i.e.*, Liberia and South Africa, following the complete collapse of both the government and judicial systems in those countries. Plaintiffs are also asking this Court to hold that a prospective plaintiff's *subjective fear* in pursuing alleged human rights violations may result in what is effectively an indefinite tolling of the statute of limitations.

Plaintiffs' equitable tolling argument has a major problem which requires dismissal since there is no case in the United States which holds that a TVPA plaintiff's reliance upon ongoing criminal proceedings in their home country may serve as a basis to toll the statute of limitations

---

[4] The exchange with the Court took place in the morning of the last day of trial, beginning at 8:50 a.m., when the Judge and the parties agreed that the verdict form would have the two statute of limitations questions. Tr. Day 5: 24-25.  However, at 1:59 p.m. that same day, the Judge asked if the parties had any objections to the form and the parties responded in the negative. *Id.* at 118: 10-13.

**HABER LAW, P.A.**
251 NW 23 Street | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

which, in this case, was for a period of at least twenty-eight years.   Finally,   the   subjective

fear/indefinite tolling argument advanced by Plaintiffs would create a completely unworkable

standard that would leave the question of when the statute of limitations begins and ends solely as

a matter  in the mind of a particular plaintiff without any basis for the court to make an objective

determination of when the statute of limitations starts to run.

### III.   LEGAL STANDARD FOR A JUDGMENT AS A MATTER OF LAW, OR, ALTERNATIVELY, FOR A NEW TRIAL

Rule 50(a)(2) of the Federal Rules of Civil Procedure provides that a party may move for

judgment as a matter of law "before the case is submitted to the jury." FED. R. CIV. P. 50(a)(2).

"The motion must specify the judgment sought and the law and facts that entitled the movant to

the judgment." *Id.* "If a district court does not grant the motion, the movant may file 'a renewed

motion,' under Rule (50)(b), after trial." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d

1241, 1254 (11th Cir. 2016) (*quoting* FED. R. CIV. P. 50(b)). "The standard for granting a renewed

motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for

granting the pre-submission motion [under 50(a)]." *Id.* (citations omitted). "Thus, as with motions

under Rule 50(a), the question before a district court confronting a renewed Rule 50(b) motion is

whether the evidence is 'legally sufficient . . . to find for the party on that issue.'" *Id.* (citations

omitted). The entry of judgment as a matter of law under Rule 50(b), is appropriate "when the

plaintiff presents ***no legally sufficient evidentiary basis*** for a reasonable jury to find for him on a

material element of his cause of action." *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 957 (11th

Cir. 2014) (citation omitted).

"In evaluating a motion for judgment as a matter of law, the evidence is reviewed in the

light most favorable to the non-moving party, but the non-movant must put forth ***more than a mere***

***scintilla of evidence*** suggesting that reasonable minds could reach differing verdicts." *Smart v.*

*City of Miami Beach, Florida*, 933 F. Supp. 2d 1366, 1371 (S.D. Fla. 2013). As the Eleventh

Circuit has explained, "[f]or a trial court to properly deny a motion for directed verdict, there must be ***substantial evidence*** opposed to the motion; that is, ***evidence of such quality and weight*** that reasonable and fair-minded persons in the exercise of impartial judgment might reach a different conclusion." *Benford v. Richards Medical Co*., 792 F.2d 1537, 1539 (11th Cir. 1986); *see generally Huss v. Gayden*, 465 F.3d 201, 2006 U.S. App. LEXIS 23596 (5th Cir. 2006) (**reversing jury verdict and granting motion for judgment as a matter of law on statute of limitations grounds**); *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 505 F. Supp. 2d 1 (D.D.C. 2007) (granting motion for judgment as a matter of law on statute of limitations grounds).

"A *motion* for a *new trial* may be granted 'for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). Although a comprehensive list of the grounds for granting a new trial is elusive, the Supreme Court has held a motion for a new trial may rest on the fact that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "Generally, motions for a new trial are committed to the discretion of the district court." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984) (citation omitted); *Barthelus v. G4 Government Solutions, Inc.*, 141 F. Supp. 3d 1309, 1314 (S.D. Fla. 2015).

Defendant respectfully requests that, as an alternative to granting a Motion for Judgment as a Matter of Law, this Court grant Defendant Bravo a new trial based upon the following: (i) the Court's decision to allow the question of equitable tolling to be submitted to the Jury rather than having that issue decided by the Court; (ii) the Court's erroneous instruction to the Jury which described an alleged "accountability process" as a legally recognized basis for the Jury to equitably toll a statute of limitations which had already expired; (iii) the submission by the Court of a verdict

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

form to the Jury which did not contain a question as to what point the statute of limitations would be tolled until; (iv) all evidentiary rulings made by the Court pretrial which prejudiced Defendant's defense which presented the Jury with a one-sided view of the facts including but, not limited to, the Court's pretrial ruling limiting the scope of the permitted to testimony to exclude mention of the dangerous propensities of the Trelew prisoners including, but not limited to, details about their previous escape from Rawson prison, the involvement of those prisoners in terrorist activities prior to the incident at Trelew and the affiliation of those prisoners with left wing communist terrorist groups in Argentina who had attempted, and were attempting, to overthrow the Argentine government then in power by force [D.E.107]; and, (v) the imposition of compensatory and punitive damages that were grossly excessive as set forth in Section IV(F) below.

## IV.     INCORPORATED MEMORANDUM OF LAW

### A.     TVPA's Statute of Limitations and Its Legislative History.

In 1986, the first version of the TVPA was introduced by Senator Spencer as S. 2528. Neither this version of the bill, or the ones introduced in the 100th, 101th, and the 102nd Congress, contained a statute of limitations. When Senator Spencer tried again on September 14, 1989, bill S. 1629, the relevant section stated as follows:

> (b) The court shall decline to hear and determine a claim under this section if the defendant establishes that clear and convincing evidence exists that the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred. ***The court shall not infer the application of any statute of limitations or similar period of limitations in an action under this section***.

