# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CASE NO. 1:20-CV-24294-LFL

RAQUEL CAMPS, in her capacity as the
personal representative of the ESTATE
OF ALBERTO CAMPS,

EDUARDO CAPPELLO, in his individual
capacity, and in his capacity as the personal
representative of the ESTATE OF EDUARDO
CAPPELLO,

ALICIA KRUEGER, in her individual
capacity, and in her capacity as the personal
representative of the ESTATE OF RUBÉN
BONET,

and, MARCELA SANTUCHO, in her
individual capacity, and in her capacity as the
personal representative of the ESTATE OF
ANA MARÍA VILLARREAL DE
SANTUCHO,

               Plaintiffs,

   v.

ROBERTO GUILLERMO BRAVO,

             Defendant.

---

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO RE-OPEN THE EVIDENTIARY RECORD OR, IN THE ALTERNATIVE, RE-OPEN DISCOVERY

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ................................................................................................3

III.    LEGAL STANDARD.........................................................................................3

IV.     ARGUMENT .....................................................................................................5

        A.      Bravo's motion to reopen discovery is procedurally improper .............5

        B.      The Eleventh Circuit's silence on reopening discovery leaves this decision
                to the sound discretion of the Court..........................................................6

        C.      The Court should not allow Bravo to reopen the evidentiary record to
                submit facts in his possession under Rule 59(a)(2) ..................................7

        D.      Bravo fails to establish good cause or excusable neglect for reopening
                discovery ...................................................................................................11

                1.      Bravo cannot show good cause.................................................12

                2.      Bravo fails to establish excusable neglect warranting reopening of
                        discovery....................................................................................14

                        a.      Plaintiffs will be prejudiced if this motion is granted...................14

                        b.      Reopening discovery at this late stage would cause
                                significant delay in a case that has already been litigated for
                                five years .........................................................................15

                        c.      Bravo's delay was entirely within his control...............16

V.      CONCLUSION.................................................................................................16

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
   2021 WL 6327368 (N.D. Fla. Aug. 19, 2021) ..................................................................15, 16

*BrandAid Mktg. Corp. v. Biss*,
   2008 WL 190494 (S.D.N.Y. Jan. 22, 2008) ...........................................................................7

*Camps v. Bravo*,
   142 F.4th 743 (11th Cir. 2025) ...............................................................................................6

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*,
   2021 WL 4972740 (S.D. Fla. Mar. 15, 2021) .........................................................................14

*Compulife Software, Inc. v. Rutstein*,
   2025 WL 63898 (S.D. Fla. Jan. 10, 2025) ...............................................................................7

*Crawford v. Runyon*,
   79 F.3d 743 (8th Cir. 1996) ....................................................................................................15

*CSX Transp., Inc. v. State Bd. of Equalization*,
   521 F.3d 1300 (11th Cir. 2008) ..........................................................................................4, 6

*Dorey v. Hartmann*,
   2025 WL 90050 (M.D. Fla. Jan. 14, 2025) ............................................................................12

*E.E.O.C. v. Joe's Stone Crab, Inc.*,
   220 F.3d 1263 (11th Cir. 2000) ...............................................................................................6

*EarthCam, Inc. v. OxBlue Corp.*,
   703 F. App'x 803 (11th Cir. 2017) .........................................................................................14

*Fields v. Ethicon, Inc.*,
   2022 WL 22891517 (S.D. Ga. Oct. 18, 2022) .........................................................................3

*Jean-Baptiste v. City of Miami*,
   2025 WL 360817 (S.D. Fla. Jan. 3, 2025) ...............................................................................5

*Jenkins v. Anton*,
   922 F.3d 1257 (11th Cir. 2019) ..................................................................................4, 7, 8, 10

*Lopez-Carrasquillo v. Rubianes*,
   230 F.3d 409 (1st Cir. 2000) ...................................................................................................11

*Macbeg De Occidente S.A. de C.V. v. Kaloti Metals & Logistics, LLC*,
2013 WL 12145905 (S.D. Fla. June 25, 2013) ........................................................11

*Oceans of Images Photography, Inc. v. Foster & Smith, Inc.*,
2013 WL 12155934 (M.D. Fla. June 19, 2013)........................................................15

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
120 F. Supp. 3d 468 (D. Md. 2015) ........................................................................7

*Payne v. C.R. Bard, Inc.*,
606 F. App'x 940 (11th Cir. 2015) ..............................................................4, 7, 14

*Rivas-Montano v. United States*,
2006 WL 1428507 (M.D. Fla. May 22, 2006)..........................................................11

*S.G. v. Vagabound Inn Corp.*,
2024 WL 5317312 (C.D. Cal. Oct. 10, 2024)..........................................................16

*Scotland Cay, LLC v. Am. Reliable Ins. Co.*,
2021 WL 799254 (S.D. Fla. Feb. 12, 2021) ....................................................13, 14

*Sosa v. Airprint Sys. Inc.*,
133 F.3d 1417 (11th Cir. 1998) ..............................................................................4

*Stauffer Chem. Co. v. Brunson*,
409 F.2d 1327 (5th Cir. 1969) ..............................................................................6

*Stephens v. Alltran Fin.*,
LP, 325 F.R.D. 711 (N.D. Ga. 2018) ......................................................................12

*Sung Hee Joo v. Univ. of Miami*,
389 F. Supp. 3d 1107 (S.D. Fla. 2019) ....................................................................5

*Sweet v. Lockheed Martin Corp.*,
2009 WL 10664952 (N.D. Ga. Aug. 21, 2009) ......................................................15

*Taig v. Currey*,
2022 WL 18532781 (S.D. Fla. Mar. 28, 2022)........................................................14

*Williams v. Blue Cross & Blue Shield of Fla., Inc.*,
2010 WL 3419720 (N.D. Fla. Aug. 26, 2010)..................................................4, 14

**Rules**

Fed. R. Evid. 702, 703, 705 ....................................................................................11

Fed. R. Civ. P. 6(b)(1)................................................................................... *passim*

Fed. R. Civ. P. 16(b)(4)................................................................................. *passim*

Fed. R. Civ. P.  50(a) ..........................................................................................................9

Fed. R. Civ. P. 56(d) ..........................................................................................................14

Fed. R. Civ. P. 59(a)(2)............................................................................................ *passim*

## I.       INTRODUCTION

Following remand, this Court issued a clear and straightforward order instructing the parties to "confer and file a Joint Status Report on or before Tuesday, September 30, 2025, proposing what additional proceedings should take place in this Court in light of the Mandate, ***including what additional motions the Parties anticipate filing*** and proposed briefing schedules therefor."[1] The parties timely submitted that report, and the very same day, the Court issued an order setting the parties' agreed-upon briefing schedule for post-remand supplemental briefs.[2] ***Nowhere*** in the parties' joint report did Defendant Roberto Guillermo Bravo state that he wished to file a motion to reopen and supplement the evidentiary record on remand or, in the alternative, to re-open discovery. As a result, the Court ***never*** authorized Bravo to file such a motion. Nevertheless, on October 31, 2025—an entire month after the Court's deadline for identifying anticipated motions—Bravo filed the instant motion, such that Plaintiffs' opposition brief would be due on the same day as their opening post-remand supplemental brief. Bravo's motion is facially improper, contravenes a clear Court deadline, and should be denied for that reason alone.

The motion should be rejected on the merits as well. As a threshold matter, Bravo cites the wrong legal standard. While Bravo characterizes his request to "re-open the evidentiary record" as a motion for a new trial under Rule 59(a)(2), he is in fact asking belatedly to re-open the trial record after the court-ordered deadline for trial has passed, and to belatedly introduce new evidence into the trial record. ***That*** is in fact a motion to modify a court-ordered schedule, which is governed by Rules 16(b)(4) and 6(b)(1), and can only be granted upon a showing of good cause and excusable neglect—something that Bravo has not even attempted to show. Accordingly, under the proper legal standard, Bravo's request to re-open the evidentiary record should be denied.

---

[1] ECF No. 202 (emphasis added).
[2] ECF No. 205.

1

But even under Rule 59(a)(2), Bravo's request to re-open the trial record fails, as that legal standard turns on "the interests of fairness and justice."[3] Here, nothing would be more unfair and unjust than a re-do of the trial at this point. The parties had a full and fair opportunity to present any evidence they wished to advance at trial more than three years ago. A new trial *now* would necessarily require Plaintiffs to marshal new evidence to counter the evidence Bravo seeks to belatedly introduce, in addition to new rounds of witness testimony, evidentiary objections, and Court rulings to ensure any new evidence is authentic, reliable, and admissible. Such a result would be utterly unfair and unjust to Plaintiffs, who have already suffered the cost and expense of trial. Bravo's bare assertion that the Court ruled on an "entirely new theory of equitable tolling," which "was not the subject of discovery or argument during the original trial," is also false.[4] The Court should reject Bravo's request to re-open the evidentiary record to submit documents that were clearly in his possession yet he chose not to offer during trial.

Bravo's alternative request to re-open discovery to take a deposition of Plaintiff's expert, Professor Maximo Langer, is dispatched even more easily. Re-opening discovery is also governed by Rules 16(b)(4) and 6(b)(1),[5] which, again, require Bravo to show *both* good cause *and* excusable neglect for failing to seek the discovery earlier. Bravo chose *not* to depose Professor Langer, and as the Court has previously observed, he cannot show that he was prejudiced by his own decision to take "minimal discovery" during the discovery period.[6]

For these procedural and substantive reasons and those discussed below, Bravo's request to re-open and supplement the evidentiary record on remand or, in the alternative, to re-open discovery should be rejected.

---

[3] ECF No. 206 at 5.

[4] ECF No. 206 at 1.

[5] Unless otherwise stated, references to "Rules" refers to the Federal Rules of Civil Procedure.

[6] ECF No. 180 at 25 n.5.

## II.    BACKGROUND

After the Eleventh Circuit denied Bravo's motion to reconsider its ruling and issued its mandate, this Court instructed the parties to file a joint status report proposing the additional proceedings that should take place and stating "what additional motions the Parties anticipate filing and proposed briefing schedules therefor."[7] Plaintiffs accordingly conferred with Bravo in good faith, and the parties stipulated to a briefing schedule for post-remand supplemental briefs, as well as page limits.[8] Nowhere in the stipulated joint status report is there any reference to a motion to reopen the record or discovery.[9]

Upon consideration of the parties' joint status report, the Court set a briefing schedule adopting the parties' proposed deadlines and briefs to be filed.[10] Consistent with the parties' agreed-upon joint status report, the Court's order setting the briefing schedule does not authorize the filing of any motions or briefs other than the post-remand supplemental briefs addressing the merits of the issues remaining to be resolved following the Eleventh Circuit's remand.[11] Bravo nevertheless filed the instant motion one month later, seeking to re-open and supplement the evidentiary record or, in the alternative, to re-open discovery.

## III.    LEGAL STANDARD

Bravo's entire motion is properly governed by Rules 16(b)(4) and 6(b)(1), as he is belatedly seeking both to re-open the record in a trial that has already concluded and to re-open discovery after discovery closed.[12] A party seeking to introduce additional evidence after the

---

[7] ECF No. 202.

[8] ECF No. 204.

[9] *See generally id.*

[10] ECF No. 205.

[11] *See generally id.*

[12] *See Fields v. Ethicon, Inc.*, No. CV421-020, 2022 WL 22891517, at *2 (S.D. Ga. Oct. 18, 2022) (quoting *Sosa v. Airprint Sys. Inc.*, 133 F.3d 1417, 1418 n.2 (11th Cir. 1998) "When a deadline is in a scheduling order and a party acts after the deadline, 'Rule 16 is the proper guide for determining whether a party's delay may be excused.' Rule 16 provides that a schedule may be modified only for good cause and with the judge's consent.").

3

close of discovery must "show both good cause and excusable neglect."[13] To establish "good cause," Bravo must show the deadline could not be met despite his diligence.[14] "A moving party cannot establish the diligence necessary to show good cause if it had full knowledge of the information before the scheduling deadline passed or if the party failed to seek the needed information before the deadline."[15] To show "excusable neglect" sufficient to warrant an extension, "a court must consider all pertinent circumstances, including 'the danger of prejudice to the nonmovant, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.'"[16]

Bravo first requests to supplement the trial record with evidence that he failed to admit during trial under Rule 59(a)(2). "[P]rocedural decisions whether to reopen trial proceedings or hear additional evidence are properly left to the sound discretion of the district court" which is "in the best position to determine whether it needs to hear more."[17] Rule 59(a)(2) is a "[p]roper vehicle if a party wants to present newly discovered evidence after a nonjury trial."[18] Rule 59(a)(2) relief is "inappropriate" when the movant "knew about the [evidence]," made a "strategic decision" not to introduce it at trial, and "asks for a second bite at the apple."[19]

---

[13] *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 944 (11th Cir. 2015) (citing Federal Rules of Civil Procedure 6(b)(1) and 16(b)(4)).

[14] *Id.*; *see also Sosa*, 133 F.3d at 1418 (internal citations omitted) ("If a party was not diligent the good cause inquiry should end").

[15] *See Williams v. Blue Cross & Blue Shield of Fla., Inc.*, No. 3:09-cv-225, 2010 WL 3419720, at *1 (N.D. Fla. Aug. 26, 2010).

[16] *Payne*, 606 F. App'x at 944 (quoting *Advanced Estimating Sys. v. Riney*, 77 F.3d 1322, 1325 (11th Cir. 1996)) (alteration omitted).

[17] *CSX Transp., Inc. v. State Bd. of Equalization*, 521 F.3d 1300, 1302 (11th Cir. 2008).

[18] *Jenkins v. Anton*, 922 F.3d 1257, 1265 (11th Cir. 2019).

[19] *Id.* at 1266.

3396845

## IV.     ARGUMENT

### A.     Bravo's motion to reopen discovery is procedurally improper

As a threshold matter, Bravo's motion to reopen discovery is procedurally improper because it is untimely and violates this Court's order to identify no later than September 30, 2025, what additional proceedings should take place. "Recognizing the perils of disorderly litigation, the Eleventh Circuit has consistently held that motions filed after a deadline imposed by a court should be denied as untimely."[20] This is because "courts have a responsibility to manage their dockets and the Federal Rules of Civil Procedure are intended to force parties and their attorneys to be diligent in prosecuting their causes of action. Court cannot allow litigants to ignore deadlines."[21]

Bravo did not identify his intention to file this motion to the Court by the September 30 deadline, thereby causing the Court to impose a briefing schedule for the parties' post-remand supplemental briefing that did not consider this motion. If Bravo wanted to re-open the record, the proper time to do it was when the Court asked the parties to meet and confer, "propose[] what additional proceedings should take place," and submit a briefing schedule.[22] Instead, Bravo filed this motion a month later, strategically aligning this opposition deadline to coincide with Plaintiffs' supplemental briefing deadline agreed to by the parties weeks before. The Court should deny Bravo's motion which prejudices Plaintiffs and creates chaos and unnecessary expenditure of judicial resources.

Indeed, if the motion is granted, Plaintiffs will have filed their opening brief in reliance on the existing record, whereas Bravo apparently seeks to file his responding brief on a new and different record. Because the motion was filed exactly two weeks before Plaintiffs' opening brief

---

[20] *Sung Hee Joo v. Univ. of Miami*, 389 F. Supp. 3d 1107, 1109 (S.D. Fla. 2019) (quoting *Moyer v. Disney World Co.*, 146 F. Supp. 2d 1249, 1252 (M.D. Fla. 2000)).

[21] *Jean-Baptiste v. City of Miami*, No. 1:23-CV-22670-MD, 2025 WL 360817, at *4 (S.D. Fla. Jan. 3, 2025) (Louis J.) (internal citations omitted).

[22] *See* ECF No. 202.

on remand was due, it requires Plaintiffs to file a supplemental brief and opposition simultaneously—leaving no time for the Court to rule on Bravo's motion before Plaintiffs' opening brief is due. Bravo offers no explanation why he did not raise this issue with the Court earlier. Bravo's delay is inexcusable, creates chaos, and is unduly prejudicial to Plaintiffs. This Court should deny the motion as procedurally improper.