135 Cong Rec S 11126. This bill did not become law. Neither did the similar version of the TVPA introduced by Senator Spencer on January 31, 1991, as S. 313. *See* 102 S. 313, 313 ("(c) LIMITATIONS. - **No statute of limitations or similar period of limitation shall apply to a claim under subsection (a)**). However, by late 1991, the House Judiciary Committee's Report stated as follows: "A ten year statute of limitation insures that the Federal Courts ***will not have to***

*hear stale claims*. In some instances, such as where a defendant fraudulently conceals his or her identification or whereabouts from the claimant, equitable tolling remedies *may* apply to preserve a claimant's rights. *See* 102 H. Rpt. 367; *see also* Senate Judiciary Committee Report, 102 S. Rpt. 249.  After the recommendations were made, which included the addition of the limitations period, serious considerations were given in the Senate for the explicit inclusion of a provision to permit equitable tolling of the jurisdictional statute. *See* 102 S. Rpt. 249 (November 26, 1991). However, Congress ultimately  agreed that the final version of the statute would not include equitable tolling language. *See* 137 Cong. Rec. H. 11244, 11245 (November 25, 1991). Yet, before the statute was ultimately enacted , on March 3, 1992, the Senate maintained their serious concerns[5] about the possibility of US Courts getting involved in stale claims,

> Mr. GRASSLEY. I appreciate the efforts Senator Specter has made to alleviate some of the concerns I have about this bill. *He has added a statute of limitations*,
> . . .
>  Mr. GRASSLEY. How will evidence be collected in such a case? *Is it not unrealistic to expect an American court to make full and fair factual findings concerning conduct which occurred 10 years ago in a foreign country? How will we compel witnesses to attend? What about real and physical evidence? What about the language barriers? It seems very impractical, unless the Senator is just providing victims of torture with a forum for getting default judgments that will be hard to collect.*

*See* 138 Cong Rec S 2667. Courts routinely uphold Congress' intent when holding that "[s]tatutes of limitation are primarily designed to assure fairness to defendants. Such statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Arce v. Garcia*, 434 F. 3d at 1254, 1259 (11th Cir. 2006). "Statutes of limitation embody the recognition that defendant's interest in promptly facing the Plaintiffs' claims along with the Court's interest hearing only claims that a plaintiff has diligently pursued can trump the plaintiff's right to assert even the

---

[5] In fact, senators in the minority continued to express their concerns when they stated that the legislation would allow "**individual aliens could determine the timing and manner of the making of allegations in a U.S. court about a foreign country's alleged abuses of human rights.**" *See* 102 S. Rpt. 249 (November 26, 1991).

**HABER LAW, P.A.**
251 NW 23 Street | Miami, Florida  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

most meritorious of claims." *Id*. The Eleventh Circuit has explained that the proper application of the statute of limitations reflects that: "[a] lenient approach to equitable tolling would revive claims dating back decades, if not centuries, when most or all of the eyewitnesses would no longer be alive to provide their accounts of the events in question." *Id*.

Accordingly, federal Courts across the country have enforced statutes of limitations with respect to claims under the TVPA, Alien Tort Claims Act, and similar statutes and have declined to apply "equitable tolling." *See, e.g., Wildhaber v. EFV*, 745 F. App'x 141, 142-43 (11th Cir. 2018) (claim was barred because plaintiff failed to file his complaint within the ten-year limitations period after Swiss Council allegedly enacted the decree limiting land speculation); *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 (2d Cir. 2014) (claim time-barred because alleged trafficking took place more than 50 years before suit was filed); *McPherson v. United States*, 392 Fed. Appx. 938 (3d Cir. 2010), *cert. denied*, 562 U.S. 1304 (2011) (claim barred by 10-year statute of limitations; even assuming application of equitable tolling, plaintiff did not bring suit within reasonable time after he had obtained, or by due diligence could have obtained, necessary information)*; Tu v. Koster*, 364 F.3d 1196, 1199-1200 (10th Cir. 2004) (Claim barred by 10-year statute of limitations where incident giving rise to cause of action occurred in 1968 and residents did not file suit until 2000. Even if some degree of equitable tolling was appropriate given residents' poverty, their status as subjects of Communist government, Vietnam War, and their inability to travel, plaintiffs made no showing sufficient to justify tolling *Bivens* claim for 22 years)*; Fayoade v. Spratte*, 284 Fed. Appx. 345 (7th Cir. 2008) (action was still untimely as more than 10 years had passed since the complained of conduct and doctrine of equitable tolling could not help plaintiff's case). *Hereros v. Deutsche Afrika-Linien Gmblt & Co.*, 2006 U.S. Dist. LEXIS 2761 (D.N.J. Jan. 17, 2006), *aff'd*, 232 Fed. Appx. 90, (3d Cir. 2007) (Where conduct occurred between 1890 and 1915, expiration of statute of limitations period, which was no longer than 10

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

years, provided alternative reason for dismissal of action). In *re World War II Era Japanese Forced Labor Litig.*, 164 F. Supp. 2d 1160 (N.D. Cal. 2001), *dismissed in part*, 164 F. Supp. 2d 1153 (N.D. Cal. 2001) (Ten-year statute of limitations applicable to claims under 28 USCS § 1350 barred suit by Korean and Chinese nationals seeking compensation for slave labor required of them by Japan during World War II, where time had long since expired, and there was no reason why claimants could not have brought timely suit, precluding any equitable tolling argument).

Thus, there is plenty of case law which recognizes that statutes of limitation should be enforced despite claims of equitable tolling made by plaintiffs in cases involving alleged torts committed outside the United States. We now turn to the issue of whether the circumstances which gave rise to Plaintiffs' delay in filing their Complaint from **1992 to 2020** were properly determined to be "extraordinary circumstances as the Jury in this case apparently found. D.E. 53.

**B.    Plaintiffs Failed to Meet their *Burden of Proof* at Trial to Show that the Statute of Limitations for Their TVPA Claims Should be Equitably Tolled.**

It is well settled that, in order to equitably toll the statute of limitations, the burden is on the Plaintiff. *See, e.g.*, *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993); *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004) ("The plaintiffs must establish that tolling is warranted."); *see also Arce*, 434 F.3d at 1262 (11th Cir. 2006); *Jackson v. Astrue*, 506 F.3d 1349, 1354 (11th Cir. 2007).  As the Fourth Circuit found in *Warfaa*, 1 F. 4th at 294:

> Equitable tolling is a discretionary doctrine that turns on the facts and circumstances of a particular case. For equitable tolling to apply, a litigant must establish (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing. [C]onsidered an extraordinary remedy in this [Court], . . . litigants face a considerable burden to demonstrate that it applies. Its invocation "must be reserved for those **rare instances** where—due to circumstances **external to the party's own conduct**—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.