### B.    The Eleventh Circuit's silence on reopening discovery leaves this decision to the sound discretion of the Court

The Eleventh Circuit vacated this Court's judgment and "remand[ed] for additional fact-finding and consideration of equitable tolling consistent with [its] decision."[23] It did not order that a new trial be conducted or that discovery be re-opened. Instead, it remanded so that the Court could "make sufficient findings 'to permit meaningful appellate review.'"[24] As Bravo concedes, when the appellate court is silent on the question of whether to hear additional evidence or reopen trial proceedings, the decision is left to the sound discretion of the trial court.[25]

Because the Eleventh Circuit remanded for further findings and remained silent on the question of admitting new evidence, the Court is not obliged to reopen the record.[26] On remand for additional findings, district courts routinely consider only legal arguments raised in parties'

---

[23] *Camps v. Bravo*, 142 F.4th 743, 753 (11th Cir. 2025)

[24] *Id.* at 749 (quotations omitted).; *see also id.* at 752 (explaining further "reasoning" was necessary to support tolling the statute of limitations until October 15, 2012).

[25] ECF No. 206 at 4–6.

[26] *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 & n.23 (11th Cir. 2000) (remanding for further "relevant factfinding" and stressing that the "remand in no way obligates the district court to hear additional evidence or argument in the case" and "leav[ing] these procedural decisions to the sound discretion of the district court."); *CSX Transp., Inc. v. State Bd. of Equalization*, 521 F.3d 1300, 1302 (11th Cir. 2008) (procedural decision regarding additional evidence is properly left to the sound discretion of the district court); *Stauffer Chem. Co. v. Brunson*, 409 F.2d 1327, 1328–29 (5th Cir. 1969) (affirming district court's findings on remand, which were made without taking additional evidence and explaining that remand for additional fact-finding did not imply that there was insufficient evidence).

6

supplemental briefing and the facts in the trial record.[27] Given that Bravo had ample opportunity to take discovery and present the materials he now seeks to introduce at trial, this Court should decline his request to reopen the record more than three years later.

### C.   The Court should not allow Bravo to reopen the evidentiary record to submit facts in his possession under Rule 59(a)(2)

Bravo first asks this Court to allow him to rely on evidence that was available to him during trial but he declined to proffer, such as exhibits to the report of Plaintiff's expert Maximo Langer and documents from Bravo's extradition proceedings. As a threshold matter, this request should not be analyzed under Rule 59(a)(2) at all, but is instead properly analyzed under Rules 16(b)(4) and 6(b)(1)—which govern modifications to scheduling orders. Here, Bravo is asking belatedly to re-open the evidentiary record ***three years after*** the close of evidence. To do so, he must show both good cause ***and*** excusable neglect.[28] He has not attempted in his moving papers to show either (and as discussed below, in the context of Rule 59(a)(2), he could not show either). For this reason alone, his request to re-open the record should be rejected.

It should also be rejected under Rule 59(a)(2), which precludes attempts to avoid the consequences of "strategic decision[s]" during trial and get "a second bite at the apple."[29] Or, as the Eleventh Circuit has put it:

> We quickly pause to make an obvious observation: when a party asks for relief under Rule 59(a)(2) based on newly discovered evidence, the evidence must in fact be newly discovered. If we endorsed [movant's] theory, parties would be incentivized to strategically manipulate Rule 59(a)(2). They would do so by

---

[27] *Compulife Software, Inc. v. Rutstein*, No. 9:16-CV-80808-BER, 2025 WL 63898, at *2 (S.D. Fla. Jan. 10, 2025) (declining to reopen the record on remand because "both sides had a full opportunity at the trial to develop the facts . . . the interests of justice do not require that the parties be given a 'second bite at the apple'"); *BrandAid Mktg. Corp. v. Biss*, No. 03 CIV. 5088 (WHP), 2008 WL 190494, at *1 (S.D.N.Y. Jan. 22, 2008), aff'd, No. 08-0941-CV, 2009 WL 742077 (2d Cir. Mar. 23, 2009) ("reviewing the trial record and the parties' post-remand submissions" to make "additional findings of fact and conclusions of law"); *Par Pharm., Inc. v. TWi Pharms., Inc.*, 120 F. Supp. 3d 468, 470 (D. Md.), aff'd, 624 F. App'x 756 (Fed. Cir. 2015) (making additional findings of fact and conclusions of law based on oral argument, "[t]he parties' remand briefs, and after reviewing the trial record").

[28] *Payne*, 606 F. App'x at 944.

[29] *Jenkins*, 922 F.3d at 1266.

> rolling the dice and trying their case without a witness that they knew about well before trial. Then, they would wait and see if they won. Next, if they lost, they would run to the District Court asking for relief under Rule 59. Conveniently, that witness they chose not to call is—all of sudden—necessary for a full and complete trial.[30]

And while the Eleventh Circuit was addressing previously known witnesses, its ruling applies equally to previously known documents. Granting Bravo's request would amount to a re-do of the full trial, which would be gravely unfair to Plaintiffs who already suffered the pain and cost of trial. The Court should exercise its discretion and deny Bravo's request.

First, Bravo had full notice that Plaintiffs would argue the inability to gather evidence as a tolling factor at trial, and thus there is no legitimate reason why he failed to present previously the documents he now seeks to introduce. Bravo's assertion that "[t]his entirely new theory of equitable tolling was not the subject of discovery or argument during or after the original trial," ECF No. 206 at 1, is plainly contradicted by the record.

Although Bravo declined to take discovery in advance of trial,  Bravo was on notice that Plaintiffs would argue that their inability to gather evidence tolled the statute of limitations from this case's inception. Plaintiffs' complaint alleged that the Argentine "military's cover-up of the Trelew Massacre prevented [them] from investigating and discovering the truth of what happened" and that "[f]or decades, [they] were unable to learn the identifies of the perpetrators or of key witnesses present on the night of the massacre or in its aftermath." ECF No. 1, ¶ 73.

Additionally, two months before trial, Plaintiffs sent Bravo proposed jury instructions that made clear they would rely on this theory. *See* **Ex. A** (Plaintiffs 4/27/22 email and to Bravo attaching draft jury instructions); **Ex. B** at 59 (Plaintiffs 4/27/22 draft jury instructions stating that, for the purposes of equitable tolling, "extraordinary circumstances include, but are not limited to, situations where . . . plaintiffs could not investigate their claims because of the circumstances in their home country). The parties conferred on that instruction and eventually filed competing proposals in advance of trial. *See* ECF No. 106 at 114 (plaintiffs equitable

---

[30] *Id.*

tolling jury submitted to court before trial as part of joint filing); *id.* at 120 (responding to Bravo's proposed jury instructions arguing that Bravo failed to consider that "difficulty investigating claims" may "justify tolling").[31]

Plaintiffs continued to argue this tolling theory at the trial. Plaintiffs responded to Bravo's Rule 50(a) motion at the close of Plaintiffs' case by arguing that Plaintiffs had "presented extensive evidence showing their efforts to find out what happened in Trelew and the extraordinary challenges they faced in obtaining information" and explaining that "[i]t was not until the criminal proceedings were underway that the full identities of the perpetrators were finally known, documents that shed light on internal investigations were made available, and witnesses who disproved the military's version of events came forward." ECF No. 144 at 9-10.[32]

Not only was Bravo on notice of Plaintiffs' theory of equitable tolling throughout the litigation, he had the evidence he now seeks to rely on in his possession in advance of trial but chose not to offer it. Bravo admits that all the documents—the Langer Report, its exhibits, and the extradition docket—he is now trying to introduce were produced during discovery. ECF No. 206 at 7-8.[33] In fact, he objected to the admission of several of these documents in the parties' Joint Pretrial Stipulation. *See* ECF No. 91 at 18 & n.1, ECF No. 91-4 at 5–6. Bravo had the opportunity to review the documents he now seeks to inject into the record and present them

---

[31] Plaintiffs also made clear their intention to argue an inability to discover evidence tolled the statute of limitations in their pretrial evidentiary briefing. *See* ECF No. 104 at 9 (arguing in a pretrial evidentiary brief that testimony from witnesses who received threats from the military was relevant because it showed that "the military stopped witnesses from coming forward for decades."); *id.* at 10-11 (arguing that testimony concerning how a witness and his family were persecuted illustrated the military's cover-up and witness intimidation practices); *id.* at 11-12 (contending that a conscript's testimony about being ordered to repeat the military's version of events was relevant to tolling because it showed the military's cover-up and explained "why it was difficult for Plaintiffs to acquire evidence related to the massacre.").

[32] Bravo was also on notice that Plaintiffs' intent to rely on multiple tolling arguments, thus rendering the exact date until which their claims were tolled uncertain, depending on each factor and the evidence presented to support them. *See* ECF No. 148 at 112-15 (finding that courts rely on multiple, overlapping tolling factors with different periods of time).

[33] Bravo's insinuation that Plaintiffs' expert could have perjured himself is baseless. *See* ECF No. 206 at 8 n.6.

during trial, and yet he never sought to do so. The Court should not allow him to introduce the documents now.[34]

Moreover, Bravo's request to supplement the trial record is more far-reaching than Bravo's motion suggests. The voluminous records Bravo seeks to introduce will undoubtedly face admissibility and authentication challenges, which will require the parties to engage in further litigation and cause more delay. Bravo has made no showing regarding the admissibility or authenticity of the documents he seeks to introduce now. Should Bravo be permitted to have a second chance at proffering trial evidence, Plaintiffs would likely seek to submit new evidence both to support their claims and to rebut any evidence Bravo seeks to admit. This evidence would likely require additional expert or percipient witness testimony to rebut evidence and authenticate documents. As a result, the parties would submit objections and the Court would have to issue rulings on admissibility for all new evidence. In practice, Bravo's request to introduce evidence beyond the scope of the trial record will lead to an entirely new trial, which would be redundant, contrary to the ends of justice, and utterly unfair to Plaintiffs. Bravo should not be granted a new trial simply because he now wants to pursue a different litigation strategy than the one he took three years ago.

Bravo's repeated argument that the Court considered Langer's report during trial is nonsensical. While the Court had Langer's report and consulted it for multiple reasons, including to ensure that Langer was testifying within the scope of his report, it was neither proffered nor admitted as part of the trial record. Bravo argues that Plaintiffs, Langer, and the Court "relied" on the exhibits to Langer's report, and asserts that therefore they are admissible and material to the Court's decision making. This is incorrect. These documents were not relied on by the Court or the parties. The Court reviewed Langer's expert report to determine whether his testimony was within the scope of what was set forth in his report. *See, e.g.*, ECF No. 145 at 109-113

---

[34] *See Jenkins*, 922 F.3d at 1266 (affirming district court's denial of Rule 59(a)(2) relief where movant made a "strategic decision" not to enter evidence during trial).

(reviewing Langer's report and the contours of his testimony); ECF No. 145 at 62-65 (discussing the same). The Court did not admit, nor did either of the parties seek to admit, Langer's expert report—much less the exhibits Langer cited in the report—into evidence. *See* ECF No. 155 (admitted exhibits). In fact, the Court never saw the unfiled and untranslated Langer report exhibits that Bravo is now seeking to admit, and therefore could not have relied on them.[35] Had Plaintiffs admitted these documents into evidence, they would have offered them in translated and authenticated form.[36] *See e.g.,* ECF No. 206 at 9 (admitting that Plaintiffs noted that the extradition proceeding documents were "unauthenticated" and that they did "not intend to seek to admit" these exhibits). The record is clear that neither the Langer Report nor its exhibits were proffered or admitted into evidence or otherwise considered by the Court in determining equitable tolling. The Court should reject Bravo's request to re-open the evidentiary record to submit documents that were clearly in his possession and that he never chose to offer during the existing trial.

### D.   Bravo fails to establish good cause or excusable neglect for reopening discovery

Bravo's alternative request to reopen discovery is effectively a motion to be relieved from the Court's scheduling order, which set the deadline for the close of discovery.[37] Under

---

[35] Similarly, that Langer relied on the exhibits to his report to form his opinion is immaterial. The Federal Rules of Evidence clearly state that while an expert's opinion must be based on sufficient facts or data, proponents have no obligation to offer those facts and data into evidence, and Plaintiffs did not do so here. *See* Fed. R. Evid. 702, 703, 705.

[36] Plaintiffs were well-aware that parties are required to file English translations of foreign language documents they wish to have considered by the Court. See ECF No. 155 at 2–5 (listing Plaintiffs' admitted trial exhibits, including translations accompanying every Spanish-language exhibit). *See, e.g.*, *Lopez-Carrasquillo v. Rubianes*, 230 F.3d 409, 413-14 (1st Cir. 2000) (declining to consider as part of summary judgment record a deposition excerpt in Spanish, where party submitting excerpt failed to provide English translation); *Macbeg De Occidente S.A. de C.V. v. Kaloti Metals & Logistics, LLC*, No. 12-24050-CIV, 2013 WL 12145905, at *3 (S.D. Fla. June 25, 2013) (declining to consider exhibits filed without translations into English); *Rivas-Montano v. United States*, No. 803CR47T24EAJ, 2006 WL 1428507, at *1 (M.D. Fla. May 22, 2006) (striking untranslated documents filed with the court because documents in a foreign language that a party wishes to submit to the court must be translated to English).

[37] ECF No. 18; *see also* ECF No. 46 at 5 (noting that expert disclosures were due July 29, 2021, and discovery closed on August 27, 2021).

Rule 16(b)(4), a scheduling order may be modified only for good cause, and under Rule 6(b)(1), a party seeking to extend an already-expired deadline must also demonstrate excusable neglect. Bravo can establish neither.

### 1.   Bravo cannot show good cause

Good cause requires a showing that the deadline could not be met despite the moving party's diligence. "[T]he moving party cannot establish the diligence necessary to show good cause . . . if the party failed to seek the needed information before the deadline."[38]

Bravo cannot satisfy this standard because he was not diligent during discovery. As this Court has previously recognized, Bravo "took minimal discovery"[39] during the pretrial proceedings, choosing not to propound ***any*** interrogatories, serve ***any*** requests for production, or notice ***any*** depositions. Indeed, Bravo had every opportunity to depose Professor Langer during the discovery period but chose not to. As a result, he cannot now request to re-open discovery to pursue "a new or re-noticed session of Langer's deposition,"[40] "when he had ample opportunity to engage in discovery but failed to diligently prosecute his case."[41]

Rather than addressing his failure to diligently conduct discovery, Bravo seeks to shift responsibility to this Court, asserting that its equitable-tolling ruling relied on an "entirely new theory of equitable tolling [that] was not the subject of discovery or argument during or after the original trial."[42] His contention is unavailing. The record makes clear that Bravo pursued no

---

[38]  *Stephens v. Alltran Fin.*, LP, 325 F.R.D. 711, 712 (N.D. Ga. 2018) (quoting *Williams v. Blue Cross & Blue Shield of Fla., Inc.*, No. 3:09CV225/MCR/MD, 2010 WL 3419720, at *1 (N.D. Fla. Aug. 26, 2010) (citing *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235 (11th Cir. 2009)).

[39]  ECF No. 180 at 25 n.5.

[40]  ECF No. 206 at 7. Bravo's request for a "new or re-noticed session of Langer's deposition" is a blatant misrepresentation. He ***never*** noticed Langer's deposition and neglected to seek ***any*** discovery. The only depositions were noticed by Plaintiffs. *See* ECF Nos. 24; 164-1; 164-2; 164-3; 164-4; 164-5; 164-6; 179-2; 179-3; *see also* ECF No. 180 at 25 n.5.

[41]  *Dorey v. Hartmann*, No. 5:22-cv-657-WFJ-PRL, 2025 WL 90050, at *2 (M.D. Fla. Jan. 14, 2025).

[42]  ECF No. 206 at 1; *see also id.* at 4 ("This theory was raised by this Court in the Judgment.").

discovery whatsoever. Even assuming the Court's ruling reflected a new or expanded tolling theory (it did not), Bravo's own inaction would have precluded him from developing **any** evidence to rebut it.

In any event, Bravo's claim of unfair surprise is contradicted by the record. As discussed above, Plaintiffs consistently maintained that their inability to investigate the circumstances surrounding the Trelew Massacre and to access crucial evidence constituted an extraordinary circumstance that tolled the statute of limitations. The complaint alleged that the Argentine "military's cover-up of the Trelew Massacre prevented [them] from investigating and discovering the truth of what happened" and that "[f]or decades, [they] were unable to learn the identities of the perpetrators or of key witnesses present on the night of the massacre or in its aftermath."[43] Had Bravo taken discovery when it was available to him, he could have investigated the merits of this allegation, including through a interrogatories seeking to identify Plaintiffs' contentions with respect to tolling or a deposition of Professor Langer. He chose not to.

In addition, Bravo's argument regarding the extradition dockets is unpersuasive for the same reason. He now contends that the content of those dockets was a "central issue in the case,"[44] yet he never sought to admit the documents into evidence, use them at trial, or rely on them for impeachment. This omission forecloses any showing of diligence and therefore cannot establish good cause.[45]

---

[43] ECF No. 1, ¶ 73.

[44] ECF No. 206 at 10.