*Warfaa*, 1 F. 4th at 289 (quotations and citations omitted). The Eleventh Circuit has also explained that: "[Equitable] tolling is an extraordinary remedy which should be extended only *sparingly*."

*Arce*, 434 F.3d at 1262; *see also Jackson*, 506 F.3d at 1354. Equitable tolling "must be reserved

for those **rare instances** where— due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Harris*, 209 F.3d at 330; *Jean v. Dorelien*, 431 F.3d 776, 779 (11th Cir. 2005) ("extraordinary circumstances that are both beyond [plaintiff's] control and unavoidable even with diligence")(citations omitted); *Cabello*, 402 F.3d at 1148 (tolling "is reserved for extraordinary facts."). In order to apply equitable tolling, "***courts usually require some affirmative misconduct, such as deliberate concealment***." *Id.* at 1155; *see Jackson*, 506 F.3d at 1354, 1356. "Traditional equitable tolling principles require that the claimant demonstrate extraordinary circumstances such as fraud, misinformation, or deliberate concealment." *Id.* at 1355. Further, a petitioner is not entitled to equitable tolling based on a showing of either extraordinary circumstances or diligence alone; **the petitioner must establish both**. *Arthur v. Allen*, 452 F.3d 1234, 1252 (11th Cir. 2006).

Typically, the question of equitable tolling is one that should be determined by the Court in the first instance, not the Jury. *See Arce,* 434 F. 3d at 1259 (District Court decided the issue of equitable tolling); *Jara v. Nunez*, No. 6:13-cv-1426-Orl-37GJK, 2016 U.S. Dist. LEXIS 59226, at *11-12 (M.D. Fla. May 3, 2016) ("'[W]hether the doctrine of equitable tolling saves a cause of action otherwise barred by the statute of limitations is a question of law' for the Court."); *Justice v. United States*, 6 F.3d 1474, 1478 (11th Cir. 1993) (same); *see, e.g.*, *Harris v. United States*, 627 F. App'x 877, 877 (11th Cir. 2015) (reviewing the district court's grant of a motion to dismiss for failure to state a claim and the legal issue of applicability of equitable tolling and affirming the dismissal of a claim as untimely); *Cabello v. Fernandez-Larios*, 402 F. 3d 1148, 1152 (11th Cir. 2005) ("The question of whether equitable tolling applies is a legal one"). Thus, the District Court erred when it allowed the jury to assume this Court's role and decide the issue of equitable tolling which is more properly a question of law.

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

The Courts that have applied equitable tolling in TVPA cases have focused on several factors to justify the tolling in those cases: (i) the presence of civil war and/or repressive authoritarian regimes in the countries where the acts occurred; (ii) whether the repressive regime that participated in the acts in question remained in power at the time that the statute of limitations began to run; (iii) whether and for what period of time Plaintiffs lacked a legal remedy in their home country; and (iv) the presence of "extraordinary circumstances." *See Warfaa,* 1 F.4th at 292-93. As we demonstrate below, the factors delineated above may have existed in Argentina at one point but one question presented by this case is whether and to what extent were Plaintiffs required to act when these circumstances were no longer present in Plaintiffs' home country and whether any of the other factors identified by Plaintiffs at trial constituted "extraordinary circumstances."

**C.** **Plaintiffs Failed to Prove that Extraordinary Circumstances Existed to Toll the Statute of Limitations For Events Which Occurred in 1972 Until October 20, 2010.**

At trial, Plaintiffs argued that there were three factors which should equitably toll the statute of limitations: (i) the political conditions in Argentina from 1972 until 2020 that caused Plaintiffs to fear persecution; (ii) the alleged lack of knowledge of Defendant's whereabouts, and (iii) Plaintiffs' alleged "reliance …[upon] a criminal proceeding in Argentina" and the fact Argentina attempted (albeit unsuccessfully) to extradite Bravo.[6]

**(i)** **Plaintiffs Did Not Meet Their Burden of Proof At Trial to Show that there was "Widespread Fear" of a "Repressive Regime" in Argentina After 2005.**

The Court allowed Plaintiff to adduce evidence at trial regarding a series of excesses and intimidation tactics that the government of Argentina engaged in during the 1970s both prior to and during the so-called "Dirty War." Plaintiffs did not introduce any genuine credible evidence

---

[6] Tr. Day 2, pp. 31:14-25; 32:1-9; 34:4-8 ("And so either through fear or through the inability to find Mr. Bravo, we get to the 2005 and 2008 period. At which point, they were engaged and fully relying upon a criminal process that has had peaks and valleys but has been ongoing, and we contend there has been reasonable reliance on that from the 2005 period up until now").

**HABER LAW, P.A.**
251 NW 23 Street | Miami, Florida  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

that a fear of persecution or fear of a repressive regime existed after 2005.[7] **This is when the Argentine Government commenced a criminal investigation into the events at Trelew.**[8]

Nonetheless, Plaintiffs argue that country conditions thereafter created a "generalized fear [] sufficient to toll the statute of limitations" even until today.[9] Tr. Day 4, 16:6-7; Day 2, 35:12-13 ("our point is simply that reasons for fear continue until this day in Argentina."). Thus, under Plaintiffs' theory of tolling, advanced for the first time at trial, the statute of limitations could be *tolled forever* provided that it is possible for a plaintiff to believe that there was still a "generalized fear" of persecution. There are serious problems with Plaintiffs' theory that plainly has implications for other TVPA cases. The question of whether a plaintiff was in fear cannot be solely subjective. There must be other objective corroborating evidence of the basis for fear and, in this case, that proof was not presented as it relates to conditions in Argentina after 2005.

In order to fit their theory of tolling into the facts presented in this case, Plaintiffs overestimate and misapply the Fourth Circuit's opinion in *Warfaa.* Plaintiffs at trial claimed that *Warfaa* supports the premise: "[t]hat the repressive regime [that] generates widespread fear" tolls

---

[7] In fact, Plaintiff's testimony on this point actually contradicts this claim. For example, Alicia Krueger received compensation from the Argentine government in 2000 and wrote letters to the Argentine government seeking justice in 1995, 1997 and 2005. Marcella Santucho received compensation from the Argentine government in 2006 and 2007. Def. Trial Deposition Designations of Marcella Santucho, Pg. 83:16-20. She admitted that she tried to return to Argentina in 1994 but left the country again because she could not find work. Def. Trial Deposition Designations of Marcella Santucho, Pg. 79:4-11. Plaintiff Capello admitted on cross-examination that his grandmother was working with other families of those who died at Trelew as early as 1993 for the purpose of having a criminal trial. Tr. Day 2 at 75-78. Capello also admitted that his family began to look into civil remedies for his uncle's death in 1993 or 1994. *Id.* Raquel Camps received reparations in 1998. Tr. Day 4 at 156. She also admitted that she worked with a forensic anthropology team in Argentina to identify her father's remains in 2001. Tr. Day 4 at 160-61.