[45] *See Scotland Cay, LLC v. Am. Reliable Ins. Co.,* No. 20-CV-60345, 2021 WL 799254, at *10 (S.D. Fla. Feb. 12, 2021), report and recommendation adopted, No. 20-CIV-60345-RAR, 2021 WL 796025 (S.D. Fla. Mar. 1, 2021) (stating that "potential importance of this evidence does not alone create good cause in the absence of diligence to discover it during the discovery period").

Having "full knowledge of the information" long before trial, Bravo "cannot establish the diligence necessary to show good cause."[46] Bravo's lack of diligence "ends the good cause inquiry."[47]

### 2. Bravo fails to establish excusable neglect warranting reopening of discovery

Bravo also fails to establish "excusable neglect" sufficient to warrant reopening discovery or supplementing the record.[48] To determine whether a party has shown excusable neglect, courts consider "(1) the danger of prejudice to the nonmovant; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith."[49] While Plaintiffs have no concrete information, one way or the other, regarding the fourth factor, the first three weigh decisively against Bravo's request.

### a. Plaintiffs will be prejudiced if this motion is granted

Bravo argues that because the documents he is now trying to admit were in Plaintiffs' possession, Plaintiffs will not suffer prejudice. That argument is misplaced. Reopening discovery at this stage would impose substantial prejudice, requiring Plaintiffs to expend significant time and resources re-litigating matters long resolved. Plaintiffs have pursued justice for decades

---

[46] *Williams*, 2010 WL 3419720, at *1.

[47] *Id.*; *see also Scotland Cay*, 2021 WL 799254, at *10 (denying defendant's request to depose a witness after the close of discovery because "Defendant was not diligent in pursuing discovery . . . [t]he good cause inquiry ends when a party is not diligent"); *Taig v. Currey*, No. 9:21-CV-80391-RLR, 2022 WL 18532781, at *1 (S.D. Fla. Mar. 28, 2022) (denying motion to reopen discovery because "[i]t cannot be said that Plaintiff acted diligently here. Plaintiff already had a second chance"); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, No. 07-60821-CIV, 2021 WL 4972740, at *5 (S.D. Fla. Mar. 15, 2021) (denying the plaintiffs' Rule 56(d) motion for lack of good cause because they "were provided with ample time while discovery was still open to pursue the evidence they now seek [to rebut Defendants' summary judgment motions], and they have failed to demonstrate good cause to reopen discovery at this late stage.")

[48] *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 944 (11th Cir. 2015) (quoting *Advanced Estimating Sys. v. Riney*, 77 F.3d 1322, 1325 (11th Cir.1996)) (alteration omitted).

[49] *EarthCam, Inc. v. OxBlue Corp.*, 703 F. App'x 803, 813 (11th Cir. 2017).

14

against the only perpetrator of the Trelew Massacre who has thus far evaded accountability. Further delay would risk undermining that pursuit and reward Bravo's lack of diligence.[50]

Moreover, reopening the record to allow Bravo to selectively introduce evidence and depose Plaintiffs' expert, without allowing Plaintiffs to supplement the record with additional context or responsive testimony, would be inherently prejudicial and unfair.[51] If Bravo wanted to impeach Plaintiffs or their witnesses with these documents, the time to do so was during their trial testimony, not through a one-sided attempt to reopen discovery and supplement the record following a remand on appeal.[52]

      **b.**     **Reopening discovery at this late stage would cause significant delay in a case that has already been litigated for five years**

In asking to reopen the record and reopen discovery, Bravo is asking for a redo of discovery and trial.[53] This would needlessly drag out proceedings, which have already been extensively litigated over many years. Supplementing the record would also require that the parties have the opportunity to make evidentiary objections and obtain rulings on the admissibility of the proffered documents, causing additional delay.[54]

---

[50] *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19MD2885, 2021 WL 6327368, at *2 (N.D. Fla. Aug. 19, 2021) (finding that, if discovery is reopened a year after the close of discovery, a non-movant would suffer prejudice in the form of wasted time, effort, and resources); *Oceans of Images Photography, Inc. v. Foster & Smith, Inc.*, No. 8:11-CV-01160-T-AEP, 2013 WL 12155934, at *3 (M.D. Fla. June 19, 2013) (finding significant prejudice against the non-movant, who would have to restructure their arguments on the eve of trial if discovery was reopened).

[51] *See In re 3M Combat Arms*, 2021 WL 6327368, at *2 (denying a request to reopen discovery in part because "taking Vietas' deposition now. . . will likely necessitate additional discovery").

[52] *See Crawford v. Runyon*, 79 F.3d 743, 744 (8th Cir. 1996) (denying appellant's motion to supplement record where "[t]he material he offers is presented for impeachment only, which should have been done at trial").

[53] This is not the first time Bravo has asked for a redo of discovery. On the eve of trial, Bravo proffered two previously undisclosed expert witnesses and tried to introduce documents at trial that were neither produced nor disclosed during discovery. *See* ECF 107.

[54] *See In re 3M Combat Arms*, 2021 WL 6327368, at *2 (denying a request to reopen discovery "taking Vietas' deposition now would inject significant delay and will likely necessitate additional discovery"); *Sweet v. Lockheed Martin Corp.*, No. 1:08-CV-2094-WBH-SSC, 2009 WL 10664952, at *3 (N.D. Ga. Aug. 21, 2009) (holding that the "unnecessary delay . . . weigh[s]

15

c.        **Bravo's delay was entirely within his control**

Bravo has offered no credible explanation or justification for his delay. As set forth above, there was no unfair surprise regarding Plaintiffs' tolling arguments. Bravo's failure to pursue discovery when he had the opportunity was a deliberate choice, and his attempt to revisit the issue now is an improper effort to relitigate matters he neglected to develop before trial. That these documents have purportedly "turned out to be more important" than Bravo initially believed was entirely within Bravo's control and does not amount to excusable neglect.[55]

## V.        CONCLUSION

Bravo's untimely and improper motion to reopen and supplement the record or, alternatively, to reopen discovery fails to satisfy any of the requirements necessary to justify such relief. Bravo fails to show good cause or excusable neglect: He chose to conduct minimal discovery and litigate only sparingly until the eve of trial. He was on notice of Plaintiffs' intent to rely on equitable tolling and the extraordinary circumstances they alleged. All the documents he now seeks to introduce were in his possession, and he had ample opportunity to introduce them during trial and to cross-examine Professor Langer. In short, Bravo forfeited his opportunity to develop the record on tolling while discovery was open and during trial, and his current attempt to revisit those issues rests entirely on choices within his own control.

For the foregoing reasons, the Court should deny Bravo's motion in its entirety and issue its post-remand ruling based on the existing trial record.

---

against reopening discovery"); *S.G. v. Vagabound Inn Corp.*, No. 8:21-CV-00955-SSS-KESX, 2024 WL 5317312, at *3 (C.D. Cal. Oct. 10, 2024) ("Though all motions for leave to amend result in prolonging litigation and adjusting strategies, reopening fact discovery would be prejudicial. This factor weighs in favor of not granting [Plaintiff's motion to reopen]").

[55] *In re 3M Combat*, 2021 WL 6327368, at *3. To the extent the Court believes Bravo's request has any merit and is disinclined to deny Bravo's motion, for the purposes of judicial economy and to conserve the parties' resources, Plaintiffs ask that the Court defer its decision until after it has addressed the merits on remand, including Plaintiffs alternative argument that tolling is proper while Plaintiffs were reasonably relying on domestic accountability proceedings in Argentina until November 2010, when Argentina's extradition request was denied.

Dated:  November 14, 2025

By:  */s/ Vishesh Narayen*

**KEKER, VAN NEST & PETERS LLP**
AJAY S. KRISHNAN (pro hac vice)
FRANCO MUZZIO (pro hac vice)
NEHA SABHARWAL (pro hac vice)
VISHESH NARAYEN (Florida Bar Number 1015975)
633 Battery Street
San Francisco, CA 94111
Tel:    (415) 391-5400
Fax:    (415) 397-7188
Email:  akrishnan@keker.com
        fmuzzio@keker.com
        nsabharwal@keker.com
        vnarayen@keker.com

**CENTER FOR JUSTICE & ACCOUNTABILITY**
CLARET VARGAS (pro hac vice)
ELZBIETA T. MATTHEWS (pro hac vice)
CARMEN K. CHEUNG (pro hac vice)
268 Bush Street #3432
San Francisco, CA  94104
Tel:    (415) 544-0444
Fax:    (415) 544-0456
Email:  cvargas@cja.org
        ematthews@cja.org
        ccheung@cja.org

**MARKUS/MOSS PLLC**
A. MARGOT MOSS
Florida Bar Number 091870
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel:    (305) 379-6667
Fax:    (305) 379-6668
Email:  mmoss@markuslaw.com

*Attorneys for Plaintiffs*
*Raquel Camps, Eduardo Cappello,*
*Alicia Kreuger and Marcela Santucho*

17

# Exhibit A

| | |
|---|---|
| **From:** | Laura Lind |
| **To:** | nrslaw@sonnett.com; service@haber.law; sdavis@haber.law; rslade@haber.law |
| **Cc:** | mmoss; cvargas; ematthews; ccheung; Franco Muzzio; Neha Sabharwal; Ajay Krishnan |
| **Subject:** | Camps v. Bravo, Case No. 1:20-cv-24294-KMM | Pretrial Disclosures |
| **Date:** | Wednesday, April 27, 2022 2:33:53 PM |
| **Attachments:** | 2022 04 27 Plaintiffs Deposition Designations.pdf |
| | 2022 04 27 Plaintiffs Deposition Designations - Exhibit A.xlsx |
| | 2022 04 27 Plaintiffs Witness List.pdf |
| | 2022 04 27 Plaintiffs Proposed Jury Instructions.pdf |
| | 2022 04 27 Plaintiffs Trial Exhibit List.pdf |

Counsel –

Attached for service are copies of the following documents:

1. Plaintiffs' Deposition Designations

2. Plaintiffs' Witness List

3. Plaintiffs' Proposed Jury Instructions

4. Plaintiffs' Trial Exhibit List

Best,

Laura

**Laura Lind**

Paralegal

**Keker, Van Nest & Peters LLP**

633 Battery Street

San Francisco, CA 94111-1890

415 676 2254 direct | 415 391 5400 main

llind@keker.com | keker.com

# Exhibit B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| RAQUEL CAMPS, in her capacity as the personal representative of the ESTATE OF ALBERTO CAMPS, | ) ) ) |
| EDUARDO CAPPELLO, in his individual capacity, and in his capacity as the personal representative of the ESTATE OF EDUARDO CAPPELLO, | ) ) ) |
| ALICIA KRUEGER, in her individual capacity, and in her capacity as the personal representative of the ESTATE OF RUBÉN BONET, | ) ) ) | Case No. 1:20-cv-24294-KMM
| and, MARCELA SANTUCHO, in her individual capacity, and in her capacity as the personal representative of the ESTATE OF ANA MARÍA VILLARREAL DE SANTUCHO, | ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| ROBERTO GUILLERMO BRAVO, | ) |
| Defendant. | ) |

## PLAINTIFFS' PROPOSED JURY INSTRUCTIONS

1

## TABLE OF CONTENTS

1.    Preliminary Instructions ...................................................................................4

      1.1    General Preliminary Instruction...............................................................4

      1.2    Official English Translation/Interpretation.............................................11

      1.3    Jury Questions.........................................................................................12

      1.4    Interim Statements..................................................................................13

      1.5    The Parties..............................................................................................14

      1.6    "Representative of the Estate" Defined ..................................................15

2.    Trial Instructions ...........................................................................................17

      2.1    Stipulations ............................................................................................17

      2.2    Use of Depositions..................................................................................18

      2.3    Interim Statements..................................................................................19

      2.4    Judicial Notice .......................................................................................20

      2.5    Use of Interrogatories.............................................................................21

      2.6    In-Trial Instructions on News Coverage.................................................22

3.    Basic Instructions ..........................................................................................23

      3.1    Introduction............................................................................................23

      3.2    The Duty to Follow Instructions – No Corporate Party Involved .........24

      3.3    Consideration of Direct and Circumstantial Evidence; Argument of
             Counsel; Comments by the Court............................................................25

      3.4    Credibility of Witnesses.........................................................................26

      3.5    Impeachment of Witnesses Because of Inconsistent Statements...........27

      3.6    Expert Witnesses.....................................................................................28

      3.7    Responsibility for Proof.........................................................................29

             3.7.1   Responsibility for Proof – Plaintiffs' Claims – Preponderance of
                     the Evidence                                                              29

             3.7.2   Responsibility for Proof – Affirmative Defense – Preponderance of
                     the Evidence                                                              30

      3.8    Duty to Deliberate When Only the Plaintiffs Claims Damages ............31

      3.9    Election of Foreperson Explanation of Verdict Form............................32

4.    Specific Instructions on Claims & Liability ................................................33

      4.1    Extrajudicial Killing...............................................................................34

      4.2    Attempted Extrajudicial Killing..............................................................38

      4.3    Torture.....................................................................................................41

**TABLE OF CONTENTS**
**(Continued)**

4.4     Political Views or Past Actions Do Not Provide An Affirmative Defense for International Law Violations ..................................................44

4.5     Illegal Orders Do Not Provide An Affirmative Defense for International Law Violations ..................................................45

4.6     Self-Defense Excludes Liability in Some Circumstances ...................................47

4.7     Defendant's Liability ..........................................49

4.8     Liability for Aiding and Abetting ........................................51

4.9     Liability for Conspiracy .........................................53

4.10    Liability for Joint Criminal Enterprise ..................................56

**5.     Affirmative Defenses ..........................................58**

5.1     Affirmative Defense – Statute of Limitations ..................................59

5.2     Affirmative Defense – Exhaustion of Remedies ...............................61

**6.     Damages ..........................................63**

6.1     Compensatory Damages .........................................64

6.2     Punitive Damages ..........................................67

**Plaintiffs' Proposed Jury Instructions[1]**

**1.   Preliminary Instructions**

**1.1      General Preliminary Instruction**

Members of the Jury:

Now that you've been sworn, I need to explain some basic principles about a civil trial and your duty as jurors. These are preliminary instructions. I'll give you more detailed instructions at the end of the trial.

The jury's duty:

It's your duty to listen to the evidence, decide what happened, and apply the law to the facts. It's my job to provide you with the law you must apply – and you must follow the law even if you disagree with it.

What is evidence:

You must decide the case on only the evidence presented in the courtroom. Evidence comes in many forms. It can be testimony about what someone saw, heard, or smelled. It can be an exhibit or a photograph. It can be someone's opinion.

Some evidence may prove a fact indirectly. Let's say a witness saw wet grass outside and people walking into the courthouse carrying wet umbrellas. This may be indirect evidence that it rained, even though the witness didn't personally see it rain. Indirect evidence like this is also called "circumstantial evidence" – simply a chain of circumstances that likely proves a fact.

As far as the law is concerned, it makes no difference whether evidence is direct or indirect. You may choose to believe or disbelieve either kind. Your job is to give each piece of evidence whatever weight you think it deserves.

---

[1] Instructions 1.1 through 3.9 on page 31 are modeled on the Eleventh Circuit Civil Pattern Jury Instructions. Citations to supporting authority are included for the remaining sections.

1850245

<u>What is not evidence</u>:

During the trial, you'll hear certain things that are not evidence and you must not consider them.

First, the lawyers' statements and arguments aren't evidence. In their opening statements and closing arguments, the lawyers will discuss the case. Their remarks may help you follow each side's arguments and presentation of evidence. But the remarks themselves aren't evidence and shouldn't play a role in your deliberations.

Second, the lawyers' questions and objections aren't evidence. Only the witnesses' answers are evidence. Don't decide that something is true just because a lawyer's question suggests that it is. For example, a lawyer may ask a witness, "You saw Mr. Jones hit his sister, didn't you?" That question is not evidence of what the witness saw or what Mr. Jones did – unless the witness agrees with it.

There are rules of evidence that control what the court can receive into evidence. When a lawyer asks a witness a question or presents an exhibit, the opposing lawyer may object if he/she thinks the rules of evidence don't permit it. If I overrule the objection, then the witness may answer the question or the court may receive the exhibit. If I sustain the objection, then the witness cannot answer the question, and the court cannot receive the exhibit. When I sustain an objection to a question, you must ignore the question and not guess what the answer might have been.

Sometimes I may disallow evidence – this is also called "striking" evidence – and order you to disregard or ignore it. That means that you must not consider that evidence when you are deciding the case.

1850245

I may allow some evidence for only a limited purpose. When I instruct you that I have admitted an item of evidence for a limited purpose, you must consider it for only that purpose and no other.