[8] Tr. Day 2, p.32:20-21; 33:20-22 ("Our position is that fear and country conditions that gets us from 1972 to at least 2005 **when the criminal investigation began in Argentina**."). It is undisputed that the military regime left power in 1983 [DE 1 ¶ 69] and that Plaintiffs openly participated in the Argentina criminal case identifying each by their names.

[9] Plaintiffs argued at trial that a statement by Plaintiff Camps' grandmother, "silence is health," constitutes sufficient "reasonable" evidence to bring their fear to 2020 and toll the limitations period. Camps Testimony, Tr. Day 4, 162:20-25. *Compare* Tr. Day 5, 87:10-19 ("COURT: Should you be able to -- is there record evidence that would support your ability to ask this jury to find that the fear was an extraordinary circumstance up to 2010 that permitted you to toll the statute of limitations -- or, rather, that tolled the statute of limitations?  MR KRISHNAN: We would put forth the following evidence Your Honor: the plaintiff Raquel Camps testified to  the – testified to her grandmother's statement that 'silence is health' as of 2002 and her grandmother's refusal to share with her the circumstances of her father's death.").

the statute of limitations indefinitely.[10] The *Warfaa* opinion, in which the Fourth Circuit found a basis for equitable tolling, focused on circumstances "where civil war and repressive authoritarian regimes significantly impeded a Plaintiff's access to judicial remedy…". 1 F.4th at 294. The Court also found that: "…Somalia fell into chaos. Its central government collapsed and disintegrated into regions or districts controlled by warlords using clan base militia to practice extortion, murder, rape and robbery." *Id.* at 295. *Warfaa* does not stand for the proposition that "widespread fear" may serve to toll the statute of limitations indefinitely. Plaintiffs have dramatically overstated and oversold the impact of the *Warfaa* opinion.

Plaintiffs admitted at trial that, after 2005, there was neither civil unrest nor lack of access to a legal remedy in Argentina. Moreover, one of the key components of equitable tolling is circumstances must exist that are "external to the party's own conduct…." which was not proven at trial.  In fact, the law in this Circuit holds that when a person has a "well-founded fear of future persecution" in an immigration context, for example, evidence that there is a "fundamental change in the country's conditions" can refute the allegation of fear. *Acharya v. United States AG*, 758 F. App'x 769, 771 (11th Cir. 2018). In *Acharya*, the Eleventh Circuit held that "a change in governmental regime, the institution of governmental reforms to redress past problems, and a substantial decline in violence against a persecuted group . . . may signify that a country has undergone such a 'fundamental change' to negate the claim of a fear of persecution. *Id.*; *Gonzalez v. Reno*, 212 F.3d 1338, 1355 (11th Cir. 2000) ("Political conditions 'which affect the populace as a whole or in large part are generally insufficient to establish [persecution].'").[11]

---

[10] Tr. Day 4, 30:10-13

[11] *See Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir.1995); *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995) (explaining that "persecution is an **extreme concept** that does not include every sort of treatment our society regards as offensive"); *see also Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir.1998) (stating that "persecution" "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty"); *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir.1997) ("Mere harassment does not amount to persecution."); Ira J. Kurzban, *Kurzban's Immigration Law Sourcebook*, 254-61 (6th ed.1998) (citing cases discussing meaning of "persecution").

Plaintiffs here have not argued that an official policy or conduct by anyone placed them in fear of their lives or that other external forces prevented them from filing suit after 2005. What Plaintiffs suggest is that their fear of persecution for the actions that the military regime occurred well before 2005, caused them to remain in a state of subjective state of fear of persecution until today. Plaintiffs needed to present specific and objective facts that caused them to have a reasonable fear of persecution. Plaintiffs did not show that anyone was being targeted in Argentina **after 2005** by either the defunct military regime or by the government then in power.[12] Simply, Plaintiffs cannot rely upon the general history of Argentina in the 1970's and then claim that those events caused then to remain in fear until 2020.

(ii)   **The Evidence at Trial Revealed that Plaintiffs Were Aware of Sufficient Facts Giving Rise to Their Claims More than Ten Years Before October 2020.**

The uncontroverted evidence showed that Plaintiffs were aware of sufficient facts giving rise to their causes of action more than ten years before filing suit. Plaintiffs filed their Complaint on October 20, 2020. [DE 1]. It is undisputed that by 2008, at the very latest, Plaintiffs knew the full names of the officers at Trelew (including Defendant Roberto Bravo), the information and circumstances surrounding their family members' deaths, and the specific location of Bravo in the United States. In fact, Plaintiffs knew since the early the 1970s that their relatives were killed at Trelew on August 22, 1972, and the manner of their death. *See* Death Certificates (Trial Ex. 13 & 17). Thus, Plaintiffs' second basis for equitable tolling rests exclusively on the argument that they could not find Defendant until 2008. Tr. Day 5, 142:25; 143:1-2 ("the second reason why that ten-year period was paused has to do with the fact that Mr. Bravo's location was unknown, that takes us at least -- that takes us all the way up to 2008.").