Credibility of witnesses:

To reach a verdict, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of it, or none of it. When considering a witness's testimony, you may take into account:

- · the witness's opportunity and ability to see, hear, or know the things the witness is testifying about;

- · the witness's memory;

- · the witness's manner while testifying;

- · any interest the witness has in the outcome of the case;

- · any bias or prejudice the witness may have;

- · any other evidence that contradicts the witness's testimony;

- · the reasonableness of the witness's testimony in light of all the evidence; and

- · any other factors affecting believability.

At the end of the trial, I'll give you additional guidelines for determining a witness's credibility.

Description of the case:

This is a civil case. To help you follow the evidence, I'll summarize the parties' positions. The Plaintiffs – Raquel Camps, in her capacity as the personal representative of the Estate of Alberto Camps, Eduardo Cappello ("Eduardo Cappello II"), in his individual capacity, and in his capacity as the personal representative of the Estate of Eduardo Cappello ("Eduardo Cappello I"), Alicia Krueger, in her individual capacity, and in her capacity as the personal representative of the Estate of Rubén Bonet, and, Marcela Santucho, in her individual capacity, and in her capacity as

6

the personal representative of the Estate of Ana María Villarreal De Santucho – claim that Defendant, Roberto Guillermo Bravo, extrajudicially killed Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho, attempted to extrajudicially kill Alberto Camps, and tortured Rubén Bonet and Alberto Camps on or about August 22, 1972. Alternatively, Plaintiffs contend that, even if Defendant did not personally commit these violations, Defendant Bravo is responsible for the extrajudicial killing, attempted extrajudicial killing, and torture of their relatives because he aided and abetted, conspired with and/or entered into a joint criminal enterprise with the person or people who extrajudicially killed, attempted to extrajudicially kill, and tortured their relatives on or about August 22, 1972. Defendant Bravo denies those claims.

Burden of proof:

Plaintiffs – Raquel Camps, in her capacity as the personal representative of the Estate of Alberto Camps, Eduardo Cappello II, in his individual capacity, and in his capacity as the personal representative of the Estate of Eduardo Cappello I, Alicia Krueger, in her individual capacity, and in her capacity as the personal representative of the Estate of Rubén Bonet, and, Marcela Santucho, in her individual capacity, and in her capacity as the personal representative of the Estate of Ana María Villarreal De Santucho –  have the burden of proving their case by what the law calls a "preponderance of the evidence." That means Plaintiffs must prove that, in light of all the evidence, what they claim is more likely true than not. So, if you could put the evidence favoring Plaintiffs and the evidence favoring Defendant Bravo on opposite sides of balancing scales, Plaintiffs need to make the scales tip to their side. If Plaintiffs fail to meet this burden, you must find in favor of Defendant Bravo.

To decide whether any fact has been proved by a preponderance of the evidence, you may – unless I instruct you otherwise – consider the testimony of all witnesses, regardless of who called

1850245

them, and all exhibits that the court allowed, regardless of who produced them. After considering all the evidence, if you decide a claim or fact is more likely true than not, then the claim or fact has been proved by a preponderance of the evidence.

On certain issues, called "affirmative defenses," Defendant Bravo has the burden of proving the elements of a defense by a preponderance of the evidence. I'll instruct you on the facts Defendant Bravo must prove for any affirmative defense. After considering all the evidence, if you decide that Defendant Bravo has successfully proven that the required facts are more likely true than not, the affirmative defense is proved.

<u>Conduct of the jury</u>:

While serving on the jury, you may not talk with anyone about anything related to the case. You may tell people that you're a juror and give them information about when you must be in court. But you must not discuss anything about the case itself with anyone.

You shouldn't even talk about the case with each other until you begin your deliberations. You want to make sure you've heard everything – all the evidence, the lawyers' closing arguments, and my instructions on the law – before you begin deliberating. You should keep an open mind until the end of the trial. Premature discussions may lead to a premature decision.

In this age of technology, I want to emphasize that in addition to not talking face-to-face with anyone about the case, you must not communicate with anyone about the case by any other means. This includes e-mails, text messages, phone calls, and the internet, including social-networking websites and apps such as Facebook, Instagram, Snapchat, YouTube, and Twitter. You may not use any similar technology of social media, even if I have not specifically mentioned it here.

You must not provide any information about the case to anyone by any means whatsoever, and that includes posting information about the case, or what you are doing in the case, on any device or Internet site, including blogs, chat rooms, social websites, or any other means.

You also shouldn't Google or search online or offline for any information about the case, the parties, or the law. Don't read or listen to the news about this case, visit any places related to this case, or research any fact, issue, or law related to this case. The law forbids the jurors to talk with anyone else about the case and forbids anyone else to talk to the jurors about it. It's very important that you understand why these rules exist and why they're so important. You must base your decision only on the testimony and other evidence presented in the courtroom. It is not fair to the parties if you base your decision in any way on information you acquire outside the courtroom. For example, the law often uses words and phrases in special ways, so it's important that any definitions you hear come only from me and not from any other source. Only you jurors can decide a verdict in this case. The law sees only you as fair, and only you have promised to be fair – no one else is so qualified.

<u>Taking notes</u>:

If you wish, you may take notes to help you remember what the witnesses said. If you do take notes, please don't share them with anyone until you go to the jury room to decide the case. Don't let note-taking distract you from carefully listening to and observing the witnesses. When you leave the courtroom, you should leave your notes hidden from view in the jury room.

Whether or not you take notes, you should rely on your own memory of the testimony. Your notes are there only to help your memory. They're not entitled to greater weight than your memory or impression about the testimony.

<u>Course of the trial</u>:

9

Let's walk through the trial. First, each side may make an opening statement, but they don't have to. Remember, an opening statement isn't evidence, and it's not supposed to be argumentative; it's just an outline of what that party intends to prove.

Next, Plaintiffs will present their witnesses and ask them questions. After Plaintiffs' counsel questions the witness, Defendant's counsel may ask the witness questions – this is called "cross-examining" the witness. Then Defendant's counsel will present his witnesses, and Plaintiffs' counsel may cross-examine them. You should base your decision on all the evidence, regardless of which party presented it.

After all the evidence is in, the parties' lawyers will present their closing arguments to summarize and interpret the evidence for you, and then I'll give you instructions on the law. [Note: Some judges may wish to give some instructions before closing arguments. See Fed. R. Civ. P. 51(b)(3).]

You'll then go to the jury room to deliberate.

10

**1.2    Official English Translation/Interpretation**

You may hear or see languages other than English during this trial.

You must consider evidence provided through only the official court translators/interpreters. It is important that all jurors consider the same evidence. So even if some of you know Spanish, you must accept the English translation/interpretation provided and disregard any different meaning.

11

### 1.3    Jury Questions

During this trial, you may submit questions to a witness after the lawyers have finished their own questioning. Here is how the procedure works: After each witness has testified, and the lawyers have asked all of their questions, I'll ask if any of you have questions. If you have a question, write it down and give it to the court staff.

You may submit a question for a witness only to clarify an answer or to help you understand the evidence. Our experience with juror questions indicates that jurors rarely have more than a few questions for any one witness, and there may be no questions at all for some witnesses.

If you submit a question, the court staff will give it to me and I'll share your questions with the lawyers in the case. If the rules of evidence allow your question, one of the lawyers or I will read your question to the witness. I may modify the form or phrasing of a question so that it's allowed under the evidence rules. Sometimes, I may not allow the questions to be read to the witness, either because the law does not allow it or because another witness is in a better position to answer the question. If I can't allow the witness to answer a question, you must not draw any conclusions from that fact or speculate on what the answer might have been.

Here are several important things to keep in mind about your questions for the witnesses:

·    First, you must submit all questions in writing. Please don't ask any questions aloud.

·    Second, the court can't re-call witnesses to the stand for additional juror questions. If you have a question for a particular witness, you must submit it when I ask.

·    Finally, because you should remain neutral and open-minded throughout the trial, you should phrase your questions in a way that doesn't express an opinion about the case or a witness. You must keep an open mind until you've heard all the evidence, the closing arguments, and my final instructions on the law.

1850245

**1.4**    **Interim Statements**

At times during the trial, the lawyers will address you. You'll soon hear the lawyers' opening statements, and at the trial's conclusion you'll hear their closing arguments. Sometimes the lawyers may choose to make short statements to you, either to preview upcoming evidence or to summarize and highlight evidence they just presented. These statements and arguments are the lawyers' views of the evidence or of what they anticipate the evidence will be. They are not evidence themselves.

13

**1.5     The Parties**

The parties to this case are the following four Plaintiffs and the Defendant:

Plaintiffs:

· Raquel Camps, as the personal representative of the estate of Alberto Camps;

· Eduardo Cappello II, in his individual capacity, and as the personal representative of the estate of Eduardo Cappello I;

· Alicia Krueger, formerly Alicia Bonet, in her individual capacity, and as the personal representative of the estate of Rubén Bonet; and

· Marcela Santucho, in her individual capacity, and as the personal representative of the estate of Ana María Villarreal de Santucho.

Defendant:

· Roberto Guillermo Bravo

1850245

**1.6     "Representative of the Estate" Defined**

As part of this lawsuit, Plaintiffs Eduardo Capello II, Alicia Krueger, and Marcela Santucho have brought claims against Defendant Bravo in their individual capacities—that is, on behalf of themselves personally—for the extrajudicial killings of Eduardo Capello I, Rubén Bonet, and Ana María Villarreal de Santucho, respectively. In addition, all four plaintiffs have also brought claims against Defendant Bravo as the representatives of the estates of their family members.

Plaintiff Raquel Camps is the representative of the estate of Alberto Camps. As the representative of this estate, Plaintiff Raquel Camps may file lawsuits on behalf of Alberto Camps for injuries he suffered during his lifetime.

In this case, Plaintiff Raquel Camps contends that the estate of Alberto Camps is entitled to damages because Defendant Bravo is responsible for the torture and attempted extrajudicial killing of Alberto Camps. Therefore, you should think of the estate of the Alberto Camps as the real plaintiff as regards claims brought on behalf of his estate. If you decide in favor of Alberto Camps on one or more of the claims brought by Plaintiff Raquel Camps on behalf of his estate, then any damages that you find will be awarded to the estate of Alberto Camps, not Plaintiff Raquel Camps.

Plaintiff Eduardo Cappello II is the representative of the estate of Eduardo Cappello I. As the representative of this estate, Plaintiff Eduardo Cappello II may file lawsuits on behalf of Eduardo Cappello I for injuries suffered during his lifetime.

In this case, Plaintiff Eduardo Cappello II contends that the estate of Eduardo Cappello I is entitled to damages because Defendant Bravo is responsible for the extrajudicial killing of Eduardo Cappello I. Therefore, you should think of the estate of the Eduardo Cappello I as the real plaintiff

15

as regards claims brought on behalf of his estate. If you decide in favor of Eduardo Cappello I on one or more of the claims brought by Plaintiff Eduardo Cappello II on behalf of his estate, then any damages that you find will be awarded to the estate of Eduardo Cappello I, not Plaintiff Eduardo Cappello II.

Plaintiff Alicia Krueger is the representative of the estate of Rubén Bonet. As the representative of this estate, Plaintiff Alicia Krueger may file lawsuits on behalf of Rubén Bonet for injuries suffered during his lifetime.

In this case, Plaintiff Alicia Krueger contends that the estate of Rubén Bonet is entitled to damages because Defendant Bravo is responsible for the torture and extrajudicial killing of Rubén Bonet. Therefore, you should think of the estate of the Rubén Bonet as the real plaintiff as regards claims brought on behalf of his estate. If you decide in favor of Rubén Bonet on one or more of the claims brought by Plaintiff Alicia Krueger on behalf of his estate, then any damages that you find will be awarded to the estate of Rubén Bonet, not Plaintiff Alicia Krueger.

Plaintiff Marcela Santucho is the representative of the estate of Ana María Villarreal de Santucho. As the representative of this estate, Plaintiff Marcela Santucho may file lawsuits on behalf of Ana María Villarreal de Santucho for injuries suffered during her lifetime.

In this case, Plaintiff Marcela Santucho contends that the estate of Ana María Villarreal de Santucho is entitled to damages because Defendant Bravo is responsible for the extrajudicial killing of Ana María Villarreal de Santucho. Therefore, you should think of the estate of the Ana María Villarreal de Santucho as the real plaintiff as regards claims brought on behalf of her estate. If you decide in favor of Ana María Villarreal de Santucho on one or more of the claims brought by Plaintiff Marcela Santucho on behalf of her estate, then any damages that you find will be awarded to the estate of Ana María Villarreal de Santucho, not Plaintiff Marcela Santucho.

16

## 2. Trial Instructions

### 2.1    Stipulations

Sometimes the parties have agreed that certain facts are true. This agreement is called a stipulation. You must treat these facts as proved for this case. The parties have stipulated to the following facts:

- [insert]

1850245

**2.2     Use of Depositions**

A deposition is a witness's sworn testimony that is taken before the trial. During a deposition, the witness is under oath and swears to tell the truth, and the lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

When a person is unavailable to testify at trial, the deposition of that person may be used at the trial.

The deposition(s) of the following witnesses will be presented to you by a video:

· Julio Ulla (May 14, 2021)

· Miguel Marileo (June 15, 2021)

· Carlos Marandino (August 26, 2021)

· Carlos Celi (February 14, 2022)

· Alicia Krueger (March 28, 2022)

· Marcela Santucho (April 4, 2022)

The deposition testimony that you will see is entitled to the same consideration as live testimony, and you must judge the deposition testimony just as if the witness was testifying in court.

1850245

**2.3     Interim Statements**

At the beginning of the trial, I told you that the lawyers might make statements previewing upcoming evidence or summarizing and highlighting evidence that they have already presented before. Right now, [Mr./Ms.] [name of attorney] is going to make a short statement. Please remember that the statement you are about to hear – like all statements by the lawyers – is [Mr./Ms.] [name of attorney]'s view of the evidence or of what he anticipates the evidence will be, but isn't itself evidence.

19

**2.4**     **Judicial Notice**

The rules of evidence allow me to accept facts that no one can reasonably dispute. The law calls this "judicial notice." I've accepted [state the fact(s) that the court has judicially noticed] as proved even though no one introduced evidence to prove it. You must accept it as true for this case.

**2.5     Use of Interrogatories**

During the trial, you may hear answers that Defendant gave in response to written questions the other side submitted. The questions are called "interrogatories" or "requests for admission." Before the trial, Defendant gave the answers in writing while under oath.

You must consider Defendant's answers to the interrogatories or requests for admission as though Defendant gave the answers on the witness stand.

1850245

**2.6     In-Trial Instructions on News Coverage**

Reports about this trial or about this incident may appear in the media. The reporters may not have heard all the testimony as you have, may be getting information from people who are not under oath and subject to cross examination, may emphasize an unimportant point, or may simply be wrong.

You must not read, listen to, or watch anything about this trial. It would violate your oath as a juror to decide this case on anything other than the evidence presented at trial and on your own common sense. You must decide this case exclusively on the evidence you receive here in court.

### 3.  Basic Instructions

**3.1      Introduction**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-cv-24294-KMM

RAQUEL CAMPS, in her capacity as the
personal representative of the ESTATE OF
ALBERTO CAMPS,

EDUARDO CAPPELLO, in his individual
capacity, and in his capacity as the personal
representative of the ESTATE OF
EDUARDO CAPPELLO,

ALICIA KRUEGER, in her individual
capacity, and in her capacity as the
personal representative of the ESTATE OF
RUBÉN BONET,

and, MARCELA SANTUCHO, in her
individual capacity, and in her capacity as
the personal representative of the ESTATE
OF ANA MARÍA VILLARREAL DE
SANTUCHO,

                    Plaintiffs,

    v.

ROBERTO GUILLERMO BRAVO,

          Defendant.

<u>COURT'S INSTRUCTIONS TO THE JURY</u>

Members of the jury:

It's my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished you will go to the jury room and begin your discussions, sometimes

called deliberations.

23

**3.2**     **The Duty to Follow Instructions – No Corporate Party Involved**

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

1850245

### 3.3    Consideration of Direct and Circumstantial Evidence; Argument of Counsel; Comments by the Court

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But, anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact.

There's no legal difference in the weight you may give to either direct or circumstantial evidence.