---

[12] Plaintiffs point to the unrelated Videla and La Perla trials which took place in Spain to establish their subjective fear. The La Perla trial, however, took place in Spain in 2012 after Plaintiffs filed this lawsuit. Tr. Day 1. at 83. Plaintiffs were unable to show any impact of either trial or alleged witness intimidation on any party to **this case.**

**HABER LAW, P.A.**
251 NW 23 Street | Miami, Florida  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

Both Plaintiffs and this Court agreed that even applying equitable tolling under that factor, it does not make Plaintiffs' claims timely. *Id.* 112:25; 113:1-2 ("We couldn't get there on inability to locate the defendant standing alone. We concede that."); 143:4-5 ("It doesn't get us all the way to 2010. But it takes up to 2008, that's when Interpol found Mr. Bravo.); *id.* 86:5-7 (the Court: "it is without dispute that the families had identified him in the United States in 2008, inability to find him could not have tolled the statute of limitations to 2010."). Moreover, contrary to Plaintiffs' suggestions at trial, the Argentinean government in this case did not conceal the manner in which the prisoners died nor concealed their place of burial. In fact, Plaintiffs' own expert, Professor Brennan, testified that given the general public's knowledge and "the **public scandal** surrounding the events in Trelew, [it] became a **major public scandal** and a serious problem for the [military] regime." Tr. Day 1, 61:11-12. **There were no conflicting death certificates or cover-up of the events surrounding Trelew.** *See* Trial Exh. 27 & 28 (PX0079/79T). Plaintiffs knew in detail the alleged wrongs committed against their family members and all the necessary information to bring this suit by early 2008. In fact, in the Joint Pre-Trial Stipulation, Plaintiffs describe the Trelew incident as "infamous." [D.E. 91, p. 1]. The events at Trelew were reported in the newspaper shortly after the events occurred. "*14 Terrorist Suspects Are Slain In a Prison Break in Argentina*," New York Times, August 23, 1972. Knowledge of all this information is imputed to Plaintiffs as of 2008. They knew and had been put on notice of sufficient facts to bring this action more than ten years before filing suit on October 20, 2020. Accordingly, Plaintiffs' claims are time-barred under this factor and should be dismissed as a matter of law.

    (iii)    <u>**Plaintiffs Did Not Meet Their Burden of Proof At Trial To Show that the Statute of Limitations Should be Equitably Tolled Based Upon Their Pursuit of and Reliance Upon Domestic Remedies.**</u>

Plaintiffs also made the novel argument at trial, which this Court justifiably questioned, that the alleged ongoing criminal proceedings in Argentina somehow justified the tolling of a civil

lawsuit in the United States. When that analogy was put under a microscope by the Court, Plaintiffs pivoted and defaulted to an apparent fallback position – that the Argentine criminal proceedings were somehow analogous to certain "truth and reconciliation" commission proceedings which occurred in Africa.[13] First, the cases relied upon by Plaintiffs presented markedly different circumstances than those here. In *Thomas*, the District Court in Pennsylvania was faced with TVPA claims and claims of equitable tolling.  The *Thomas* court found that plaintiffs had satisfied their burden to prove equitable tolling for several reasons: (i) the defendant had purportedly used his contacts in Liberia to intimidate individuals suspected of being plaintiffs or witnesses **in the pending lawsuit** (*id*. at 866); (ii) Liberia's two civil wars and its unstable government (*id*. at 872); (iii) defendant's absence from the United States (*id);* and (iv) defendant's alleged concealment of his identity (*id.*). These issues had apparently been resolved adversely to the defendant at the Motion to Dismiss stage. *Id*. at 872.

      None of the facts relied upon by the District Court in *Thomas* are present here. There has been no allegation or testimony that Bravo ever intimidated any witnesses. There was no testimony that there was a civil war in Argentina during the 1992 to 2020 time period.  Bravo  testified that he has lived continuously in the United States (*see generally* Tr. Day 3, pp. 115-116) and he certainly never concealed his identity. Thus, the one thread from *Thomas* upon which Plaintiffs rely is the establishment of a truth and reconciliation commission in Liberia.

      In *In re S. African Apartheid Litig*, it is clear that the District Court in the Southern District of New York, in deciding that a TVPA claim should be tolled for statute of limitations purposes, relied upon the fact that the "**abusive government remain[ed] in power**…" *S. African Apartheid Litig*, F. Supp 2d at 288. There has been no testimony that the abusive government (*i.e.*, the

---

[13] *See, e.g., Jane v. Thomas*, 560 F.Supp.3d 855 (E.D. Pa. 2021) (Liberia); *S. African Apartheid Litigation v. Daimler*, 617 F.Supp. 2d 228 (S.D.N.Y. 2009)

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

Lanusse government was in power in Argentina in 1972) remained in power up to and including any time period in between 1992 and 2010. In fact, the testimony showed the opposite – that monetary payments were made in 2000 to Plaintiffs and Plaintiff Krueger began to write to the President of Argentina in 1995 and 1997 because there was a **new government in power**. Thus, the cases relied upon by Plaintiffs  to toll the statute of limitations did not rely solely on the presence of a "truth and reconciliation commission." Rather, there were substantial additional factors at play which related specifically to the government in power at the time that the TVPA lawsuits were filed.

In any event, the actual "evidence" upon which Plaintiffs relied at trial to establish the alleged similarity between the truth and reconciliation proceedings in Africa could not have been any thinner.  The entire point apparently consisted of a **single sentence** uttered by Professor Langer which took place during the course of the five day at trial:

> And since Mr. Bravo did not surrender himself to Argentine authorities, he was not tried in Argentina. Then he was not tried together with the other people that, as I mentioned earlier, were criminally convicted in those criminal proceedings. ***So in that regard, those criminal proceedings <u>were kind of the equivalent</u> to a truth commission, as I was saying, and <u>they function equivalent</u> to a truth commission***.

Tr. Day 5, 139:13-19.

First, Langer was offered as an expert on "the availability of legal remedies in Argentina" not on truth commissions which took place in Africa or with respect to any comparison of the two proceedings.[14]  Nothing in Langer's testimony or report even describes what a truth commission is, or of the steps necessary for the prosecution of a criminal proceeding in Argentina, or their comparison. Langer did not elaborate on his one-sentence statement, he did not provide any examples, did not explain the steps or how long a criminal proceeding or a truth commission

---

[14] Tr. Day 4, 106:6-8: ("Your Honor, at this point, plaintiffs would move to proffer Professor Langer as an expert as to the availability of legal remedies in Argentina.").

**HABER LAW, P.A.**
251 NW 23 Street | Miami, Florida  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

generally takes, or who their parties are, did not even describe a truth commission at all.[15] Contrary to Plaintiffs' proffer, Langer did not explain the "**level of involvement**" or the "**time and effort**" required to participate in either TRC or a criminal proceeding in Argentina.

A lone sentence in Langer's testimony cannot constitute sufficient evidence that a truth commission is equivalent to a criminal prosecution and that a criminal prosecution that lasted seven years (from 2005 to 2012) can toll the statute of limitations indefinitely.