1850245

### 3.4    Credibility of Witnesses

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

1. Did the witness impress you as one who was telling the truth?

2. Did the witness have any particular reason not to tell the truth?

3. Did the witness have a personal interest in the outcome of the case?

4. Did the witness seem to have a good memory?

5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

6. Did the witness appear to understand the questions clearly and answer them directly?

7. Did the witness's testimony differ from other testimony or other evidence?

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses may or may not cause you to discredit such testimony. Two or more persons seeing an event may see or hear it differently. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood. After making your own judgment, you will give the testimony of each witness such weight, if any, that you may think it deserves. In short, you may accept or reject the testimony of any witness, in whole or in part.

26

### 3.5     Impeachment of Witnesses Because of Inconsistent Statements

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony that same witness gave during this trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

27

### 3.6    Expert Witnesses

When historical, scientific, forensic, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

28

1850245

### 3.7.1    Responsibility for Proof – Plaintiffs' Claims – Preponderance of the Evidence

In this case it is the responsibility of Plaintiffs to prove every essential part of their claims by a "preponderance of the evidence." This is sometimes called the "burden of proof" or the "burden of persuasion."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that the Plaintiffs' claim is more likely true than not true. In other words, a "preponderance of the evidence" means that the scales tip in favor of the Plaintiffs' claim even if the scales tip only 51% for them and 49% for the Defendant.

If the proof fails to establish any essential part of a claim or contention by a preponderance of the evidence, you should find against the Plaintiffs.

When more than one claim is involved, you should consider each claim separately.

In deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of the Plaintiffs' claims by a preponderance of the evidence, you should find for Defendant as to that claim.

1850245

### 3.7.2   Responsibility for Proof – Affirmative Defense – Preponderance of the Evidence

In this case, the Defendant asserts the affirmative defenses of statute of limitations, failure to exhaust remedies, <mark>and acquittal by a military investigation and an amnesty</mark>. Even if the Plaintiffs prove their claims by a preponderance of the evidence, the Defendant can prevail in this case if he proves an affirmative defense by a preponderance of the evidence.

When more than one affirmative defense is involved, you should consider each one separately.

I caution you that the Defendant does not have to disprove the Plaintiffs' claims, but if the Defendant raises an affirmative defense, the only way he can prevail on that specific defense is if he proves that defense by a preponderance of the evidence.

1850245

**3.8      Duty to Deliberate When Only the Plaintiffs Claims Damages**

The fact that I have given you instructions concerning the issue of Plaintiffs' damages should not be interpreted in any way as an indication that I believe that the Plaintiffs should, or should not, prevail in this case.

Your verdict must be unanimous – in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

1850245

**3.9     Election of Foreperson Explanation of Verdict Form**

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.

A verdict form has been prepared for your convenience.

[Explain verdict]

Take the verdict form with you to the jury room. When you've all agreed on the verdict, your foreperson must fill in the form, sign it and date it. Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me and I'll respond as promptly as possible – either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.

**4. Specific Instructions on Claims & Liability**

Plaintiffs are pursuing three claims against Defendant based on the allegations that Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho were the victims of extrajudicial killing, that Alberto Camps was the victim of attempted extrajudicial killing, that Rubén Bonet and Alberto Camps were the victims of torture, and that Defendant is liable for those violations. In a moment I will tell you what the Plaintiffs must prove in order for you to find that those violations happened.

Plaintiffs have alleged that the Defendant is liable for each of these violations under various forms of liability, A form of liability is the way the law defines how a person may be held legally responsible for a violation against another person.

Plaintiffs allege that the Defendant is liable for each of the violations because he: (1) personally committed the violation; (2) aided and abetted the person or persons who committed the violation; (3) entered into a conspiracy to commit the violation; and/or (4) entered into a joint criminal enterprise to commit the violation. Any single one of these forms of liability is sufficient to establish the Defendant's liability in connection with one of the violations alleged by Plaintiffs. After I discuss the alleged violations themselves, I will provide you with more detail on each of these forms of liability.

1850245

**4.1     Extrajudicial Killing**

Plaintiffs Alicia Krueger, Eduardo Cappello II, and Marcela Santucho, in their individual capacities and in their capacities as the personal representatives of the estates of Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho, respectively, contend that Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho were the victims of extrajudicial killing. On their claims for extrajudicial killing, Plaintiffs must prove by a preponderance of the evidence:

1.   A person or persons deliberately killed Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho;

2.   The person or persons killed of Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho while acting under the actual or apparent authority, or color of law, of the Argentine Republic; and

3.   The killing was not previously authorized by a judgment of a regularly constituted court affording all the judicial guarantees, which are recognized as indispensable by civilized peoples.

I want to provide you with some additional details regarding some of the terms I have just used.

Extrajudicial

You have heard me use the term "extrajudicial." Extrajudicial means that the killing was not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. A "regularly constituted court" must be independent and impartial, and it excludes all special tribunals (that is, courts or tribunals created for a specific event). Further, the judicial guarantees recognized as indispensable by civilized peoples, and that the Plaintiffs' relatives were entitled to receive, include:

1.  The right to a fair hearing free from torture of the accused and bribery of witnesses;

2.  The right to a lawyer to represent the accused without restrictions or undue pressure and the right to freely communicate with one's lawyer;

3.  The right of access to evidence in the possession of the prosecution that could potentially assist the accused; and

4.  The right to have a conviction and sentence reviewed by appeal to a higher court or tribunal.

A killing may have been extrajudicial even if it was authorized by a judge, court or tribunal or done pursuant to a judgment that was legal under the laws of the Argentine Republic at the time, if the proceedings for authorizing the killing did not afford "all the judicial guarantees which are recognized as indispensable by civilized peoples" as explained above.

Under Color of Law

You have also heard me use the term "under color of law." Acting "under color of law" means that a person is acting or purporting to act in the performance of his official duties; it means that the action is cloaked with the authority of the government. A person can act under "color of law" even when his actions overstep, or constitute an abuse of, the actor's legal authority.

Proof By Circumstantial Evidence

Finally, I want to explain something about proving extrajudicial killing, as it is relevant to the instructions I have given you. Sometimes proof may be offered in the form of direct evidence. It is also possible, however, to prove extrajudicial killing through the use of evidence that is entirely circumstantial or through a combination of direct and circumstantial evidence. For example, and only as an example, if there is evidence that a defendant abducted victims, refused to disclose their fate, and they were never seen alive again, you may reasonably infer that they

35

were killed by the defendant in question. All that is required is that the weight of the evidence supports a reasonable inference that an extrajudicial killing occurred.

**Sources:**

Extrajudicial Killing: 28 U.S.C. § 1350 note ("For the purposes of this Act, the term 'extrajudicial killing' means a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2021 WL 4427455, at *4–*5 (S.D. Fla. Sept. 27, 2021); (finding that the hiring of a hitman to execute a specific, targeted killing constitutes an extrajudicial killing under the TVPA); *Jane W. v. Thomas*, No. CV 18-569, 2021 WL 4206665, at *15 (E.D. Pa. Sept. 15, 2021) (noting "[c]ourts have held that summary executions and a course of indiscriminate brutality, known to result in death can also be extrajudicial killings" and finding the killing of civilians sheltering in a church amounted to extrajudicial killing under the TVPA (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 17 (D.D.C. 1998))); *Chavez v. Carranza*, 413 F. Supp. 2d 891, 903–904 (W.D. Tenn. 2005) (granting summary judgment on two plaintiffs' claims of extrajudicial killing under the TVPA where undisputed evidence showed their family members were executed by members of the security forces without judicial process); *Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262, 271–73, 275 (S.D.N.Y. 2002) (finding that plaintiffs "easily met" the standard for extrajudicial killing under the TVPA where ZANU-PF, Zimbabwe's ruling party, murdered members of an opposition party); *see also* Court's Instructions to the Jury at 14–15, *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184; Transcript of Trial at III-205–06, Court's Instructions to the Jury, *Warfaa v. Ali*, No. 1:05-cv-00701-LMB-JFA (E.D. Va. Nov. 11, 2019), ECF No. 294.

Color of Law: S. Rep. No. 102-249, at 8 (1991) (directing courts to apply "principles of liability under U.S. civil rights laws, in particular [42 U.S.C. § 1983], in construing 'under color of law'"); *United States v. Picklo*, 190 F. App'x 887, 888 (11th Cir. 2006) (affirming that "under color of law" means under "pretense of law," and not necessarily under authority of law. Therefore, "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law." Defendant acted under color of law when he robbed and shot the victim after identifying himself as a state investigator, flashing a badge, and using his official status to get plaintiff to follow his instructions (quoting *Williams v. United States*, 341 U.S. 97, 99 (1951))); *United States v. Ramey*, 336 F.2d 512, 515 (4th Cir. 1964) (finding "under color of law" means under pretense of law and includes misuse of power possessed by virtue of law and made possible only because the wrongdoer is clothed with the authority of the law. Defendant acted under color of law when he went to plaintiff's home as a police officer and arrested him without a valid warrant); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2021 WL 4427455, at *3 (S.D. Fla. Sept. 27, 2021) (noting that, to interpret "color of law," "the Eleventh Circuit looks to "the principles of agency law and jurisprudence under 42 U.S.C. § 1983" and finding that defendant acted under color of law when paramilitary to which defendant belonged "operated in symbiotic relationship with Colombian state actors" (citation omitted)); *United States v. Emmanuel*, No. 06-20758-CR, 2007 WL 2002452, at *14 (S.D. Fla. July 5, 2007) (finding under the Torture Act, 18 U.S.C. § 2340(1), that "[t]o act under color of law is not synonymous with sovereignty, as government officials may act under color of law even when violating the law.");

*Belfast v. United States*, No. 06-20758-CR, 2012 WL 7149532, at \*13 (S.D. Fla. Oct. 17, 2012) (holding that defendant acted under color of law under the Torture Act when he committed acts of torture in concert with the President of Liberia and members of the Liberian police and armed forces), *report and recommendation adopted*, No. 12-20754-CIV, 2013 WL 594023 (S.D. Fla. Feb. 14, 2013); *see also* Court's Instructions to the Jury at 15, *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184; Transcript of Trial at III-205–06, Court's Instructions to the Jury, *Warfaa v. Ali*, No. 1:05-cv-00701-LMB-JFA (E.D. Va. Nov. 11, 2019), ECF No. 294.

Judicial Guarantees: *Hamdan v. Rumsfeld*, 548 U.S. 557, 632-34 (2006) ("The commentary accompanying a provision of the Fourth Geneva Convention, for example, defines 'regularly constituted' tribunals to include 'ordinary military courts' and 'definitely exclud[e] all special tribunals.'" . . . . [Indispensable judicial guarantees] "must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law. Many of these are described in Article 75 of Protocol I to the Geneva Conventions of 1949, adopted in 1977 (Protocol I)." [The accused] "must be privy to the evidence against him."); Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, 1125 U.N.T.S. 3, art. 75(4) (Rights of the accused, under "generally recognized principles of regular judicial procedure," include, inter alia, rights to know the nature of the charges against him; to "all necessary rights and means of defense"; to present and examine witnesses; and, upon conviction, to be advised of "his judicial and other remedies and of the time-limits within which they may be exercised."); *see also* Court's Instructions to the Jury at 15–16, *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184; Transcript of Trial at III-205–06, Court's Instructions to the Jury, *Warfaa v. Ali*, No. 1:05-cv-00701-LMB-JFA (E.D. Va. Nov. 11, 2019), ECF No. 294.

1850245

**4.2     Attempted Extrajudicial Killing**

Plaintiff Raquel Camps, in her capacity as the personal representative of the estate of Alberto Camps, contends that Alberto Camps suffered an attempted extrajudicial killing. To establish this claim, Plaintiff must prove by a preponderance of the evidence the following:

1. That a person or persons attempted to deliberately kill Alberto Camps;

2. This person or persons attempted to kill Alberto Camps while acting under the actual or apparent authority, or color of law, of the Argentine Republic;

3. That the person or persons intended to carry out a deliberate killing of Alberto Camps and that there was a substantial step made towards commission of the deliberate killing; and

4. The attempted killing was not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees, which are recognized as indispensable by civilized peoples.

Extrajudicial

You may refer to instruction 4.1 for the definition of "extrajudicial."

Under Color of Law

You may refer to instruction 4.1 for the definition of "color of law."

Substantial Step

A substantial step is an act or series of acts that mark Defendant's conduct as criminal and strongly corroborate the required culpability. Certain facts such as detaining the victim, possessing the materials necessary to commit an extrajudicial killing of him, and possessing these materials at or near the place where that crime was attempted, taken together, may constitute a "substantial step" towards the commission of the extrajudicial killing.

Proof by Circumstantial Evidence

I want to explain something about proving attempted extrajudicial killing, as it is relevant to the instructions I have given you. Sometimes proof may be offered in the form of direct evidence, perhaps testimony from a witness who observed the killing. It is also possible, however, to prove attempted extrajudicial killing by using entirely circumstantial evidence or through a combination of direct and circumstantial evidence.

**Sources**:

Attempted Extrajudicial Killing:  *Doe v. Constant*, 354 F. App'x 543, 544 (2d Cir. 2009) (affirming default judgment against defendant for attempted extrajudicial killing under the Torture Victims Protection Act); *Jane W. v. Thomas*, No. CV 18-569, 2021 WL 4206665, at *16 (E.D. Pa. Sept. 15, 2021) (granting motion for summary judgment against defendant for attempted extrajudicial killing under the TVPA); *Boniface v. Viliena*, 338 F. Supp. 3d 50, 68 (D. Mass. 2018) (denying defendant's motion to dismiss plaintiffs' claims for attempted extrajudicial killing under the TVPA); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 665–66 (E.D. Va. 2014) (affirming that Plaintiff's allegations under the TVPA—including for attempted extrajudicial killing—were adequately pled), *aff'd*, 811 F.3d 653 (4th Cir. 2016); *Yousuf v. Samantar*, No. 1:04CV1360 LMB/JFA, 2012 WL 3730617, at *14–*16 (E.D. Va. 2012) (awarding damages for plaintiffs' claims, including attempted extrajudicial killing under the ATS and TVPA); *Doe v. Constant*, No. 04 Civ 10108 (SHS), 2006 WL 3490503, at *9 n.3 (S.D.N.Y. Oct. 24, 2006) (entering default judgment against defendant under the TVPA after finding that liability for attempted extrajudicial killing had "been cleary established" where plaintiffs were victims of "attack[s] that were attempts to kill them," even though plaintiffs survived), *aff'd* 354 Fed. App'x 543 (2d Cir. 2009); *see also* Transcript of Trial at III-205–06, Court's Instructions to the Jury, *Warfaa v. Ali*, No. 1:05-cv-00701-LMB-JFA (E.D. Va. Nov. 11, 2019), ECF No. 294; Rome Statute of the International Criminal Court arts. 8(2)(c)(iv), 25(3)(f), July 1, 1998, 2187 U.N.T.S. 3 (stating that extrajudicial execution is a punishable war crime, and a person is liable if that person "[a]ttempts to commit such a crime by taking action that commences its execution by means of a substantial step, but the crime does not occur because of circumstances independent of the person's intentions").

Substantial Step: *Braxton v. United States*, 500 U.S. 344, 349 (1991) (attempted murder requires proof that the defendant intended to commit the crime and that the defendant "must have taken a substantial step towards that crime"); *United States v. Heyn*, 605 F. App'x 801, 803 (11th Cir. 2015) (affirming district court's finding that the possession of materials necessary to commit murder constitutes a "substantial step" toward its commission); *United States v. Scognamiglio*, 424 F. App'x 809, 811 (11th Cir. 2011) (affirming district court's finding that certain facts, taken together, constitute a "substantial step" toward the commission of murder, including the

acquisition of materials necessary to commit murder, the identification of victims, and the surveillance of potential locations to commit the murder); *United States v. Bird*, 409 Fed. App'x 681, 687 (4th Cir. 2011) (finding that certain facts taken together constitute a "substantial step" towards the commission of murder such as lying in wait for the victim, possessing the materials necessary to commit the crime, and possessing these materials at or near the place where the crime was attempted); *see also* Transcript of Trial at III-206, Court's Instructions to the Jury, *Warfaa v. Ali*, No. 1:05-cv-00701-LMB-JFA (E.D. Va. Nov. 11, 2019), ECF No. 294 ("The term 'substantial step' means certain actions, such as detaining the plaintiff, possessing the materials necessary to commit an attempted extrajudicial killing of him, and possessing these materials at or near the place where that crime was attempted, taken together, may constitute a substantial step towards the commission of the attempted extrajudicial killing.").