Moreover, Langer's lone sentence did not even touch upon what the literature and the case law says that a truth commission actually is. According to *actual* experts on the field of Truth and Reconciliation Commissions, "**Truth commissions are not judicial inquiries.**" Truth Seeking: Elements of Creating an Effective Truth Commission, INT'L CTR. FOR TRANSITIONAL JUSTICE, Ch.2, pp. 10-11 (Eduardo Gonzalez & Howard Varney eds. 2013), http://ictj.org/sites/default/files/ICTJ-Book-Truth-Seeking-2013-English.pdf. Some of the reasons as to why truth commissions are not "the functional equivalent" of even similar to a criminal proceeding are as follows:

> **[truth commissions] do not establish individual criminal responsibility for specific crimes, determine punishment, or use the standards of due process applicable in a court of law**. If they gather evidence useful for a criminal investigation, their inquiries may precede or complement the work of a court of law. While courts of law usually focus on the facts of an individual case, which are proven by exacting standards of evidence, **truth commissions complement that approach by establishing the social and historical context of violations and large-scale patterns behind massive numbers of cases**. Their analysis can help to uncover the logic and strategy behind abuses, **helping to establish moral or political responsibility.**

*Id.* at 10-11. Further, truth commissions are not the same as judicial proceedings because "[t]rials establish the facts using judicial techniques, which may be inadequate to acknowledge the

---

[15] "Truth commissions are usually set up to investigate large-scale violations of human rights committed in a country during a protracted civil war or following the demise of a particularly brutal regime. . . . In addition to investigating these events, truth commissions are frequently charged with recommending measures for national reconciliation, including the preparation of impartial accounts of the causes that led to a given conflict." Centennial Essay: THE EVOLVING INTERNATIONAL HUMAN RIGHTS SYSTEM, 100 A.J.I.L. 783, 802-803.

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

personal, cultural, or psychological experiences of victims," running counter to the purpose of a truth commission. *Id.* at p. 4.[16] Yet, with the only evidence on the record being a single sentence during a five-day jury trial stating that because Bravo was not convicted in Argentina, the other officers' "criminal proceedings were *kind of the equivalent* to a truth commission," this Court allowed the question of whether the statute of limitations should be tolled to go to the jury. Plaintiffs failed to marshal sufficient evidence to justify tolling under this twisted theory. The fact that Plaintiffs chose to participate in a criminal proceeding in Argentina and waited to file suit does not constitute an extraordinary circumstance that warrants equitable tolling. Rather, these are facts that are more aligned with the cases in which plaintiffs failed to diligently exercise their rights.[17]

Plaintiffs also argued during trial that the statute of limitations had to be tolled during the time they were relying on the Argentinean criminal proceedings because those criminal cases were the **only** means for these victims to obtain redress. Tr. Day 4, 127:19-22 ("Mr. Langer's testimony on this subject will be very limited. He is just going to make the point that there was *no other public investigation or accountability process* in Argentina related to the Trelew shootings."); 125:23-25 ("*this criminal lawsuit functioned as the only investigation that Argentina had broadly into these crimes*."). Right after this proffer, Langer testified that "[*t*]*he* **only** *public accountability process* for the Trelew Massacre is an investigation on what happened in Trelew -- was a criminal investigation that ended up with three people being criminally convicted for their participation in these shootings." *See* Tr. Day 4, 138:23-25; 139:1-2. However, the record evidence at trial did not support this conclusion.

---

[16] The purposes or functions of a truth commission, aside from investigating and creating a report of human rights violations, include (i) "provide mental health support, physical protection, legal information, social services, and in some cases financial support" to the victims; (ii) "conducting educational outreach activities;" (iii) "make recommendations to support the rule of law; reform the security sector; promote good governance and fight corruption; improve respect for human rights; and to address the specific challenges faced by vulnerable populations such as indigenous people, children, youth, and women;" (iv) "promoting communal or national reconciliation." *Id.* at p. 24.

[17] Defendants' reiterates his arguments of Plaintiffs' lack of due diligences made in D.E. 138 & 146.

**HABER LAW, P.A.**
251 NW 23 Street | Miami, Florida  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

During the first day of trial, even before Langer took the stand, Plaintiffs admitted that "Argentina has passed what are considered reparations law which paid survivors' benefits to the families of victims who were killed or detained by the military during its many atrocities, and all of my clients' families have received those benefits in acknowledgment of the Trelew Massacre." Tr. Day 1, 31:1-5. Moreover, according to Plaintiff Camps, in order to obtain those benefits, the Argentinean government conducted an investigation that included, but was not limited to, documentary evidence. Camps Testimony, Tr. Day 4, 159:16-19. Plaintiffs' attempts to characterize them as "administrative remedies"[18] is meaningless and does not change the fact that the government conducted investigations, that Plaintiffs participated in them, and Plaintiffs received monetary compensation. **Plaintiffs also failed to explain how a criminal proceeding in Argentina could possibly impact their decision to obtain further economic redress in the United States by filing a TVPA lawsuit**. Therefore, the claim that the criminal proceedings were "***the only public investigation***" or "***the only accountability process***," available to Plaintiffs for the Trelew events was not supported by the facts at trial.

In addition, a crucial detail that dismantles Plaintiffs' argument that they did not timely file this damages action because they were relying on the criminal proceedings in Argentina is the fact that even if Plaintiffs would have been able to criminally prosecute Defendant in Argentina, they still would not have obtained monetary damages in that case. As Plaintiffs' expert testified at trial:

> in a criminal case, [the remedy] would be punishment like imprisonment the punishment. That would be a legal remedy for the legal wrong of committing a crime.
> Q. What about in a civil case?
> A. In a civil case like this one, for instance, typically would be compensation, monetary compensation.

Tr. Day 4, 104:15-20. Plaintiffs did not put forward any evidence or even an allegation at trial that somehow a criminal proceeding in Argentina will provide damages to a plaintiff.  Waiting for a

---

[18] Tr. Day 4, 104:23.

criminal proceeding in a foreign country to conclude before filing a federal TVPA case was not only not supported by the testimony at trial it is completely illogical. Plaintiffs' expert testified that, before criminal proceedings in Argentina could commence, Bravo would have to be extradited to the United States. There has been no explanation as to how it would assist Plaintiffs' United States TVPA case to have Bravo stand for a criminal trial in Argentina first. In fact, Plaintiffs brought their TVPA case and prevailed at trial without extraditing Bravo and having him tried criminally in an Argentine Court. It remains unexplained as to how or why an Argentina criminal trial was a necessary precondition to a United States civil TVPA trial.