### 4.3    Torture

Plaintiffs Raquel Camps and Alicia Krueger, in their capacities as the personal representatives of the estates of Alberto Camps and Rubén Bonet, respectively, allege that Alberto Camps and Rubén Bonet were tortured. To establish this claim, Plaintiffs must prove that:

1.  Alberto Camps and Rubén Bonet were subjected to severe pain or suffering, whether physical or mental;

2.  The person or persons who intentionally inflicted severe pain or suffering on Alberto Camps and Rubén Bonet did so while acting under the actual or apparent authority, or color of law, of the Argentine Republic;

3.  Alberto Camps and Rubén Bonet were in the custody or control of that person or persons; and

4.  The severe pain or suffering was inflicted for such purposes as obtaining from Alberto Camps, Rubén Bonet, or a third person information or a confession, punishing Alberto Camps or Rubén Bonet for an act they or another person committed or was suspected of having committed, intimidating or coercing Alberto Camps, Rubén Bonet, or another person, or for any discriminatory purpose.

Severe Physical or Mental Pain and Suffering

Torture can be either physical or mental, or both.

Severe physical pain or suffering includes, but is not limited to, shooting at or leaving injured victims for dead.

Torture includes severe mental pain and suffering, including the mental harm resulting from the threat of imminent death, the threat of severe physical pain or suffering, the threat that another person will be imminently subjected to death, severe physical pain or suffering, or

1850245

witnessing the torture of others. To constitute torture, the mental pain and suffering must be prolonged and caused by or resulting from the intentional infliction or threatened infliction of severe physical pain or suffering, or the threat of imminent death.

Further, torture, like extrajudicial killing, can be proved through either direct or circumstantial evidence, or through a combination of both.

Physical Control

Physical control includes situtations where an individual's freedom of movement is restrained by a concrete threat. For example, if there is evidence that the defendant threatened the decedents with imminent death by pointing a gun at them, that would constitute sufficient physical control.

Under Color of Law

You may refer to instruction 4.1 for the definition of "color of law."

**Sources:**  Torture Victim Protection Act, 28 U.S.C. §1350 note ("For the purposes of this Act (1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from (A) the intentional infliction or threatened infliction of severe physical pain or . . . (C) the threat of imminent death."); *see also* Court's Instructions to the Jury at 17, *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184; Court's Instructions to the Jury at 12, *Cabello v. Fernandez-Larios*, No. 1:99-cv-00528-JAL (S.D. Fla. Oct. 17, 2003), ECF No. 308, aff'd, 402 F.3d 1148 (11th Cir. 2005).

Severe Physical or Mental Suffering: *Aldana v. Del Monte Fresh Produce, N.A., Inc*., 416 F.3d 1242, 1252–53 (11th Cir. 2005) (finding that the threat of imminent death and resultant mental anguish and emotional distress could constitute torture under the ATS and the TVPA); *Jane W. v. Thomas*, No. CV 18-569, 2021 WL 4206665, at *16–*17 (E.D. Pa. Sept. 15, 2021) (finding that plaintiffs were tortured because they "faced 'threat of imminent death' as soon as the assault on the Lutheran Church began; they all hid for their lives, including under other dead bodies, fearing that they would be killed"); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2021 WL 4427455, at *5 (S.D. Fla. Sept. 27, 2021) (finding that a paramilitary member physically assaulting plaintiff,

causing plaintiff to fear imminent death, and forcing plaintiff to witness her spouse being shot and bleeding to death constitutes torture under the TVPA); *Boniface v. Viliena*, 338 F. Supp. 3d 50, 69 (D. Mass. 2018) (finding that plaintiffs sufficiently alleged torture under the TVPA where they described defendant pistol whipping and beating victims, threatening victims with imminent death, shooting victims, and leaving victims for dead); *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK, 2014 WL 12623015, at *3 (M.D. Fla. June 30, 2014) (finding that plaintiffs' allegations that defendant shot victim in the head then shot his body at least forty more times constitute sufficient pleadings of torture under the TVPA); *Chavez v. Carranza*, 413 F. Supp. 2d 891, 899–902 (W.D. Tenn. 2005) (finding that sexual assault, electric shocks, acid burns, witnessing father's death, and being threatened with imminent death are acts that amount to torture under the ATS and the TVPA).

<u>Physical Control</u>: *Jane W. v. Thomas*, No. CV 18-569, 2021 WL 4206665, at *16–*17 (E.D. Pa. Sept. 15, 2021) (holding that custody or physical control, for TVPA purposes, include "situations where an individual's freedom of movement is restrained by a concrete threat"); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2014 WL 4898210, at *14 (S.D. Fla. Sept. 30, 2014) (finding that a person standing over the plaintiff with a gun constituted sufficient "physical control" for TVPA purposes); *Xuncax v. Gramajo*, 886 F. Supp. 162, 174, 178 n.15 (D. Mass. 1995) (finding that plaintiff was in defendant official's "custody" under the TVPA where defendant had authority and discretion to order that plaintiff be released).

**4.4    Political Views or Past Actions Do Not Provide An Affirmative Defense for International Law Violations**

In your deliberations, you should not give any regard to the political views, beliefs, affiliations, or past actions of any parties, or any other person about whom you have heard testimony, as a basis to excuse extrajudicial killing, attempted extrajudicial killing, or torture. The prohibitions against these abuses are absolute. Every person – no matter what his or her political views, beliefs, affiliations, or past actions – has the right to be free from these abuses. There are no circumstances that justify, necessitate or excuse their commission.

**Sources:** *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, G.A. Res. 39/46 Art. 1 (1987), 39 U.N. GAOR, Supp. No. 51, at art. 2(2), U.N. Doc. A/39/51  (1984), *reprinted in* 23 I.L.M. 1027 and 24 I.L.M 535 (ratified by the United States Oct. 21, 1994) ("No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political in stability or any other public emergency, may be invoked as a justification of torture."); Transcript of Trial at III-207, Court's Instructions to the Jury, *Warfaa v. Ali*, No. 1:05-cv-00701-LMB-JFA (E.D. Va. Nov. 11, 2019), ECF No. 294 ("You should not give any regard to the political views, beliefs, affiliations, or past actions of any parties or any other person about whom you've heard testimony as the basis to excuse torture or attempted extrajudicial killing. The prohibitions against these abuses are absolute. Every person, no matter what his or her political views, beliefs, affiliations, or past actions has the right to be free from these abuses. There are no circumstances that justify and necessitate or excuse their commission."); Final Jury Instructions at 29, *In re Estate of Ferdinand Marcos Human Rights Litig.*, No. MDL 840 (D. Haw. Feb. 3, 1995) ("In your deliberations, you should not give any regard to whether Plaintiffs in this case may have opposed the Philippine government or what their political views may have been. Every person – even if they are in custody because they have been accused of violating the law – has the right to be free from being tortured by the government or military officials. And every person – no matter what their political persuasion – has the right to be free from being tortured, summarily executed, or 'disappeared' or prolonged arbitrary detention by officials."), *aff'd*, 103 F.3d 767 (9th Cir. 1996).

### 4.5    Illegal Orders Do Not Provide An Affirmative Defense for International Law Violations

In your deliberations, you should not give any regard to illegal orders that the defendant may have received from a superior as a basis to excuse international crimes including extrajudicial killing, attempted extrajudicial killing, or torture. Thus, for example, an order to murder unarmed prisoners is illegal, and should not be considered during your deliberations. The prohibitions against these abuses are absolute. Every person has the right to be free from these abuses and, in particular, the murder of unarmed prisoners, unarmed civilians, or combatants who have laid down their weapons are prohibited even in times of war. There are no circumstances that justify, necessitate, or excuse these abuses.

**Sources:** Transcript of Trial at III-212, Court's Instructions to the Jury, *Warfaa v. Ali*, No. 1:05-cv-00701-LMB-JFA (E.D. Va. Nov. 11, 2019), ECF No. 294 ("A defendant cannot escape liability by claiming that he was himself acting under orders from a higher authority."); *Cabello Barrueto v. Fernandez Larios*, 205 F. Supp. 2d 1325, 1332-33 (S.D. Fla. June 5, 2002) (observing that the Senate Report on the TVPA provides that "low-level officials cannot escape liability by claiming that they were acting under orders of superiors" and that Article 2(3) of the Torture Convention likewise provides that "[a]n order from a superior official or a public authority may not be invoked as a justification for torture"); *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, G.A. Res. 39/46 Art. 1 (1987), 39 U.N. GAOR, Supp. No. 51, at art. 2(3), U.N. Doc. A/39/51  (1984), *reprinted at* 23 I.L.M. 1027 and 24 I.L.M 535 (ratified by the United States Oct. 21, 1994) ("An order from a superior officer or a public authority may not be invoked as a justification of torture."); Rome Statute of the International Criminal Court art. 33, July 1, 1998, 2187 U.N.T.S. 3 ("[O]rders to commit . . . crimes against humanity are manifestly unlawful[,]" regardless of whether the crime was committed by a person pursuant to an order of a superior); Int'l Comm. Red Cross, *Practice Relating to Rule 47: Attacks against Persons Hors de Combat*, CUSTOMARY IHL DATABASE, https://ihl-databases.icrc.org/customary-ihl/eng/docs/v2_rul_rule47 (last visited Aug. 26, 2021) (noting that both customary international law and Argentina's 1969 Law of War Manual prohibit attacks on persons who are *hors de combat*); Int'l Comm. Red Cross, *Practice Relating to Rule 87: Humane Treatment*, CUSTOMARY IHL DATABASE, https://ihl-databases.icrc.org/customary-ihl/eng/docindex/v2_rul_rule87 (last visited Aug. 26, 2021) (noting that both customary international law and Argentina's 1969 Law of War Manual require that prisoners of war be treated humanely); Int'l Comm. Red Cross, *Practice Relating to Rule 89: Violence to Life*, CUSTOMARY IHL DATABASE, https://ihl-databases.icrc.org/customary-

1850245

ihl/eng/docindex/v2_rul_rule89 (last visited Aug. 26, 2021) (noting that both customary international law and Argentina's 1969 Law of War Manual prohibit violence to the life and person of combatants who are *hors de combat*).

46

**4.6     Self-Defense Excludes Liability in Some Circumstances**

Defendant has offered evidence of having acted in self-defense. Self-defense is a ground for excluding liability only when the Defendant acted reasonably to defend himself or another person against an imminent and unlawful use of physical force. For self-defense to be applicable, the use of force by the Defendant must have been proportionate to the degree of danger to the Defendant or the other person protected. Firearms should be used only when strictly necessary; that is, as a last resort to protect against the imminent threat of death or serious injury, when less extreme means are insufficient. Thus, for example, firearms cannot be used to prevent the escape from custody of someone who does not pose a serious and imminent threat to the lives or bodily integrity of others. A finding that the Defendant was involved in a defensive operation would not, in itself, demonstrate that he was acting in self-defense sufficient to exclude liability, and the continued use of force after the threat has been subdued is neither proportionate nor strictly necessary.

**Sources:** Rome Statute of the International Criminal Court art. 31(1)(c), July 1, 1998, 2187 U.N.T.S. 3 (self-defense may be a ground for excluding criminal responsibility if it was used "reasonably . . . against an imminent and unlawful use of force in a manner proportionate to the degree of danger to the person or the other person . . .  protected"); Basic Principles on the Use of Force and Firearms by Law Enforcement Officials,  U.N. Doc. A/CONF.144/28/Rev.1 at 112, para. 9 (1990) ("Law enforcement officials shall not use firearms against persons except in self defense or defense of others against the imminent threat of death or serious injury, to prevent the perpetration of a particularly serious crime involving grave threat to life, to arrest a person presenting such a danger and resisting their authority, or to prevent his or her escape, and only when less extreme means are insufficient to achieve these objectives."); G.A. Res. 34/169, Code of Conduct for Law Enforcement Officials, U.N. Doc. A/34/46 (Dec. 17, 1979) ("In general, firearms should not be used except when a suspected offender offers armed resistance or otherwise jeopardizes the lives of others and less extreme measures are not sufficient to restrain or apprehend the suspected offender."); U.N. Hum. Rts. Comm., General Comment No. 36, ¶ 12, U.N. Doc. CCPR/C/GC/36 (Oct. 30, 2018) ("The use of potentially lethal force for law enforcement purposes is an extreme measure, which should be resorted to only when strictly necessary in order to protect life or prevent serious injury from an imminent threat. It cannot be used, for example, in order to prevent the escape from custody of a suspected criminal or a convict who does not pose a serious and imminent threat to the lives or bodily integrity of others. The intentional taking of life by any means is permissible only if it is strictly necessary in order

47

to protect life from an imminent threat."); *see also United States v. Black*, 692 F.2d 314, 318 (4th Cir. 1982) ("[T]he quantum of force which one may use in self-defense is proportional to the threat which he reasonably apprehends."); *United States v. Middleton*, 690 F.2d 820, 826 (11th Cir. 1982) ("[S]elf-defense is a defense which justifies the use of a reasonable amount of force against an adversary when a person reasonably believes that he is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger."); *Robinson v. Lambert*, 753 App'x 777, 780 (11th Cir. 2018) ("the use of force is objectively unreasonable" and therefore excessive "when it continues past the need for such force" for example when a prisoner has been subdued, has clearly stopped resisting or is otherwise incapacitated).

**4.7     Defendant's Liability**

Plaintiffs claim that Defendant Bravo directly perpetrated the extrajudicial killing of Eduardo Cappello I, Rubén Bonet, and Ana María Villarreal De Santucho, the attempted extrajudicial killing of Alberto Camps, and the torture of Rubén Bonet and Alberto Camps. Plaintiffs also contend that Defendant Bravo is liable for the extrajudicial killing, attempted extrajudicial killing, and torture of their relatives under alternative forms of liability, as they are entitled to do, without prejudice to their claim that Defendant Bravo directly perpetrated the extrajudicial killing, attempted extrajudicial killing, and torture of their relatives.

Thus, even if the jury were to find that Plaintiffs have not shown by a preponderance of the evidence that Defendant Bravo personally extrajudicially killed, attempted to extrajudicially kill, or tortured Plaintiffs' relatives, the jury may still find that Defendant Bravo is nevertheless responsible for the extrajudicial killing of Eduardo Cappello I, Ruben Bonet, and Ana María Villareal De Santucho, the attempted extrajudicial killing of Alberto Camps, and the torture of Rubén Bonet and Alberto Camps under one or more of the three following additional theories of liability:

1. Aiding and abetting;

2. Conspiracy;

3. Joint criminal enterprise.

Each of these is a separate theory of liability and will be explained in more detail in subsequent instructions. You must consider them separately. You only need to find in Plaintiffs' favor on one of these four theories to hold Defendant Bravo liable with respect to each of Plaintiffs' claims. If you find that Plaintiffs have not carried their burden of proof on any one theory of liability, that finding does not affect any other theory.

1850245

**Sources:**  *See Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1709 (2012) (noting that the TVPA contemplates direct liability as well as "liability against officers who do not personally execute the torture or extrajudicial killing"); *Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1220 (11th Cir. 2020) (affirming that the TVPA permits theories of indirect liability, including aiding and abetting, conspiracy, agency, and command responsibility); *Doe v. Drummond Co.*, 782 F.3d 576, 607-610 (11th Cir. 2015) (recognizing direct and secondary theories of liability under the TVPA, including command responsibility and aiding and abetting); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157–60 (11th Cir. 2005) (upholding a jury verdict premised on indirect liability claims under the ATS and TVPA, including aiding and abetting and conspiracy); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2021 WL 4427455, at *6–*8 (S.D. Fla. Sept. 27, 2021) (finding defendant liable under the TVPA on theories of aiding and abetting, conspiracy, and command responsibility); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 190 F. Supp. 3d 1100, 1116–20 (S.D. Fla. 2016) (noting that, "[b]y its terms, the [TVPA] contemplates claims based on secondary, or indirect, theories of liability" and recognizing that theories of secondary liability under the federal common law, including aiding and abetting and conspiracy, are "available to support TVPA claims"); *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK, 2015 WL 8659954, at *3 (M.D. Fla. Dec. 14, 2015) ("The TVPA contemplates theories of direct and indirect liability," including aiding and abetting, conspiracy, and command responsibility); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014) (finding Plaintiff's allegations supported secondary liability for "command responsibility, aiding and abetting liability, and joint criminal enterprise"), *aff'd*, 811 F.3d 653 (4th Cir. 2016); *Yousuf v. Samantar*, No. 1:04-cv-1360 (LMB/JFA), 2012 WL 3730617, at *10–11 (E.D. Va. Aug. 28, 2012) ("command responsibility, aiding and abetting liability and joint criminal enterprise liability" are cognizable modes of liability in TVPA cases); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 491 (D. Md. 2009), *aff'd on other grounds*, 402 F. App'x. 834 (4th Cir. 2010) (recognizing joint criminal enterprise); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1148 (E.D. Cal. 2004) (finding that a defendant can be held liable under the TVPA as a direct participant, conspirator, accomplice, or aider and abettor); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386(KMW), 2002 WL 319887, at *15–*16 (S.D.N.Y. Feb. 28, 2002) (finding that "the language and legislative history of the TVPA supports liability for aiders and abettors of torture and extrajudicial killings").