**D.     The Verdict Form Submitted to the Jury Was Fatally Defective and Not Consistent with the Court's Prior Rulings.**

The law in this Circuit is that once it is "determined that the TVPA was equitably tolled, the inquiry does not end there. We ***must*** establish when exactly the ten-year statute of limitations began to run." *Cabello v. Fernandez Larios*, 402 F. 3d 1148, 1155 ([1]11th Cir. 2005). This Court understood the law, that is why during trial it made clear that the verdict form was to have ***two*** questions as to the statute of limitations: one, whether "Plaintiffs have shown extraordinary circumstances tolled the statute of limitations," **and** two, "until what date was the state of limitations tolled." Tr. Day 5, 19:11-23. Actually, there were several instances in which the Court made clear that the jury verdict form would include the two statute of limitations questions. *See id.* 22:19-24; 24:7-25; 25:1 (general discussion pp. 14-24). However, the verdict form submitted to the jury **did not** include the second question: requiring that the Jury determine what date the statute of limitations should be tolled until.[19]

Although Defendant maintains his position that this Court should answer the equitable tolling question, not the jury, the law still requires that the jury must determine the date until which

---

[19] *See* fn. 3.

the statute is to be tolled if, in fact, the case was submitted to the Jury as it was here. The absence of a tolling date question in the verdict misstated the law and misled the jury into believing that no date needed to be established by them for the statute of limitations to begin to run. Although this error was likely a clerical one, is nonetheless **fundamental** and has undoubtedly affected the outcome of this trial. *Saunders v. Ed Voyles Chrysler, Inc.*, 242 F. App'x 653, 656 (11th Cir. 2007) (error is "so fundamental as to result in a miscarriage of justice."); *Maiz v. Virani*, 253 F.3d 641, 676 (11th Cir. 2001) ( "Reversal for plain error in the jury instructions or verdict form will occur only in exceptional cases where the error is so fundamental as to result in a miscarriage of justice").

In addition, Defendant renews his objection made at trial as to the jury instruction on statute of limitations because it enumerated as a factor for equitable tolling the following language: "where plaintiffs did not pursue their claims in the United States while they were participating in or relying on accountability proceedings in the country where the incident occurred." Tr. Day 5: 192:22-25. As explained in detail in the briefing in D.E. 138 & 146 and in this Motion, there is no legal or factual support for creating this new tolling principle based on the facts of this case and the lack of due diligence of Plaintiffs.  This is an error of law and judgment in favor of Defendant is warranted.

**E.       The Punitive Damages are Excessive and Should be Remitted.**

On July 1, 2022, the jury returned a verdict in favor of the Plaintiffs on behalf Eduardo Capello I, Ruben Bonet, and Ana Maria Villarreal Santucho, and Alberto Camps (collectively, "Deceased"). Each of the Plaintiffs received punitive damages in the amount of $3,000,000.00, totaling twelve million dollars ($12,000,000.00) in punitive damages. When compared to Bravo's net worth of approximately $7,000,000.00, (PX. 05), the awards are unconstitutionally excessive and must be remitted.

i. **Legal Standard for Motion to Reduce Damages**

The TVPA does not outline or provide for the calculation of damages in the statute. Accordingly, federal courts are "free to and should create federal common law to provide justice for an injury contemplated by the Alien Tort Statute and [TVPA]." [20] *Tachiona v. Mugabe*, 216 F. Supp. 2d 262, 267 (S.D.N.Y. 2002). This Court reviews a request for remittitur for abuse of discretion. *See Agro Air Assocs., v. Houston Cas. Co.*, 128 F. 3d 1455, 1455-56 (11th Cir. 1997). The imposition of punitive damages is subject to constitutional limitations because the Due Process Clause of the Fourteenth Amendment prohibits states from imposing a "grossly excessive" punishment. *Regions v. Kaplan,* No. 8:12-CV-1837-T-17MAP, 2016 U.S. Dist. LEXIS 63164, *4 (M.D. Fla. May 12, 2016). This Court reviews a punitive damages award *de novo* for constitutional excessiveness. *Johansen v. Combustion En'g, Inc.* 170 F. 3d 1320, 1334 (11th Cir. 1999). The Court, not the jury, has the responsibility to determine whether an award is within the constitutional limit. *Id.* at 1332. The reduction of an award due to constitutional limits is not considered a remittitur. *Id.* at 1331. Unlike a remittitur, which essentially requires the court to substitute the decision of a jury's award because it is unreasonable on the *facts*, a determination that an award is unconstitutionally excessive is a question of *law.* Therefore, a court **"has the mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause**. *Id.* (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 585 (1996)). An award for punitive damages is considered constitutionally excessive when it is so out of proportion to the Defendant's net worth  that it results in the defendant's financial devastation. *Kaplan*, at *4; *see also Whyte v. Alston Mgmt.*, No. 10-81041-CIV-DIMITROULEAS/S, 2012 U.S. Dist. LEXIS 190423 (S.D. Fla. Apr. 10, 2012)("punitive damages cannot result in the 'financial ruin' of the

---

[20] Notably, the Supreme Court stated that "only two TVPA plaintiffs have been able to recover successfully against a natural person – one only after the defendant won the state lottery." *Mohamad v. Palestinian Auth.*, 566 US 449, 460 (2012).

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

defendant."); *see also Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith*, 767 F.2d 1498 (11th Cir. 1985)("…punitive damages should not be so out of proportion to the defendant's net worth that it destroys him").

### ii.    Punitive Damages Awarded to Edward Capello Are Grossly Excessive and Unconstitutional.

Punitive damages, unlike compensatory damages, exist solely to punish a defendant and to deter him from similar behavior. The law concerning excessive punitive damages is well established. Under the Due Process Clause of the United States Constitution, a punitive damages award is impermissible if a lesser amount would suffice to serve a State's legitimate interest in punishment and deterrence. *State Farm Mut. Auto Ins. Co v. Campbell*, 538 U.S. 408, 419-20 (2003) ("a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives, and the Utah courts should have gone no further."). The Due Process Clause prohibits courts from imposing grossly excessive or arbitrary punishments on individuals. *Id.* An award which is grossly excessive serves no legitimate purpose, and is akin to an arbitrary deprivation of property. *Id.* A court may order a remittitur if an award of  punitive damages is grossly excessive. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996). In determining whether an award of punitive damages is grossly excessive, a court must consider, among other things, "the disparity between the harm or potential harm suffered by the plaintiff and his punitive damage award" *Id.*  An award of punitive damages must bear a "reasonable relationship" to actual damages. *Gore*, 517 U.S. at 580.