50

### 4.8    Liability for Aiding and Abetting

Defendant Bravo may be found liable if you find that he aided and abetted others in a wrongful act committed against Alberto Camps, Eduardo Cappello I, Rubén Bonet, and/or Ana María Villarreal De Santucho. To hold Defendant Bravo liable under a theory of aiding and abetting, Plaintiffs must prove by a preponderance of the evidence, as to each claim:

1. One or more of the wrongful acts that comprise the claim were committed;

2. Defendant Bravo gave substantial assistance to the person or persons who committed or caused one or more of the wrongful acts that comprise the claim; and

3. Defendant Bravo knew that his actions would assist in the illegal or wrongful activity at the time he provided the assistance.

Under an aiding and abetting theory, it is not necessary for you to find that Defendant Bravo knew specifically which wrongful acts were being committed by the perpetrators, so long as those wrongful acts were a natural and foreseeable result of the activity Defendant Bravo helped undertake.

**Sources:** *See Doe v. Drummond Co.*, 782 F.3d 576, 608 (11th Cir. 2015) (holding aiding and abetting liability requires finding that "the wrongful act at the center of the claim was, in fact, committed, and the defendant gave knowing substantial assistance to the person or persons who committed the wrongful act"); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-1160 (11th Cir. 2005) (upholding a jury verdict premised on indirect liability claims under the ATS and TVPA, including aiding and abetting, and holding that the standard for aiding and abetting under the TVPA is "knowing substantial assistance"); *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) ("[U]nder an aiding-abetting theory, it was a natural and foreseeable consequence of the activity [defendant] helped [the perpetrator] to undertake. It was not necessary that [defendant] knew specifically that [the perpetrator] was committing burglaries. Rather, when [defendant] assisted [the perpetrator], it was enough that [defendant] knew [the perpetrator] was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises."); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2021 WL 4427455, at *6 (S.D. Fla. Sept. 27, 2021) (finding that plaintiffs met "every element of an aiding and abetting theory" under the TVPA when defendant "knew of the [paramilitary]'s pattern of killing people, . . . issued orders for the purpose of silencing critics of the organization, . . . met personally with zone commanders to evaluate regions under his control[,] oversaw regulations that labelled critics of the [paramilitary] as military targets for murder and . . . issued orders to eliminate approximately 1300 people");

*Penaloza v. Drummond Co., Inc*., 384 F. Supp. 3d 1328, 1346 (N.D. Ala. 2019) (liability for aiding and abetting is supported "if the wrongful act at the center of the claim is, in fact, committed, and the defendant gave knowing substantial assistance to the persons who committed the wrongful act"); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig*., 190 F. Supp. 3d 1100, 1117 (S.D. Fla. 2016) ("Aiding and abetting liability . . . requires a showing of 'knowing substantial assistance' to the person or persons who committed the wrongful act."); *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK, 2015 WL 8659954, at *3 (M.D. Fla. Dec. 14, 2015) (plaintiffs sufficiently pled knowing substantial assistance "via allegations that Defendant was involved in the establishment of the system of imprisonment, torture, and execution . . . during a mass detention of civilians in a Chilean university stadium . . . that ultimately led to the torture and killing of Victor Jara by Defendant and by individuals who operated under Defendant's command"); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1148 (E.D. Cal. 2004) (finding that, for accomplice liability, it is "sufficient that the accomplice knows that [their] actions will assist the perpetrator in the commission of the crime" and concluding that defendant was liable under the TVPA as a direct participant, conspirator, accomplice, and aider and abettor in coordinating and planning the assassination of Archbishop Romero); *see also* Court's Instructions to the Jury at 18–19, *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184.

**4.9      Liability for Conspiracy**

Defendant Bravo may be found liable if you find that he conspired with another person or persons who committed a wrongful act against Alberto Camps, Eduardo Cappello I, Rubén Bonet, and/or Ana María Villarreal De Santucho. To hold Defendant Bravo liable under a theory of conspiracy, Plaintiffs must prove by a preponderance of the evidence, as to each claim:

1. Two or more persons agreed to commit a wrongful act;

2. Defendant Bravo joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and

3. One or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.

<u>Agreement</u>

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed to every detail of the conspiracy. Proof of a spoken or written agreement is not required. Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement.

Circumstantial evidence may also be used to show the existence of an agreement. The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme. Among other things, this may include the nature of the acts done, the relationship between the co-conspirators, the interests of the alleged co-conspirators, and the relationships between the co-conspirators and the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity).

1850245

Knowledge

The exact limits or scope of the plan need not be known to each conspirator, nor is it necessary that the identity of everyone involved in the conspiracy be known to all of them. What the Plaintiffs must show is that conspirators shared the same general conspiratorial objective, even if their motives for desiring the result are not necessarily identical.

Knowledge of and participation in the plan may also be shown by circumstantial evidence. As long as at least one overt act is done by a member of the criminal conspiracy, then all of the members of the conspiracy are considered to have committed the crime. Defendant can be found liable even if his participation in the scheme is "slight" by comparison to the actions of other co-conspirators. Once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy and all acts that were the natural and foreseeable consequence of the conspiracy. A conspirator can be held liable for all reasonably foreseeable offenses committed by co-conspirators during and in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action, so long as the purpose of the injurious action was to advance the overall object of the conspiracy.

**Sources:**  *See Pinkerton v. United States,* 328 U.S. 640, 645–48 (1946); *Cabello v. Fernandez-Larios,* 402 F.3d 1148, 1157–1160 (11th Cir. 2005) (upholding a jury verdict premised on indirect liability claims under the ATS and TVPA, including conspiracy, and holding that plaintiffs "needed to prove by a preponderance of the evidence that (1) two or more persons agreed to commit a wrongful act, (2) [defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy"); *United States v. Dozie,* 27 F.3d 95, 97 (4th Cir. 1999) (citation omitted) ("To prove a conspiracy, the government must show an agreement to do something illegal, willing participation by the defendant, and an overt act in furtherance of the agreement. Knowledge and participation may be shown by circumstantial evidence. Once a conspiracy has been established, it is only necessary to show a 'slight connection between the defendant and the conspiracy to

support conviction.'"); *United States v. Calderon,* 127 F.3d 1314, 1324, 1326 (11th Cir. 1997); *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996); *United States v. Gold,* 743 F.2d 800, 824 (11th Cir. 1984); *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) ("As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action, . . . so long as the purpose of the tortious action was to advance the overall object of the conspiracy."); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2021 WL 4427455, at *6 (S.D. Fla. Sept. 27, 2021) (to prove conspiracy in a TVPA case, plaintiffs must "prove by a preponderance of the evidence that (1) two or more persons agreed to commit a wrongful act, (2) [a defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy," and finding "the evidence meets every element of a conspiracy theory because Defendant joined with 7,000 paramilitary members for the purpose of controlling drugs and accomplished that objective through a campaign of targeted violence" (quoting *Cabello*, 402 F.3d at 1159)); *Penaloza v. Drummond Co., Inc.*, 384 F. Supp. 3d 1328, 1347 (N.D. Ala. 2019) (holding that plaintiffs alleged sufficient facts to plead conspiracy as to one individual defendant under the TVPA (citing *Cabello*, 402 F.3d at 1159)); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 190 F. Supp. 3d 1100, 1120–21 (S.D. Fla. 2016) ("To prove an Individual Defendant indirectly liable by means of conspiracy, Plaintiffs must allege and prove (1) two or more persons agreed to commit a wrongful act (2) the defendant joined the conspiracy knowing of at least one of the goals of the conspiracy and with the intent to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." (citing *Cabello*, 402 F.3d at 1159)); *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK, 2015 WL 8659954, at *3 (M.D. Fla. Dec. 14, 2015) (to establish liability under a conspiracy theory, plaintiffs must show "that Defendant knowingly joined an agreement with one or more persons to commit a wrongful act and one one of the members to the conspiracy acted in furtherance of that conspiracy"); *Doe v. Drummond Co.*, No. 2:09-CV-01041-RDP, 2010 WL 9450019, at *15 (N.D. Ala. Apr. 30, 2010) (holding that plaintiffs' TVPA claims based on a conspiracy theory of liability survive dismissal); *see also* Court's Instructions to the Jury at 19–21, Jara v. Barrientos Nunez, No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184 (using substantially the same instruction for conspiracy in a TVPA case).

### 4.10    Liability for Joint Criminal Enterprise

Defendant Bravo may be found liable if you find that he was involved in a joint criminal enterprise that resulted in the harms alleged by the Plaintiffs.

Although I have used the term "joint criminal enterprise," recall that you are not being called on to decide a criminal case. As with the other claims, the Plaintiffs' burden of proof is a preponderance of the evidence, and not the higher burden of proof required in criminal cases.

A joint criminal enterprise is a common plan or purpose between two or more people to commit a wrongful act. If Defendant Bravo is found to participate in a joint criminal enterprise, then he is liable as a co-perpetrator of wrongful acts that result from that enterprise.

To establish a joint criminal enterprise, Plaintiffs must prove:

1. The existence of a common plan or purpose to commit any wrongful act;

2. Defendant Bravo committed an act that either directly or indirectly contributed to the execution of this common plan;

3. Defendant Bravo committed this act with the intention to participate in and further the common plan; and

4. Wrongful acts committed in the execution of this common plan resulted in the harm claimed by Plaintiffs.

Defendant Bravo can also be held liable for acts committed by a member of the joint criminal enterprise that were not agreed upon in the common plan as long as (i) the act was a natural and foreseeable consequence of the enterprise; (ii) Defendant Bravo was aware that the wrongful conduct was a possible consequence of the joint criminal enterprise; and (iii) even with that awareness, he continued to participate in the enterprise.

A common plan or purpose need not be express but can be inferred from the circumstances, such as the fact that several people acted in unison; nor do Plaintiffs need to show that the plan

56

was prearranged. Instead, Plaintiffs can show that the plan materialized spontaneously and without prior preparation.

Plaintiffs need not prove that Defendant Bravo personally committed or personally participated in any of the wrongful acts. Nor do Plaintiffs need to prove that Defendant Bravo was physically present during the commission of the wrongful acts.

**Sources:** *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014) (finding plaintiff had adequately pled claims "against defendant under three theories of secondary liability: command responsibility, aiding and abetting liability, and joint criminal enterprise"), *aff'd*, 811 F.3d 653 (4th Cir. 2016); *Yousuf v. Samantar*, No 1:04-CV-1360 (LMB/JFA), 2012 WL 3730617, at *11 (E.D. Va. Aug. 28, 2012) (explaining the "doctrine of joint criminal enterprise, which is the international law analog to a conspiracy as a completed offense," is a potential theory of liability in a case alleging claims under the TVPA); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 490 (D. Md. 2009) (accepting joint criminal enterprise as a separate basis for liability and explaining that "[t]he concept of joint criminal enterprise provides for joint liability where there is a common design to pursue a course of conduct where: '(i) the crime charged was a natural and foreseeable consequence of the execution of [the] enterprise, and (ii) the accused was aware that such a crime was a possible consequence of the execution of [the] enterprise, and, with that awareness, participated in [the] enterprise'" (quoting *Prosecutor v. Brdjanin*, Case No. IT–99–36–T, Judgment, ¶ 265 (Sept. 1, 2004))), *aff'd on other grounds*, 402 Fed. Appx. 834 (4th Cir. 2010); *Prosecutor v. Vasiljevic*, Case No. IT-98-32-A, Judgment of Appeals Chamber, ¶ 102 (Int'l Crim. Trib. For the Former Yugoslavia Feb. 25, 2004) (finding that if the defendant is found to participate in a joint criminal enterprise, then he is liable as a co-perpetrator of that wrongful act); *Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment of Appeals Chamber, ¶ 227 (Int'l Crim. Trib. For the Former Yugoslavia Jul. 15, 1999) (detailing elements of joint criminal enterprise and noting that plaintiffs need not show that the plan was prearranged, but that it can be spontaneous); *see also* Court's Instructions to the Jury at 23–25, *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184.

### 5.  Affirmative Defenses

If you find that the Plaintiffs have proved each element that they must prove, you must decide whether Defendant Bravo has established his affirmative defenses by a preponderance of evidence.

1850245

**5.1     Affirmative Defense – Statute of Limitations**

Defendant Bravo has raised as an affirmative defense that Plaintiffs cannot prevail on their claims because they did not bring suit within the time allowed by the law. Defendant Bravo must prove this affirmative defense by a preponderance of evidence. Statutes of limitations specify the amount of time a person has to initiate legal proceedings after an event occurs. The statute of limitations that applies to the law Plaintiffs rely on to bring their claims – the Torture Victim Protection Act – provides that claims must be brought within 10 years of the date the incident occurred. If any of the acts or occurrences that are the subject of this lawsuit took place more than 10 years before Plaintiffs brought suit, then a claim based on that act or occurrence is barred by the statute of limitations, unless an exception applies.

There are situations in which the statute of limitations is suspended, or "tolled." Tolling applies if Plaintiffs show they could not bring suit due to extraordinary circumstances beyond their control and that were unavoidable even with diligence. Such extraordinary circumstances include, but are not limited to, situations where a repressive regime exists, where litigants or witnesses face danger pursuing claims related to human rights violations, where plaintiffs could not investigate their claims because of the circumstances in their home country, where plaintiffs were unable to locate the defendant, where plaintiffs did not pursue their claims in the United States due to reasonable reliance on domestic accountability processes, or where the defendant was immune from suit.

The Plaintiffs brought their suit against Defendant Bravo on October 20, 2020.

**Sources:** Pub. L. No. 102-256, § 2(c), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C.A. § 1350 note); S. Rep. No. 102-249 at 10–11 (1991) (the TVPA "provides for a 10-year statute of limitations, but explicitly calls for consideration of *all equitable tolling principles* in calculating this period with a view toward giving justice to plaintiff's rights" (emphasis added)); *Arce v. Garcia*, 434 F.3d 1254, 1261–62, 1264 (11th Cir. 2006) (holding that equitable tolling applies to TVPA claims when a movant untimely files because of "extraordinary circumstances that are both beyond his control and unavoidable even with diligence" and tolling limitations period

when repressive regime existed and when defendant was outside the jurisdictional reach of the United States (quoting *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir.1999))); *Jean v. Dorelien*, 431 F.3d 776, 779, 780–81 (11th Cir. 2005) (finding that "equitable tolling is clearly legally applicable to the [TVPA] claims" and tolling statute of limitations given the "pattern and practice of torture, mass murder, intimidation and reprisals against perceived opponents of the government during the military regime in Haiti from 1991 to 1994" until "the plaintiff can investigate and compile evidence without fear of reprisals against him, his family and witnesses"); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1155 (11th Cir. 2005) (the statute of limitations under the TVPA was properly tolled until the military dictatorship lost power in 1990, because "the Chilean political climate prevented the Cabello family from pursuing any efforts to learn of the incidents surrounding Cabello's murder"); *Chavez v. Carranza*, 559 F.3d 486, 493–94 (6th Cir. 2006) (finding that the district court properly tolled the TVPA and ATS statute of limitations where the record established "widespread human rights abuses were carried out by the Salvadoran military against civilians during the country's civil war [and after] and that plaintiffs feared reprisals against themselves or their family members."); *Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir. 1996) (tolling statute of limitations under the TVPA for claims of torture, "disappearance," and summary execution against former Philippine dictator Ferdinand Marcos until he left power and the country regained democratic rule); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (E.D. Va 2014) (tolling the statute of limitations until at least democracy returned to Somalia and noting "[t]here is a consensus among the federal courts that . . . a repressive authoritarian regime constitute[s] 'extraordinary circumstances' for purposes of tolling the TVPA's limitations period" (citing *Jean*, 431 F.3d at 780–81 (collecting cases))); *Yousuf v. Samantar*, No. 1:04-cv-1360, 2012 WL 3730617, at *4–6 (E.D. Va. Aug. 28, 2012) (equitable tolling available for the TVPA and tolling the limitations period because "[i]n addition to the turmoil within Somali[a], defendant's absence—and plaintiffs' lack of knowledge about his whereabuts in the years following his departure from Somalia—prevented the commencement of [plaintiffs' ATS and TVPA claims]"); *Jane W. v. Thomas*, No. CV 18-569, 2021 WL 4206665, at *9 (E.D. Pa. Sept. 15, 2021) (tolling limitations period until Liberian Supreme Court found Truth and Reconciliation Commission's recommendations non-binding); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 291 (S.D.N.Y. 2009) (tolling limitation period during transitional justice process because "[a] reasonable plaintiff may have assumed that defendants would participate in the . . . process, in which case plaintiffs would have had no need to conduct an independent investigation"); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 482 (D. Md. 2009) (tolling the statute of limitations for plaintiffs' ATS and TVPA claims because plaintiffs pled that "the political climate in Peru was unremittingly hostile to any effort on their part to pursue remedies"); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1146–48 (E.D. Cal. 2004) (tolling statutes of limitations during and after El Salvadoran civil war due to fear of retaliation from military, government and death squads if plaintiffs brought litigation in United States); *Doe v. Unocal Corp.*, 963 F. Supp. 880, 897 (C.D. Cal. 1997) (ATS and TVPA claims "should be tolled" during Burmese dictatorship based on plaintiffs' alleged inability to "obtain access to judicial review" in Burma and the "threat of reprisal from [the government]" if plaintiffs attempted to access courts in the United States).