Although the United States Supreme Court has been hesitant to establish a bright-line rule with respect to the ratio between compensatory and punitive damages, it has generally limited punitive damages that far exceed an award of compensatory damages. *See Thomas v. Nat'l Legal Prof'l Assocs.*, 594 F. Supp. 2d 31, 33 (D.D.C. 2009); *see also Gore*, 517 US at 583 (a "general concern of reasonableness […] properly enter[s] into the constitutional calculus"). Accordingly, a

high ratio between punitive and compensatory damages is an indication that the defendant did not have adequate notice that he would be subject to an award of such size. *Gore* 517 U.S. at 574; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) (holding that a punitive-to-compensatory damages ratio of 1:1 was considered fair); *Campbell*, 538 U.S. at 425 ("Few awards exceeding a single-digit ratio between punitive and compensatory damages […] will satisfy due process"). The Supreme Court has previously stated that "an award of more than four times the compensatory damages might be close to the line of constitutional impropriety." *Campbell* 538 U.S. at 425.

Here, Plaintiff Capello's punitive damages award is ***eleven*** times greater than the compensatory damages award, *i.e.*, on an 11:1 ratio. In this case, the evidence barely supports the jury's award of $250,000.00 to Plaintiff Eduardo Capello. Plaintiff Capello, who was not even born at the time that the events giving rise to the Complaint transpired, is not the spouse, parent, or child, of the deceased Eduardo Capello I. In fact, Plaintiff Capello was not even entitled to receive compensation for the Deceased Eduardo Capello I in Argentina; his grandmother received such compensation. Despite this, the jury awarded Plaintiff Capello $250,000.00 on behalf of the Deceased Capello. As such, he has failed to show any evidence of damage that would necessitate the award of compensatory damages, much less serve as a basis for punitive damages eleven times more than such a damages award.

Further, the punitive damages awarded to Plaintiff Capello greatly, and arbitrarily, exceed the amount of punitive damages awarded to any other Plaintiff. To compare, Plaintiff Capello was awarded a punitive to compensatory damage ratio of 11:1. Plaintiff Camps was awarded punitive damages on a 3:1 ratio, Plaintiff Kreuger was awarded punitive damages on a 1:1.5 ratio, and Plaintiff Santucho was awarded punitive damages on approximately 1:2 ratio. An award of this scale to Plaintiff Capello is not supported by the facts in this record. The Plaintiffs did not present any evidence that Plaintiff Capello nor the Deceased Eduardo Capello I suffered any harm above

**HABER LAW, P.A.**
251 NW 23 STREET | MIAMI, FLORIDA  33127 | T: 305.379.2400 | F: 305.379.1106 | www.haber.law

and beyond what the other Plaintiffs suffered. Therefore, Plaintiff Capello should not be entitled to punitive damages above and beyond the other Plaintiff. The award must be considered arbitrary, improper, and unconstitutional.

### iii.   A Punitive Damages Award in Excess of Twelve Million Dollars is Constitutionally Excessive in Light of Bravo's Net Worth

Damages must not be so excessive so as to financially ruin a defendant. *See Kaplan*, at *4; *see also Alston Mgmt,* at *3-4; *Arceneaux*, F. 2d at 1502-03. The purpose of compensatory damages, as stated above, is to make the Plaintiffs whole for their injury, and the purpose of punitive damages is to punish and deter the Defendant. However, the purpose of such damages is not served by financially ruining the Defendant. *Id.* Here, Bravo's net worth is approximately $7,000,000.00. The total punitive damage awarded is almost twice as much as Bravo's net worth. Payment of such judgment will bankrupt and financially ruin the Defendant.

### F.  The Compensatory Damage Awards were excessive

In this case, Plaintiffs have already been made whole for their injuries by the prior award from the Argentine government. Thus, the purpose of compensatory damages has already been fulfilled. A party is entitled to remittitur of compensatory damages "if [the court] believes the jury's verdict is excessive [….]" *Webb v. Worldwide Flight Servs.*, No. 02-21758-CIV-HUCK/TUR, 2004 U.S. Dist. LEXIS 31191 (S.D. Fla. July 12, 2004) (citing *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 (11th Cir. 1999). A jury verdict is considered excessive where "the jury's damage award exceeds the amount established by the evidence." *Coquina Invs. v. Rothstein*, No. 10-60786-Civ, 2012 U.S. Dist. LEXIS 139947 (S.D. Fla. Sep. 28, 2012) (citing *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985)) The Supreme Court has instructed that "courts can and should preclude double recovery by an individual." *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1203 (11th Cir. 2009)(citing *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 333, 100 S. Ct. 1698, 1708 (1980).

The compensatory damages awarded in this litigation serve to compensate the Plaintiffs above and beyond their injury. Plaintiffs presented no testimony by experts or otherwise justifying the damages awarded.  As such, compensatory damages totaling more than $12,000,000.00 must be considered grossly excessive and subject to a reduction.

### V.     CONCLUSION

For all the reasons delineated above, Defendant respectfully requests that this Court grant Defendant's Motion and enter Judgment as a Matter of Law in Defendant's favor or, alternatively, grant a new trial, together with any other and further relief which this Court deems just and proper.

Respectfully submitted,

HABER LAW, P.A.
*Counsel for Defendant, ROBERTO*
*GUILLERMO BRAVO*
251 NW 23rd Street
Miami, Florida 33127
Telephone No.: (305) 379-2400
Facsimile No.: (305) 379-1106
E-Mail: service@haber.law

By:   */s/ Steven W. Davis*
      STEVEN W. DAVIS, ESQ.
      Florida Bar No.: 347442
      sdavis@haber.law
      mapinto@haber.law
      ROGER SLADE, ESQ.
      Fla. Bar No. 41319
      E-mail: rslade@haber.law
       cpla@haber.law
      MARIA SOLEDAD BODERO, ESQ.
      Fla. Bar No. 76413
      E-mail: mbodero@haber.law

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 29, 2022, a true and correct copy of the foregoing document was electronically filed through CM/ECF. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

By:   */s/ Steven W. Davis*
      STEVEN W. DAVIS, ESQ.