**5.2**     **Affirmative Defense – Exhaustion of Remedies**

Defendant Bravo has raised as an affirmative defense that Plaintiffs cannot prevail on their claims because they have not exhausted adequate and available remedies in Argentina. Plaintiffs are entitled to a presumption that local remedies have been exhausted because they brought suit here in the United States. But, if you find that Defendant Bravo proved by a preponderance of evidence that adequate and available remedies exist and Plaintiffs have not exhausted them, Plaintiffs may rebut that evidence by showing that that the local remedies in Argentina were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.

You should find that the local remedies in Argentina are ineffective, unobtainable, unduly prolonged, inadequate, or futile if Plaintiffs have shown by a preponderance of evidence that, for example, Argentinean criminal proceedings have made little progress over years despite Plaintiffs' participation, or where pursuing remedies in Argentina would have place Plaintiffs or witnesses in danger.

The exhaustion of remedies defense bars Plaintiffs' claims only if remedies are available in Argentina and Plaintiffs have not tried to pursue them; once Plaintiffs have tried to pursue such remedies in Argentina, the bar is lifted. For example, if Plaintiffs have recovered administrative benefits that were available to them in Argentina due to the events that are the subject of this lawsuit or have attempted, whether successfully or unsuccessfully, to bring civil lawsuits in Argentina relating to the events at issue in this lawsuit, they have adequately exhausted their remedies and the defense fails.

**Sources:** 28 U.S.C. § 1350(2)(b); S. Rep. No. 102-249, at 9–10 (1991) ("[T]he respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use. Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant."); *Jean v. Dorelien*, 431 F.3d 776, 781–82 (11th Cir.

2005) (explaining burden shifting framework for proving exhaustion and finding that ongoing risk of retaliation against plaintiffs and a political structure that would prevent successful litigation of human rights claims in Haiti excuse exhaustion under the TVPA); *Mamani v. Berzain*, 825 F.3d 1304, 1309 (11th Cir. 2016) (holding that exhaustion bar exists only when remedy is available and has not been sought by plaintiffs); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996) ("[I]n most instances the initiation of litigation under [the TVPA] will be virtually *prima facie* evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the [abuses] occurred." (quoting S. Rep. No. 102-249 at 9–10 (1991))); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig*., 190 F. Supp. 3d 1100, 1115 (S.D. Fla. 2016) (denying motion to dismiss for lack of exhaustion where plaintiffs alleged that exhausting remedies in Colombia "would be futile because of the ongoing risk of violent retaliation"); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 485 (D. Md. 2009) (finding that defendant failed to prove exhaustion as "[t]he record is barren of any evidence that the criminal case against [defendant] is proceeding apace or that there is any reasonably foreseeable date for its conclusion"), *aff'd in part, appeal dismissed in part sub nom. Ochoa Lizarbe v. Rivera Rondon*, 402 F. App'x 834 (4th Cir. 2010); *Sinaltrainal v. Coca–Cola* Co., 256 F. Supp. 2d 1345, 1357–58 (S.D. Fla. 2003) (finding that plaintiffs "are entitled to a presumption that local remedies have been exhausted"); *Estate of Rodriguez v. Drummond Co*., Inc., 256 F. Supp. 2d 1250, 1267–68 (N.D. Ala. 2003) (finding that plaintiffs adequately alleged unavailability of remedies because they would have faced retaliation for seeking legal redress); *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 244 F. Supp. 289, 343 n.44 (S.D.N.Y. 2003) ("[T]he Court is aware of no case . . . in which plaintiffs were required to exhaust local remedies . . . where doing so would be futile and would put plaintiffs in great danger."); *Xuncax v. Gramajo*, 886 F. Supp. 162, 178 (D. Mass. 1995) (finding that plaintiff exhausted remedies where domestic criminal case had made no progress for years despite her participation and civil actions could not be brought until final criminal judgment had been rendered).

62

### 6.  Damages

It is my duty to instruct you as to the proper measure of damages to be applied in this case if you find that Plaintiffs have proved each of the elements of their claims. By instructing you regarding damages, I am not indicating, one way or the other, that I have any opinion regarding whether or not damages should be awarded in this case.

**6.1      Compensatory Damages**

If you find in favor of any or all of the Plaintiffs and against Defendant Bravo, then you must determine an amount that is fair compensation for the damages suffered by each Plaintiff for the loss of life of his or her family member, as well as the suffering of each decedent him or herself. Compensatory damages seek to make the party whole – that is, to compensate the Plaintiff or decedent for the damage suffered as a result of Defendant Bravo's wrongful conduct. The damages, if any, that you award, must be full and fair compensation, no more and no less.

If you decide to award compensatory damages, you should be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require Plaintiffs to prove their losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.

Compensatory damages are the measures of the loss or injury sustained by the injured Plaintiff, and may embrace shame, mortification, humiliation, indignity to the feelings and the like, and they require no proof. Compensatory damages are also the measure of the injury and suffering sustained by the deceased, and may include physical harm, pain, distress, fear, loss of life, and the like; these do not require proof. You are not confined to the actual pecuniary damages or loss in terms of money sustained by the Plaintiffs or the decedents, but you may take into consideration the motive of Defendant Bravo, if any is shown, the insulting character of the violations, if such is shown, and all circumstances of aggravation attending the acts, if any. Such damages, if any have been shown, are in their nature actual or compensatory as much as those given for any bodily harm, pain, suffering, loss of earnings and expense incurred.

In particular, you may award compensatory damages for pain and suffering and mental and emotional distress. No evidence of the monetary value of such intangible things as pain and

suffering has been, or need be, introduced into evidence. You must determine what amount fairly compensates Plaintiffs for their claims. There is no exact standard for fixing the compensation to be awarded for these elements of damages. Any award you make must be fair in light of the evidence presented at trial.

To the extent you find them proved by a preponderance of the evidence, you should consider the following elements in determining the amount of compensatory damages for each Plaintiff:

(1) Emotional pain and suffering;

(2) Mental anguish;

(3) Physical disfigurement; and/or

(4) Physical pain.

In evaluating these items, you may consider the following factors:

(1) Physical torture; including methods used or abuses suffered;

(2) Mental abuse, including fright and anguish;

(3) Length of time torture endured;

(4) Length of detention; and/or

(5) Victim's age or other limiting physical or emotional characteristics.

In making an award for such damages, you must use your best judgment and establish an amount of damages that is fair and reasonable in light of the evidence before you.

**Sources:** Eleventh Circuit Pattern Jury Instructions, § 4.1 (2020 ed.); Court's Instructions to the Jury at 25–26, *Jara v. Barrientos Nunez*, No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184; Transcript of Trial at III-221–24, Court's Instructions to the Jury, *Warfaa v. Ali*, No. 1:05-cv-00701-LMB-JFA (E.D. Va. Nov. 11, 2019), ECF No. 294; *see also Chavez v. Carranza*, 559 F.3d 486, 491, 499 (6th Cir. 2009) (affirming jury's award of $500,000 in compensatory damages and $1 million in punitive damages to each plaintiff under the TVPA and the ATS); *Arce v. Garcia*, 434 F.3d 1254, 1256 (11th Cir. 2006) (affirming jury's award of $54,600,000 in compensatory and punitive damages under the TVPA and the ATS); *Cabello v. Fernandez-Larios*,

402 F.3d 1148, 1159 (11th Cir. 2005) (upholding general jury verdict that included an award of compensatory and punitive damages for liability under the TVPA and ATS); *Hilao v. Estate of Marcos*, 103 F.3d 767, 779–87 (9th Cir. 1996) (affirming district court's award of compensatory and punitive damages for liability under the TVPA and the ATS); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2021 WL 4427455, at *9–*12 (S.D. Fla. Sept. 27, 2021) (reasoning that, in determining a damages award under the TVPA, "[c]ourts typically consider . . . (1) the brutality of the act; (2) the egregiousness of the defendant's conduct; (3) the unavailability of a criminal remedy; (4) international condemnation of the act; (5) deterrence of others from committing similar acts; and (6) provision of redress to plaintiff, country, and world" (quoting *Ahmed v. Magan*, No. 2:10-CV-00342, 2013 WL 4479077, at *7 (S.D. Ohio Aug. 20, 2013))); *Ahmed v. Magan*, No. 2:10-CV-00342, 2013 WL 4479077, at *7 (S.D. Ohio Aug. 20, 2013) (recommending the award of $5,000,000 in compensatory damages and $10,000,000 in punitive damages under the ATS and the TVPA), *report and recommendation adopted*, No. 2:10-CV-00342, 2013 WL 5493032 (S.D. Ohio Oct. 2, 2013); *Yousuf v. Samantar*, No. 1:04-cv-1360 (LMB/JFA), 2012 WL 3730617, at *14-15 (E.D. Va. Aug. 28, 2012) (awarding compensatory and punitive damages based on plaintiffs' "credible and compelling testimony of cognizable [physical and psychological] injuries stemming from the alleged" torture and extrajudicial killing under the ATS and TVPA); *Kpadeh v. Emmanuel*, No. 09-20050-CIV-JORDAN, 2010 WL 11575054, at *6 (S.D. Fla. Feb. 5, 2010) (applying the federal common law to damages under the ATS and TVPA and awarding compensatory damages given "the physical pain and mental anguish the plaintiffs suffered a decade ago and continue to suffer today"); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004) (noting that "[c]ourts have awarded significant compensatory and punitive damages for extrajudicial killing under the TVPA" and collecting cases); *Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 441 (S.D.N.Y. 2002) (adopting the magistrate court's recommended award of $20,250,453 in compensatory damages and $51,000,000 in punitive damages for liability under the TVPA and the ATS); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1358–60 (N.D. Ga. 2002) (awarding $10,000,000 in compensatory damages to each plaintiff under the ATS and the TVPA "as compensation for [the plaintiffs'] injuries and suffering"); *Xuncax v. Gramajo*, 886 F. Supp. 162, 198 (D. Mass. 1995) (awarding compensatory damages to plaintiff under the TVPA).

**6.2    Punitive Damages**

In addition to compensatory damages, you have the discretion to award punitive damages. Unlike compensatory damages, which are imposed to reimburse the Plaintiffs for their injuries, punitive damages are designed to make an example of the defendant's conduct so that others will not engage in similar practices.

You may award punitive damages to the Plaintiffs if they have proven that Defendant Bravo's conduct was wanton and reckless, not merely unreasonable. An act is wanton and reckless if it is done in such a manner, and under such circumstances, as to reflect utter disregard for the potential consequences of the act on the safety and rights of others. The purpose of punitive damages is to punish a defendant for shocking conduct, in order to deter him and others from committing similar acts in the future. Punitive damages are intended to protect the community and to express the jury's indignation at a defendant's misconduct.

The award of punitive damages is within your discretion – you are not required to award them nor are you required to limit them to the extent you have awarded compensatory damages. Punitive damages are appropriate only for especially shocking and offensive misconduct. If you decide to award punitive damages, you must use sound reason in setting the amount. It must not reflect bias, prejudice, or sympathy toward any party. But the amount can be as large as you believe is necessary to fulfill the purpose of punitive damages. There is no exact standard for fixing the amount of punitive damages. Any award you make should be fair in the light of the evidence.

Should you award punitive damages to the Plaintiffs, in fixing the amount, you must consider what is reasonably required to accomplish the goals of punishing the defendant and deterring others from committing similar acts. You should also consider the degree of reprehensibility of Defendant Bravo's conduct toward the Plaintiffs and the relationship between the harm suffered by the Plaintiffs and the amount of punitive damages you are considering. In

67

sum, in computing punitive damages you should award the amount you find appropriate to punish the defendant for the injuries to the Plaintiffs in this lawsuit and to set an example to others that will deter them from engaging in similar conduct.

Finally, you may consider the financial resources of the defendant in fixing an amount of punitive damages. However, I instruct you that the burden is on the defendant to show that his financial circumstances warrant a limitation of any award.

**Sources**: Court's Instructions to the Jury at 26–28, *Jara v. Barrientos Nunez*, Case No. 6:13-cv-1426-ORL-37GJK (M.D. Fl. June 28, 2016), ECF No. 184;  Court's Instructions to the Jury at 22–23, *Cabello v. Fernandez-Larios*, No. 1:99-cv-00528-JAL (S.D. Fla. Oct. 17, 2003), ECF No. 308, aff'd, 402 F.3d 1148 (11th Cir. 2005).Court's Instructions to the Jury at 26, *Mamani v. Berzaín*, Case No. 1:08-cv-21063-JIC (S.D. Fl. Mar. 27, 2018), ECF No. 429; *see also Chavez v. Carranza*, 559 F.3d 486, 491, 499 (6th Cir. 2009) (affirming jury's award of $500,000 in compensatory damages and $1 million in punitive damages to each plaintiff under the TVPA and the ATS); *Arce v. Garcia*, 434 F.3d 1254, 1256 (11th Cir. 2006) (affirming jury's award of $54,600,000 in compensatory and punitive damages under the TVPA and the ATS); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005) (upholding general jury verdict that included an award of compensatory and punitive damages for liability under the TVPA and ATS); *Hilao v. Estate of Marcos*, 103 F.3d 767, 779-786 (9th Cir. 1996) (affirming district court award of compensatory and punitive damages for violations under the TVPA); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2021 WL 4427455, at *9–*12 (S.D. Fla. Sept. 27, 2021) (reasoning that, in determining a damages award under the TVPA, "[c]ourts typically consider . . . (1) the brutality of the act; (2) the egregiousness of the defendant's conduct; (3) the unavailability of a criminal remedy; (4) international condemnation of the act; (5) deterrence of others from committing similar acts; and (6) provision of redress to plaintiff, country, and world" (quoting *Ahmed v. Magan*, No. 2:10-CV-00342, 2013 WL 4479077, at *7 (S.D. Ohio Aug. 20, 2013))); *Ahmed v. Magan*, No. 2:10-CV-00342, 2013 WL 4479077, at *7 (S.D. Ohio Aug. 20, 2013) (recommending the award of $5,000,000 in compensatory damages and $10,000,000 in punitive damages under the ATS and the TVPA), *report and recommendation adopted*, No. 2:10-CV-00342, 2013 WL 5493032 (S.D. Ohio Oct. 2, 2013); *Yousuf v. Samantar*, No. 1:04-cv-1360 (LMB/JFA), 2012 WL 3730617, at *15-16 (E.D. Va. Aug. 28, 2012) (finding that "[p]unitive damages are commonly awarded in cases under the . . . TVPA"); *Kpadeh v. Emmanuel*, No. 09-20050-CIV-JORDAN, 2010 WL 11575054, at *6 (S.D. Fla. Feb. 5, 2010) (awarding punitive damages under the ATS and the TVPA as defendant's "horrific" actions, which were "a chilling example of man's inhumanity to man" and were "designed to strip the plaintiffs of their humanity and dignity, deserve the strongest judicial condemnation and warrant stiff awards of punitive damages to punish [defendant] and deter any others who might be inclined to engage in similar reprehensible conduct"); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004) ("Courts have awarded significant compensatory and punitive damages for extrajudicial killing under the TVPA[.]"); *Tachiona v. Mugabe*, 216 F. Supp. 2d 262, 282 (S.D.N.Y. 2002) (awarding compensatory and punitive damages for violations under the ATS and the TVPA); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1358–60 (N.D. Ga. 2002)

(awarding $25,000,000 in punitive damages to each plaintiff under the ATS and the TVPA "to punish defendant and deter others from committing similar abuses"); *Xuncax v. Gramajo*, 886 F. Supp. 162, 199-200 (D. Mass. 1995) (acknowledging that Congress contemplated the award of punitive damages for violations under the TVPA).

1850245